# LAW ENFORCEMENT OFFICERS PROTECTION ACT OF 1985

# HEARING

### BEFORE THE

## SUBCOMMITTEE ON CRIME

### OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

### NINETY-NINTH CONGRESS

### FIRST SESSION

### ON

## H.R. 4 and H.R. 13

### LAW ENFORCEMENT OFFICERS PROTECTION ACT OF 1985

MAY 9, 1985

## Serial No. 83



Printed for the use of the Committee on the Judiciary

**U.S. GOVERNMENT PRINTING OFFICE**

61-780 O                WASHINGTON : 1986

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

ⅠⅠⅠ·5 Exhibit A 4
Page 4

## COMMITTEE ON THE JUDICIARY

PETER W. RODINO, Jr., New Jersey, *Chairman*

JACK BROOKS, Texas
ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
JOHN CONYERS, Jr., Michigan
JOHN F. SEIBERLING, Ohio
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
DAN GLICKMAN, Kansas
BARNEY FRANK, Massachusetts
GEO. W. CROCKETT, Jr., Michigan
CHARLES E. SCHUMER, New York
BRUCE A. MORRISON, Connecticut
EDWARD F. FEIGHAN, Ohio
LAWRENCE J. SMITH, Florida
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
HARLEY O. STAGGERS, Jr., West Virginia
JOHN BRYANT, Texas

HAMILTON FISH, Jr., New York
CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois
THOMAS N. KINDNESS, Ohio
DAN LUNGREN, California
F. JAMES SENSENBRENNER, Jr.,
   Wisconsin
BILL McCOLLUM, Florida
E. CLAY SHAW, Jr., Florida
GEORGE W. GEKAS, Pennsylvania
MICHAEL DeWINE, Ohio
WILLIAM E. DANNEMEYER, California
HANK BROWN, Colorado
PATRICK L. SWINDALL, Georgia
HOWARD COBLE, North Carolina

M. Elaine Mielke, *General Counsel*
Garner J. Cline, *Staff Director*
Alan F. Coffey, Jr., *Associate Counsel*

———    ———

### Subcommittee on Crime

WILLIAM J. HUGHES, New Jersey, *Chairman*

ROMANO L. MAZZOLI, Kentucky
BRUCE A. MORRISON, Connecticut
EDWARD F. FEIGHAN, Ohio
LAWRENCE J. SMITH, Florida
HARLEY O. STAGGERS, Jr., West Virginia

BILL McCOLLUM, Florida
DAN LUNGREN, California
E. CLAY SHAW, Jr., Florida
GEORGE W. GEKAS, Pennsylvania

Hayden W. Gregory, *Counsel*
Eric E. Sterling, *Assistant Counsel*
Charlene Vanlier Heydinger, *Associate Counsel*

(II)

# CONTENTS

## WITNESSES

| | Page |
|---|---|
| Hon. Jack Brooks, a Representative in Congress from the State of Texas........... | 3 |
| Hon. Mario Biaggi, a Representative in Congress from the State of New York . | 11 |
| Edward T. Stevenson, Deputy Assistant Secretary of the Treasury for Operations, U.S. Department of the Treasury; accompanied by Edward M. Owen, Jr., Chief, Firearms Technology Branch, Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury; and Jack B. Patterson, Assistant Chief Counsel (Firearms and Explosives), Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury............................................... | 34 |
| David Green, chief of police, Sioux Falls, SD, on behalf of the Fraternal Order of Police; John J. Norton, chief of police, Parkersburg, WV, first vice president of the International Association of Chiefs of Police; Edward Murphy, legislative counsel, International Brotherhood of Police Officers; David Baker, treasurer, International Union of Police Associations; Ira Lechner, legislative counsel, National Association of Police Organizations; and Michael D. Muth, Maryland State Police, representing the National Troopers Coalition; and David Konstantin, research associate, Police Executive Research Forum ................................................................................. | 67 |
| Statements of: | |
| David Green ............................................................................................................... | 69 |
| John J. Norton.......................................................................................................... | 76 |
| Edward Murphy......................................................................................................... | 84 |
| David Baker............................................................................................................... | 93 |
| Ira Lechner................................................................................................................ | 98 |
| Michael D. Muth ....................................................................................................... | 102 |
| David Konstantin ..................................................................................................... | 106 |
| J. Warren Cassidy, executive director, Institute for Legislative Action, National Rifle Association......................................................................................... | 110 |

(III)

# LAW ENFORCEMENT OFFICERS PROTECTION ACT OF 1985

---

## THURSDAY, MAY 9, 1985

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON CRIME,
COMMITTEE ON THE JUDICIARY,
*Washington, DC.*

The subcommittee met, pursuant to call, at 2:15 p.m., in room 2141, Rayburn House Office Building, Hon. William J. Hughes (chairman of the subcommittee), presiding.

Present: Representatives Hughes, Mazzoli, Staggers, McCollum, Shaw, and Gekas.

Staff present: Hayden W. Gregory, counsel; Eric E. Sterling, and Edward O'Connell, assistant counsel; Charlene Vanlier Heydinger, associate counsel; Theresa Bourgeois, staff assistant; and Phyllis Henderson, clerk.

Mr. HUGHES. The Subcommittee on Crime will come to order.

The Chair has received a request to cover this hearing in whole or in part by the television broadcast, radio broadcast, still photography or by other similar methods. In accordance with committee rule 5(a), permission will be granted unless there is objection. Is there objection?

Hearing none, such permission is granted.

This afternoon, the subcommittee is examining the two versions of the Law Enforcement Officers Protection Act of 1985, H.R. 4 and H.R. 13. Armor-piercing ammunition is a special threat to the lives and safety of our Nation's police and we must take every reasonable step to protect the lives of those who protect our lives.

Armor-piercing ammunition has no sporting purpose whatsoever. It is not used by hunters or sportsmen or target shooters. This ammunition has principally a military or offensive purpose to penetrate armor. This ammunition should not be sold without reasonable controls to assure that it is not used in the commission of crime.

There are some who see this proposal as banning ammunition or in some incomprehensible way as the equivalent to taking guns. Let's keep a degree of reason focused on the problem. The bills specifically exempt from coverage all ammunition which is primarily intended to be used for sporting purposes. If the ammunition has a sporting purpose, it remains outside the controls of these bills. Nothing is taken away from the sportsman.

We know that at least 13 million rounds of armor-piercing ammunition were imported into this country in the last decade. It has

(1)

been conceded by the administration and by the National Rifle Association, among others, that to protect our Nation's police, it is necessary to limit the manufacture and importation of this ammunition, but so far, they have parted company with the Nation's police who insist that the sale of this ammunition should be also so limited. An apt analogy, in my judgment, to what has been the NRA position, would be to prohibit importing and manufacturing cocaine, but permit the sale of cocaine to anyone who wants to buy it. That position doesn't make sense, especially when 13 million rounds have already come into the country.

The danger police face is not that legitimate manufacturers of armor-piercing ammunition will renege on their arrangement not to sell it and risk prosecution for doing so. The danger is from the armor-piercing ammunition now on the shelves of dealers around the country.

Today, we are getting closer to placing an effective law on the books that will protect law enforcement officers from armor-piercing ammunition designed to penetrate the protective armor they wear.

The primary issue today is to take every reasonable step to protect the lives of police officers from cop-killer bullets. The other issues, in my judgment, are secondary.

At this time, the Chair recognizes the gentleman from Florida.

Mr. McCOLLUM. Thank you, Mr. Chairman.

No one deserves this committee's assistance more than the law enforcement officers who risk their lives daily to protect the citizens of this country from crime. These dedicated public servants have placed the protection of others above their own personal safety by their career choice. For this valor, we must show our appreciation. We must also do everything in our power to reduce the risk of harm to police as they perform their duties.

This was the motivation behind the development of the bullet-resistant vest. It is also our motivation as we seek to eliminate bullets designed to pierce solid armor.

These dangerous projectiles cannot be stopped by the bullet-proof vest and pose a danger to our law enforcement officers. Today's hearings will provide the testimony on which we can craft an armor-piercing bullet ban that can be promptly enacted and signed into law.

I welcome the witnesses and thank them for their assistance in this important endeavor.

Thank you, Mr. Chairman.

Mr. HUGHES. Thank you.

The Chair has just received some statements from other groups that want to submit testimony, and it is the intent of the Chair, unless there is objection, to receive those statements for the record.

It may very well be that if, in fact, additional issues are raised by this hearing, that the Chair might entertain a request for additional hearings. However, it is our hope that we can move any legislation expeditiously, but I just want to assure those that have submitted statements that those statements will be seriously considered by the committee. They will be made a part of the hearing record and if, in fact, additional issues are raised in the context of

3

those statements or other testimony today, we certainly will look at the possibility of additional hearings.

Our lead-off witness today is Congressman Jack Brooks, who represents the 9th District of Texas. Jack Brooks has had an extensive and profoundly distinguished legislative career, first in the Texas Legislature and now in the U.S. House of Representatives, where he is presently serving his 17th term.

He is the ranking democrat on the full House Judiciary Committee. He is the chairman of the House Government Operations Committee and chairman of the Subcommittee on Legislation and National Security. Jack is the author of H.R. 13, one of the bills presently pending before the House.

We are just delighted to have you with us, Mr. Chairman. We have your statement which, without objection, will be made a part of the record in full and you may proceed as you see fit. Welcome.

## STATEMENT OF HON. JACK BROOKS, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF TEXAS

Mr. Brooks. I want to thank you very much, Mr. Chairman, and tell you how much I appreciate the opportunity to testify before you today. The bill that I introduced is the same as last year. As you recall, the bill was the product of extensive efforts, really the combined effort of the various law enforcement agencies and some private groups and the administration to draft legislation to protect law enforcement officers.

The soft body armor is credited with saving the lives of many law officials and the provisions of my bill will help ensure the continued utility of these live-saving vests by deterring the availability and the use of ammunition designed specifically to penetrate them and to injure them.

The bill I introduce again this year, with the support of over 130 cosponsors, will amend title 18 of the United States Code to prohibit the manufacture and importation of armor-piercing ammunition except for law enforcement and military or export purposes.

Further, the manufacture or importation for these permissible uses is regulated through the application of licensing and annual fee provisions. The bill also provides a mandatory 5-year prison sentence for possession or use of armor-piercing ammunition during the commission of violent felonies.

I note that provisions in the Comprehensive Crime Control Act passed last year provides such mandatory penalty for persons who commit Federal crimes of violence while carrying or using a handgun loaded with AP ammunition.

My bill would extend those existing provisions beyond situations involving handguns to all instances when AP ammunition is carried during the commission of a violent crime.

I think that the bill is succinct and effective and enforceable and that it addresses the concerns of both law enforcement personnel and law-abiding citizens who uphold the right to bear arms. I look forward to working with this subcommittee to see that legislation addressing this problem is passed successfully this session.

Again, Mr. Chairman, let me tell you how grateful I am for your willingness to let me state my concerns and for your open-minded-

4

ness in trying to resolve and develop a bill that we can pass that will do the job we all want done.

Thank you very much.

[The statement of Mr. Brooks follows:]

Statement of Congressman Jack Brooks
·On H.R. 13--Law Enforcement Officers
   Protection Act
Subcommittee on Crime
Thursday, May 9, 1985

MR. CHAIRMAN--THANK YOU FOR THIS OPPORTUNITY TO TESTIFY ON BEHALF
OF H.R. 13--THE LAW ENFORCEMENT OFFICERS PROTECTION ACT OF.1985--WHICH
I INTRODUCED THIS YEAR. MY BILL IS IDENTICAL TO ONE I INTRODUCED IN
THE LAST CONGRESS.

AS YOU WILL RECALL, THAT BILL WAS A PRODUCT OF EXTENSIVE EFFORTS
BY THE VARIOUS LAW ENFORCEMENT AGENCIES, INTERESTED PRIVATE GROUPS,
AND THE ADMINISTRATION TO DRAFT LEGISLATION TO PROTECT OUR LAW
ENFORCEMENT OFFICERS.

SOFT BODY ARMOR IS CREDITED WITH SAVING THE LIVES OF MANY LAW
ENFORCEMENT OFFICERS, AND THE PROVISIONS OF MY BILL WILL HELP ENSURE
THE CONTINUED UTILITY OF THESE LIFESAVING VESTS BY DETERRING THE
AVAILABILITY AND THE USE OF AMMUNITION WHICH IS DESIGNED SPECIFICALLY
TO PENETRATE THEM.

THE BILL THAT I HAVE INTRODUCED AGAIN THIS YEAR, WITH THE SUPPORT
OF OVER 130 CO-SPONSORS, WILL AMEND TITLE '18 OF THE U.S. CODE TO
PROHIBIT THE MANUFACTURE AND IMPORTATION OF ARMOR-PIERCING AMMUNITION
EXCEPT FOR LAW ENFORCEMENT, MILITARY, OR EXPORT PURPOSES.

FURTHER, THE MANUFACTURE OR IMPORTATION FOR THESE PERMISSIBLE USES
IS REGULATED THROUGH THE APPLICATION OF LICENSING AND ANNUAL FEE
PROVISIONS.

2 2 2 2 2 2

THE BILL ALSO PROVIDES FOR A MANDATORY FIVE-YEAR MINIMUM PRISON SENTENCE FOR THE POSSESSION OR USE OF ARMOR-PIERCING AMMUNITION DURING THE COMMISSION OF A VIOLENT FELONY.  I NOTE THAT PROVISIONS IN THE COMPREHENSIVE CRIME CONTROL ACT PASSED LAST YEAR PROVIDE SUCH MANDATORY PENALTY FOR PERSONS WHO COMMIT FEDERAL CRIMES OF VIOLENCE WHILE CARRYING OR USING A HANDGUN LOADED WITH ARMOR-PIERCING AMMUNITION.  MY BILL WOULD EXTEND THOSE EXISTING PROVISIONS BEYOND SITUATIONS INVOLVING HANDGUNS TO ALL INSTANCES WHEN ARMOR-PIERCING AMMUNITION IS BEING CARRIED DURING THE COMMISSION OF A VIOLENT FELONY.

MY BILL IS SUCCINCT, EFFECTIVE AND ENFORCEABLE, WHILE ADDRESSING THE CONCERNS OF BOTH LAW ENFORCEMENT PERSONNEL AND LAW-ABIDING CITIZENS WHO UPHOLD THE RIGHT TO BEAR ARMS.  I LOOK FORWARD TO WORKING WITH THIS COMMITTEE IN SEEING THAT LEGISLATION ADDRESSING THIS PROBLEM IS PASSED DURING THIS CONGRESS.  AND, AGAIN, MR. CHAIRMAN, I APPRECIATE YOUR WILLINGNESS TO LET ME STATE MY CONCERNS TODAY.

# # # # #

Mr. HUGHES. Thank you very much, Jack.

I want to thank you, first of all, for the contributions that you have made. I really think that we are a lot closer this year. The administration, as you perhaps may know, will be testifying subsequently and their position is a lot closer to H.R. 4, although they would ban the sale prospectively. But I think the point is that we are making some progress and we are indebted to you because you have been one of the leaders in developing an initiative that has begun the dialogue which I think, hopefully, will result in legislation.

I agree with you. I think that legislation is long overdue.

I have a couple of questions of you if I might. In the last Congress, as you know, we passed the comprehensive Crime Control Act of 1984. Among the various provisions was one that would make the possession of armor-piercing ammunition subject to additional penalties. Is it your feeling that we need to go beyond what we did in sentence enhancement in the 98th Congress as part of the comprehensive Crime Control Act?

Mr. BROOKS. I think we could probably stay with that. I don't think, really, that we can solve all the problems in the world in this one piece of legislation, Mr. Chairman, and I think that if we can hammer out this one within the parameters our designs and hopes, that that would be pretty good. I don't think we ought to try and broaden it too much because you pick up additional problems.

I don't think we ought to make many changes in it. If we get an accord worked out, I think we ought to pass it like that and not try to load it up. People that want to do too much good often get nothing accomplished, so I will take a half a loaf any day.

Mr. HUGHES. I gather that your primary concern over sale has been the question of a dealer inadvertently, without willful intent, selling ammunition that he or she does not recognize as armor-piercing ammunition. Is that the thrust of your concern?

Mr. BROOKS. Basically, yes. I have not studied carefully the so-called language that the administration has sent down.

Mr. HUGHES. I just saw it myself.

Mr. BROOKS. Apparently they will testify on it today. I have not seen it. I have just heard what it is and I am sure that I would want to take a look at it pretty carefully before I would commit on it.

Certainly, down the line, there is always room for adjustment and agreement, but I want to look very carefuly at what we are doing before I would make any commitment on that, Mr. Chairman.

Mr. HUGHES. I understand. I take it that the concern among others relative the sale is based on the same concern and I think it is a somewhat legitimate concern, but I also have this concern. The Bureau of Alcohol, Tobacco and Arms does send out periodic notices alerting dealers to various regulations that have been developed. It would seem to me that we could do a pretty good job of identifying armor-piercing ammunition. It would seem to me that it would be a fair inference that no dealer should be selling ammunition if he doesn't know what he is selling.

Would you agree?

Mr. BROOKS. I would want to study that a little more carefully before I get committed on the ban on sale and on the notice and on what other people ought to do and be prepared to do. Let me study that a little bit before I dig into that.

Mr. HUGHES. All right, I appreciate that.

The gentleman from Florida.

Mr. McCOLLUM. Thank you.

Mr. Brooks, it is good to have you with us today. As we have discussed very casually, I am very open-minded. I am very much in favor of banning the armor-piercing bullet as best we can to protect our police officers, but I am very open-minded about these details. I come fresh to this subcommittee and am very pleased to be ranking the subcommittee at this time.

I have a question or two that are just related to information. I gather the basic distinction that Mr. Hughes just elicited from you between past legislation has been over the sale question.

Does your bill affect persons who make their own ammunition? Does your bill—if somebody manufactures his own ammunition, would your bill affect that?

Mr. BROOKS. I am not positive, but I would think that it probably would. If you have in possession, AP ammunition, whether it came from heaven or whether you made it in the garage——

Mr. McCOLLUM. Wouldn't matter.

Mr. BROOKS [continuing]. It would still be armor-piercing ammunition with the capability of penetrating those safety vests and killing law enforcement personnel.

Mr. McCOLLUM. Your basic thoughts, from your previous analysis of your legislation versus Mr. Biaggi's and others that you have studied—again, I know you haven't and I haven't either studied the latest proposal from the administration, but there wouldn't be any real distinction in the area of the manufacture or the possession. It is in the sale area that your legislation really differs from the others.

Mr. BROOKS. I believe that is about correct, yes, sir.

Mr. McCOLLUM. I just want to thank you for your contribution to this. I think it is an extraordinarily important issue and I appreciate very much your not only taking the time today, but all you put into it. Thank you.

Mr. HUGHES. The gentleman from West Virginia is recognized for 5 minutes.

Mr. STAGGERS. Thank you, Mr. Chairman.

I don't have any questions for my distinguished colleague. I would like to applaud him for his efforts and leadership in this area. I think that combining the two interests of protecting our law enforcement personnel and also the right to bear arms of our citizens is extremely difficult sometimes and you have taken a very good leadership role in this. I think your sentence in your last paragraph of the bill is succinct, effective and enforceable. I hope that that is true and I hope that we can come to some conclusion to this.

I yield back the balance of my time.

Mr. HUGHES. Thank you.

The gentleman from Pennsylvania is recognized for 5 minutes.

Mr. GEKAS. Yes, thank you, Mr. Chairman.

I missed the oral portion of your testimony and I am reviewing the written portion as fast as I can.

Mr. BROOKS. It is pretty much the same. I have sort of paraphrased it and rolled it along a little bit faster because you all are basically familiar with the issue.

Mr. GEKAS. Yes. In the question of ultimate responsibility for sale of this ammunition, how do you view that as to the seller?

Mr. BROOKS. Well, I avoided a commitment to that already. I said that the administration is going to offer some language which I have heard about but which I haven't seen on sale. I would take a look at their language. You know, I am one of the people who want to look at every word to see what they are saying and what they are planning to do.

It may be a great step forward and a bridge between Hughes and me that will lead us all to heaven. Then, again, it may not, so I am going to read it very carefully before I make any decision on it. I have not seen it; I am not really familiar with an evaluation of what it will do, though it seems to be offered ostensibly in an effort to resolve the problem.

Mr. GEKAS. That is what I wanted to——

Mr. BROOKS. I will give them credit for good faith, but I am not going to give them credit for competence until I read it very carefully.

Mr. GEKAS. I will help you read it when the time comes and we will see if that is a passage to heaven.

Mr. BROOKS. You are pretty good at reading, I have noticed before.

Mr. GEKAS. Yes, but that is what I wanted to draw from you, no matter what we hear today—and out of all that will be worthwhile testimony, we want to see what the final proposal is with repect to sale.

Mr. BROOKS. That is right and this is just their suggestion. It is not binding either.

Mr. GEKAS. No, no. I thank the chairman and the chairman who is testifying.

Mr. HUGHES. Thank the gentleman.

The gentleman from Kentucky is recognized for 5 minutes.

Mr. MAZZOLI. Thank you, Mr. Chairman. I also missed the gentleman from Texas, our new member here from Texas, his original statement, but I have read it and I thank him for the leadership because it is not an easy subject for us to get into and there is, obviously, a lot of very strong pressure, both for and against, but I do thank the gentleman because I think it will make certainly a constructive addition to the dialogue.

I guess the one area—does the gentleman know—in his formulation, apparently the sale of existing stocks would not be prohibited. Is that essentially the case?

Mr. BROOKS. I believe that is the case.

Mr. MAZZOLI. All right. Does the gentleman have any awareness of how many or how much we are talking about? To what extent that could pose any kind of a problem or is that generally something that the gentleman feels would be——

Mr. BROOKS. The administration and the private bodies and most of the police organizations we dealt with originally did not feel that

that would pose a significant problem in controlling the use of this AP ammunition. As I have said earlier, the administration has got some other proposal, another suggestion and we will all take a look at that and maybe it is a step forward, I don't know.

Mr. MAZZOLI. I certainly thank the gentleman and commend him on his efforts.

Thank you, Mr. Chairman.

Mr. HUGHES. The gentleman from Florida, Mr. Shaw.

Mr. SHAW. Thank you, Mr. Chairman.

I am pleased to see that we are revisiting this issue since the last Congress. I supported this type of legislation in the last Congress and I certainly expect to support it here.

I would like to focus on the difference between your bill and the Biaggi-Hughes bill, regarding those bullets that are actually on the shelf at this time.

Is there any estimate about what we are talking about? How many bullets are out there? I understand they are somewhat collectors' items now. I also understand they haven't been manufactured since 1981.

Mr. BROOKS. I don't have the numbers on that. I will try to furnish them for you, if I may.

Mr. SHAW. I would appreciate that. Perhaps——

Mr. BROOKS. I don't have them off the top of my head.

Mr. SHAW. Yes, sir. Perhaps one of the other witnesses might have that.

As I understand that is basically—that is the biggest difference that there is between the two bills.

Mr. BROOKS. It is really hard to get a difference between the distinguished Congressman from New York and myself. We have such close ties in our general attitude toward legislation and our appreciation of the military and appreciation of the armed services folks.

Mr. SHAW. All right.

Mr. BROOKS. My wife's ancestor was the first U.S. marshal in Oklahoma and so we all have a long background in law enforcement.

Mr. SHAW. Yes, sir, well, I know of the gentleman's thoughts in that regard and I certainly applaud you again for bringing this matter to us and delighted to have you with us.

I yield back. Thank you.

Mr. HUGHES. Jack, thank you, again. We really appreciate your contributions.

Mr. BROOKS. Always a pleasure to do business with you.

Mr. HUGHES. Thank you.

Our next witness today is the Representative from New York's 19th District, Representative Mario Biaggi. His distinguished service in Congress began in 1969, after a heroic 23-year career in the New York City Police Department.

He was wounded some 10 times in the line of duty and was one of the most highly decorated officers in the department's history. He was admitted to the New York Bar in 1966 at the age of 49. He has a record of personal and professional accomplishments to fill 10 lifetimes.

His work, not just in the area of law enforcement, but in ocean policy really has just been absolutely outstanding.

11

Mario, we are just honored to have you with us today. We have your statement, which will be made a part of the record without objection, and you may proceed as you see fit. We are just delighted to have you.

## STATEMENT OF HON. MARIO BIAGGI, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW YORK

Mr. BIAGGI. Thank you very much, Mr. Chairman, and let me commend you once again for your persistence and your leadership in this area. I have a full statement, as you have stated, for the record. I will give you a distilled version.

This is the fourth time since 1982 that I have testified before your subcommittee in support of my legislation to outlaw armor-piercing cop-killer bullets. With all due respect, Mr. Chairman, I hope it is the last time, and I am sure you share that same feeling.

With the help of a very competent and cooperative staff, you have taken a genuine interest in this issue, and as a result, we have been able to find answers to some very difficult questions. Progress has been slow, perhaps, but I believe we finally have a legislative product before us that we can all be proud of. The product I am referring to is H.R. 4, the Law Enforcement Officers Protection Act of 1985, a measure I was honored to coauthor with you, Mr. Chairman.

Under the provisions of H.R. 4, it would be illegal to manufacture, import or sell armor-piercing ammunition except for government use, including military and police, testing, research or export. Armor-piercing ammunition is defined by the bill as ammunition that is composed of projectiles made from certain hard metals: tungsten alloys, steel, iron, brass, bronze, beryllium copper, or uranium.

The bill was carefully crafted and represents nearly 6 years of research, evolution, and compromise. We have come a long way, but it appears that one final point must still be debated. While it appears we have been successful in convincing a majority of our colleagues and others of the need to ban armor-piercing ammunition, there are still some who question just how total that ban should be.

Their argument goes something like this: It is all right to ban the future manufacture and importation of cop-killer bullets, but we need not concern ourselves with the armor-piercing ammunition that is already sitting on gunshop shelves.

If this were not such a serious issue, I might be amused by such logic. It is like saying we should outlaw new heroin, but any heroin that drug dealers already have can go ahead and be sold. Or how about, let's prevent any new defective automobiles from being made, but the ones already at the auto dealers can go ahead and be sold. That is nonsense and it is faulty logic.

All heroin is bad; all defective automobiles are bad and all cop-killer bullets are bad. Those opposed to a ban on sale say there are an insignificant number of armor-piercing bullets now in the marketplace so why worry? I might be swayed by that fact if it could be proven, but it cannot.

12

There is not one person alive today who could say with certainty just how many cop-killer bullets are already in the marketplace. I would agree that, thanks largely to this congressional effort to ban them, the supply has diminished over the past few years, but to say that an insignificant number of them now exist is stretching the point too far, especially when the lives of so many police officers are at stake.

In fact, the evidence I have collected suggests that the supply of armor-piercing bullets still in the marketplace is anything but depleted. Consider, for example, that the crazed McDonald's killer, James Huberty, fired 192 Czechoslovakian armor-piercing cop-killer bullets when he killed 21 innocent people just last July.

Three years ago, I received a report from the Bureau of Alcohol, Tobacco, and Firearms that stated 30 million rounds of those same Czech bullets used by Huberty were imported into the United States in the mid-1970's. Are we to assume, Mr. Chairman, that James Huberty bought the last couple of hundred rounds in existence? I think not.

A more recent report I received has me even more concerned about the ready availability of armor-piercing ammunition. Let me read from a communication that was sent just 1 week ago from the Drug Enforcement Administration to the U.S. Customs Service. Information from DEA indicates that the Pablo Acosta drug trafficking organization has begun to arm its members with Teflon-coated ammunition. Teflon-coated bullets are capable of penetrating body armor-type bullet-proof vests utilized by officers. This is the kind of experience that we have with this. Again, we have a bullet that goes right through both panels, front and back of a bullet-resistant vest. We have tested this time and time again and have proven that not only does it penetrate the front panel and go through the body, but it also penetrates the back panel and then penetrates one and a half telephone books. That is the awesome penetration ability that this type of bullet has.

Now, these are the same type of Teflon-coated ammunition that ripped through this bullet-resistant vest. The Pablo Acosta drug trafficking organization is a very dangerous and notorious bunch of drug smugglers with members in the United States. If we care anything at all about the lives of our law enforcement officers, how can we possibly ignore reports like this and assume that there are not enough cop-killer bullets in existence to worry about?

If more evidence of criminal use is needed, I have referenced another 15 cases in my more detailed statement. In total, we have documentation of 17 cases of criminal use or possession of armor-piercing ammunition from 1966 to 1985 and there is good reason to assume that many of the cases have simply gone unreported or undetected.

Frankly, this evidence, along with reports of law-abiding citizens being able to purchase these bullets in gunshops leads me to only one conclusion: the sale of cop-killer bullets that already exist must be legally banned.

So how do we do that? Some have argued that dealers would have difficulty identifying an armor-piercing bullet. Admittedly, there is some merit to that concern. However, H.R. 4 would address that problem. Under H.R. 4, all federally licensed firearms dealers

13

across the country would receive a written notice from the Treasury Department telling them exactly which ammunition is classified as armor-piercing. Specific information to be provided to the dealers would be left to the Treasury Secretary to determine, but such information should include the brand name of the bullet and any other identifying characteristics.

I have been informed that this written notification procedure is a common practice already used to alert firearm dealers about changes in law and regulations, so we would not create any undue administrative burdens for the Federal Government. Further, let me emphasize that it is not our intent to penalize gun dealers who unknowingly sell an armor-piercing bullet that is not readily identifiable based on the information provided in their notification.

The Treasury Department has been kind enough to share with me an amendment to H.R. 4 that they will propose later. Basically, they will be proposing to ban the willful sale of armor-piercing ammunition manufactured in the future, but they would still leave existing armor-piercing ammunition untouched.

The Treasury Department has acted in good faith by sharing this proposal with me and I appreciate this opportunity to comment.

Simply put, the Treasury proposal is a step in the right direction, but it falls short of the mark. In order for me to seriously consider the Treasury proposal, one major shortcoming would have to be corrected. Treasury argues that only future armor-piercing bullets, which are to be marked as such under their proposal, could be banned from sale because they would be the only ones that a gun dealer could readily identify. That is simply not true.

Mr. HUGHES. Why don't we stop right there, Mario, because that is a vote. That is the Broomfield amendment that is up. We will just break for 10 minutes and come back.

The subcommittee stands in recess for 10 minutes.

[Recess.]

Mr. HUGHES. The subcommittee will come to order.

The gentleman may proceed.

Mr. BIAGGI. Thank you, Mr. Chairman.

I was making reference to the Treasury proposal, which is a step in the right direction, but it falls short of the mark.

In order for me to seriously consider the Treasury proposal, one major shortcoming would have to be corrected. Treasury argues that only future armor-piercing bullets, which are to be marked as such under their proposal, could be banned for sale because they would be the only ones that a gun dealer could readily identify. That is simply not true.

Many existing armor-piercing bullets are already identifiable, either by their head stamp, by their packaging, or even by their unique design that is demonstrated by some of the cop-killer bullets on this display board, and there are any number of them. The latest design, which is a very unusual design, is one that is manufactured by a French munitions manufacturer that has almost a needle-like appearance. Very different. It has awesome penetrating capability. Mr. Chairman, I have heard previous testimony and I believe Treasury officials will argue that the dealers could not readily identify existing armor-piercing bullets.

14

I think that statement might be palatable to some high school students or to some college kids who are not in the real world yet, but those of us who know the real situation, know full well the arms dealers and the gun shop owners know all about guns. They know all about bullets; they have the capability of making bullets; they know how to make a heavy load or lighter load. They are talking about it all the time. They have all types of advertising and ofttimes the advertising clearly points out as a feature the armor-piercing capability of a particular bullet.

I have an advertisement here, for example, that says the Czech military surplus ammo is noncorrosive, near 100-percent reliable, and has a full metal jacket with an armor-piercing core. They offer that as a feature and I have a whole supply of other advertisements that I presented to the committee in the last hearing we had in the 98th Congress.

Mr. HUGHES. Where did that advertisement appear, for instance?

Mr. BIAGGI. Let's see. It is a gun magazine a couple of years ago—Paragon Sales & Services, Inc., advertisement. If the chairman would like, I would be happy to present copies of other advertisements.

Mr. HUGHES. I think that could be very helpful.

Without objection, the record will remain open so that the gentleman can submit for us some of the advertisements that are carried in magazines or articles.

Mr. BIAGGI. Very colorful advertisements, Mr. Chairman, and the one that surprised me was this French bullet. We are talking about banning armor-piercing bullets which seem to be traditional in shape and size and yet we have a new one, the French bullet, which has a point like a hyperdermic needle. They are out there. They are all competing for the business, and not just to sell to cops and military people.

By the way, you posed the question early on, what would you do with the ammunition out there on the shelves? One, if the arguments we have heard by the opponents, which State that these bullets were only to be sold to cops and military, well, then, what is the problem? But I would suggest that is a specious argument in the first place. I have always rejected it because that is not where the problem is, but in order to make it easier for the arms dealer or for the gunshop owner not to lose any money, we had a provision in the original bill that would have provided some relief for them but objections were raised and that provision was deleted. They can still sell it though to police; they can still sell it to the military; they can still sell it for research and testing; and they can export it. There is no ban on them exporting whatever ammunition they have. It is only the importation that will come under the ban and laws of the United States, so I do not feel the gun dealers would face any distress under H.R. 4.

Now, I don't know what the numbers are. One individual or one group recommends that there are only a few of them out there. I would suggest there is an abundant supply out there, but in any event, the gun dealers do have recourse.

When you are talking about the Teflon-coated KTW bullet, well, we have one here, the "green apple," as some call it, and it is clearly stamped "KTW."

15

With the notification requirements contained in H.R. 4, I see no reason why the Treasury's proposed ban on sale could not cover readily identifiable existing armor-piercing ammunition, as well as any new bullets that are made. That is precisely the intent of H.R. 4, but if Treasury feels the sales provision needs clarification, then I would have no objection.

However, let me repeat, Mr. Chairman, that I would be opposed to any amendment to H.R. 4 that would ban the sale of new armor-piercing ammunition without also banning the sale of existing armor-piercing ammunition that is readily identifiable.

Another factor: What we have learned is that since our activity against these bullets, there are only three manufacturers producing about 200 rounds a month now, so the real thrust here is the ammunition that is already on the shelves. Now, we don't know what else would be imported in the future, what else would be manufactured in the future. I commend Treasury for at least taking this step forward, Mr. Chairman. They have helped us to come a long way in resolving some basic problems, such as definition. Now we are talking about sale.

Initially, there was opposition to the banning of sale. Now they are halfway home. They would like to ban the sale prospectively. Well, if you can justify banning prospective sales, how can you not justify banning the sale of those already in the market, where there is the large quantity, where there is the problem? How do you make the distinction between a bullet that was sold or manufactured last year and one manufactured next year? That would be a real problem.

As we sit here, Mr. Chairman, discussing changes, one thought is worth remembering. The law enforcement community has already made many concessions in order to help expedite the passage of a Federal ban against cop-killer bullets, but enough is enough. To ask them to agree to a bill without a meaningful ban on sale would be asking too much.

Let's listen to the collective voice of nine of our Nation's law enforcement groups. In a January letter to President Reagan, they fully endorsed H.R. 4, saying in part:

The essential issue is that not only must manufacture and importation of armor-piercing ammunition be controlled, but sale should also be limited. Earlier proposals that did not address the problem of sale, did not provide the law enforcement community with a crucial element of protection against armor-piercing ammunition.

Mr. Chairman, this hearing appropriately comes just a few days before the start of National Police Week, a time to pay tribute to those brave men and women who have made the supreme sacrifice in the name of public safety, and to salute those who continue to protect us. During the past 10 years, some 1,600 law enforcement officers have lost their lives in the line of duty. I don't mean to imply that they lost their lives because of armor-piercing bullets, but clearly, the potential is there.

In my opinion, there is no better way to honor those fallen heroes and help to prevent future senseless tragedies than to enact the Law Enforcement Protection Act of 1985 without any weakening amendments.

Thank you, Mr. Chairman.

[The statement of Mr. Biaggi follows:]

16



# *NEWS*

### FROM CONGRESSMAN

# **MARIO BIAGGI**

■■■■ **19TH CONGRESSIONAL DISTRICT, N.Y.** ■■■■■■■■■■■ **BRONX AND YONKERS** ■■■■

May 9, 1985

TESTIMONY IN SUPPORT OF H.R. 4,
LAW ENFORCEMENT OFFICERS PROTECTION ACT OF 1985
PRESENTED BEFORE THE HOUSE SUBCOMMITTEE ON CRIME
BY U.S. REP. MARIO BIAGGI

Mr. Chairman, this is the fourth time since 1982 that I have been privileged to testify before your Subcommittee in support of legislation to outlaw armor-piercing "cop killer" bullets. During that time you and your Subcommittee--with the help of a very competent and cooperative staff--have taken a genuine interest in this issue and, as a result, we have been able to find answers to some very difficult questions. Progress has been slow, perhaps, but I believe we finally have a legislative product before us that we can all be proud of. The product I am referring to is H.R. 4, the Law Enforcement Officers Protection Act of 1985, a measure I was honored to co-author with you, Mr. Chairman.

Under the provisions of H.R. 4, it would be illegal to manufacture, import, or sell armor-piercing ammunition, except for Government use (including military and police use), testing, research or export. Armor-piercing ammunition is defined by the bill as ammunition that is composed of projectiles made from certain hard metals: tungsten alloys, steel, iron, brass, bronze, beryllium copper or uranium.

This bill was carefully crafted and represents nearly six years of research, evolution and compromise. Many helped get us to the point where we are today. The law enforcement community, which originally requested this legislation and has lobbied so fiercely for its passage ever since. The media, which has helped raise the public consciousness about this problem. The more than 125 Members of the House who have cosponsored H.R. 4. The Administration, which has provided valuable technical expertise and helped us to overcome the definitional problems that plagued this legislation for so long. Even our adversaries helped in the fine tuning of this legislative product by focusing some useful attention on the technical flaws that existed along the way.

The process has been frustrating, even exasperating at times, but the cause has made all this effort worthwhile. Simply put, a federal ban against armor-piercing ammunition would save police lives, without infringing in any way on the rights of legitimate gun users-- rights I fully support.

More than half of our nation's 570,000 law enforcement personnel wear bullet resistant vests for protection. According to DuPont (the company that makes Kevlar, the bullet resistant fiber these vests are made from)."There have been between 500 and 600 documented reports of law enforcement officers who have been saved from death or serious personal injury by wearing vests"since they first became available around 1973.

Yet, while these vests will stop even the most powerful of the conventional handgun bullets, they are totally useless against any of the so-called "cop killer" bullets that H.R. 4 seeks to outlaw. In fact, the Teflon-coated KTW bullet, which is generally regarded as the most powerful of the armor-piercing bullets, can penetrate the equivalent of four bullet resistant vests (or 72 layers of Kevlar) in a single shot; one and one-half inches of cold-rolled steel; or, in one test, the KTW bullet penetrated the front of a house, three interior walls, the back wall, "and kicked up dust 50 yards beyond."

(more)

17

Ironically, armor-piercing handgun ammunition was first made around 1940 to help police, particularly when shooting at criminals fleeing in automobiles. While it is unclear just how much these bullets were used by police during those early years, the law enforcement community has long shunned them, because they have proven to be far too dangerous.

Yet, despite the fact that police departments across the country prohibit their officers from using armor-piercing handgun ammunition, the bullets continue to be legally made and sold in all but 14 states around the country. As a 23-year New York City police veteran, I am outraged over this obvious lack of concern for police safety, and I deeply resent those who have slowed the passage of a "cop killer" bullet ban by arguing it is somehow a move toward gun control, not police protection. Nothing could be farther from the truth.

The facts clearly show that armor-piercing ammunition is not used for any legitimate purpose. In fact, according to a July 22, 1983, Bureau of Alcohol, Tobacco and Firearms report I received, "Most State game laws . . . preclude the legitimate use of armor-piercing bullets," largely because these bullets tend to wound rather than kill the animals, resulting in inhumane suffering. I find it interesting, Mr. Chairman, that our laws, at least in this case, appear to be more concerned about animal welfare than about police welfare.

Let me point out, too, that under H.R. 4, "ammunition . . . primarily intended to be used for sporting purposes" would not be affected in any way.

H.R. 4 would only restrict a very small class of specially made bullets—most of which come from foreign countries. In fact, the U.S. Treasury Department has stated that the armor-piercing ammunition H.R. 4 seeks to ban "represents less than one percent of all existing types of ammunition." Yet, while the number of these bullets is relatively small, the risk they pose to the law enforcement community is great.

Mr. Chairman, during the course of this legislative effort some have argued that voluntary efforts are enough to keep armor-piercing ammunition away from the criminal element. Others have said that it is alright to ban the manufacture and importation of "cop killer" bullets, but not their sale. Quite frankly, Mr. Chairman, these arguments just won't work.

Consider, for example, that one of the creators of the notorious KTW armor-piercing bullet came before this Subcommittee three years ago and said that since 1968, when the KTW bullet was first marketed, voluntary restrictions have made it available only "to police and military users." Well, in 1976 two police officers were shot and killed in Broward County, Florida, by these same KTW bullets. Their murderers were arrested shortly after the shooting carrying several boxes of the KTW bullets. So much for the effectiveness of voluntary restrictions.

Or, consider the 1983 case of Louisiana v. Catchings. A summary of this case I have received from the Congressional Research Service shows that the defendant "was apprehended on suspicion of attempted murder whereupon his firearm was seized. It was found to contain Teflon-coated ammunition"—the same Teflon coating that is unique to the KTW armor-piercing bullets. The summary goes on to say that "testimony by an expert witness had been received to the effect that 'this ammunition could penetrate a bullet-proof vest, and that it was the most dangerous ammunition on the market today.'"

Let me add, Mr. Chairman, that I have received numerous other reports of civilians who were able to purchase KTW ammunition at gun shops across the country, despite the fact that a "voluntary" policy was supposedly in effect prohibiting the availability of these bullets to anyone but police and the military. I want to emphasize that I am not questioning the intent of the KTW marketing practices—I believe they were honorable. However, I am trying to show that voluntary efforts, no matter how well intentioned, are simply not enough, especially when the lives of our nation's law enforcement officers are at stake.

18

3

Mr. Chairman, at this time, I would like to submit for the record a copy of the November 27, 1984, report I received from the Congressional Research Service summarizing 13 court cases that took place between 1966 and 1983 in which the defendant either used or possessed armor-piercing ammunition.  This document clearly refutes the claims by some that armor-piercing ammunition has not been available to criminals, nor has it been used by criminals.  However, this report is not all inclusive.  Even the author of this report, Kent. M. Ronhovde, concedes that "it is, of course, impossible to know how many cases have involved such ammunition but have not resulted in specific reference to armor-piercing capability in a written opinion."

Two cases that are not included in the CRS report, for instance, involved a Federal Protective Service Officer who was wounded in 1974 by an armor-piercing bullet that penetrated the bullet resistant vest he was wearing at the time; and a Nassau County (NY) bank robbery suspect, who was arrested in September 1983 at his home, where police found a variety of 32 armor-piercing bullets.  At this time, Mr. Chairman, I would like to submit for the record a copy of the Nassau County Police Department report discussing this incident in more detail.

Fortunately, these and other facts have served to convince some who originally were reluctant to support a legislative ban against armor-piercing ammunition.  Among those are the Administration and the National Rifle Association, who last June formally endorsed a legislative proposal that is virtually identical to H.R. 4, except for one very significant difference.  Unlike H.R. 4, the Administra- tion/NRA-backed proposal does not contain a ban on the sale of armor-piercing ammunition that is already in the marketplace.

Frankly, Mr. Chairman, I just cannot understand the logic of banning future armor-piercing bullets from coming into the market- place but not concerning ourselves with the "cop killer" bullets that are already there.  Existing armor-piercing ammunition is certainly more dangerous to police than bullets that have yet to be made.

I am aware of only two arguments that have been made against a ban on sale, and I believe both can be easily addressed.  The arguments are: 1) there are an insignificant number of these bullets in the marketplace; and 2) dealers would have difficulty identifying an armor-piercing bullet.

Let me simply say that if there is even just one "cop killer" bullet in the marketplace, it is one too many.  But, that logic need not even be debated because evidence indicates a far greater number of these bullets are sitting on gun shop shelves around the country.  Nobody knows the precise figure, but whether in the hundreds, thousands or millions, the number may not be significant to some, but it certainly is to police.

If this logic escapes some, consider this.  On July 1984, a deranged individual named James Huberty walked into a crowded McDonald's restaurant in San Ysidro, California, and killed 21 people with the three firearms he carried with him.  A report I later received from the Chief of the San Diego Police Department indicated that of the 245 bullets Huberty fired during his reign of terror, 192 were armor-piercing "cop killer" bullets imported from Czechoslovakia.  Huberty is thought to have stocked his arsenal of destruction in Ohio, one of more than 30 states where armor- piercing ammunition is still legally available.

Let me emphasize that the many police officers who rushed to the scene of Huberty's séige were wearing bullet-resistant vests.  We may never know if Huberty's use of armor-piercing ammunition may have resulted in more deaths and injuries than actually occurred, but one thing is certain.  The lives of the police officers on the scene were in far greater danger--and needlessly so--than they would have been if Huberty had used conventional ammunition.  To further bolster the case against sale, the Bureau of Alcohol, Tobacco and

(more)

Exhibit A
Page 24

19

4

Firearms reports that 30 million rounds of the same Czechoslovakian armor-piercing bullets used by Huberty were imported into the U.S. in the mid-1970's, and have been sold domestically ever since. How many remain? Nobody knows for sure, but obviously James Huberty had no problem finding an ample supply. At this time, Mr. Chairman, I would like to submit for the record, a copy of the September 7, 1984, report on the Huberty shooting that I received from the San Diego Police Department.

While it may be true that gun dealers might have some difficulty identifying an armor-piercing bullet, that problem is easily remedied. Under H.R. 4, all federally licensed firearms dealers across the country would receive a written notice from the Bureau of Alcohol, Tobacco and Firearms telling them exactly which ammunition is classified as armor-piercing. I have been informed that this is a common procedure already used by BATF to alert firearms dealers to changes in laws and regulations, so it would not require any undue administrative burdens for the federal government. If any firearms dealers are still unsure of what type of ammunition they are selling after this notification process, well, then perhaps they have no business selling firearms to begin with.

Let me add that without a ban on sale, there is nothing to stop the unscrupulous munitions manufacturer or importer from simply channeling their armor-piercing bullets to a licensed firearms dealer for sale to the general public. At that point, it would be very difficult to prove whether the dealer obtained the armor-piercing ammunition before or after a federal "cop killer" bullet ban was enacted.

Mr. Chairman, prior to introducing H.R. 4 this Congress, we met with the major national law enforcement organizations who have lobbied so hard against the continued availability of "cop killer" bullets. We all agreed that certain concessions would have to be made in order to get a bill approved by the Congress. So, we gave up certain provisions, such as some strengthening language in the definition section of the bill; the buy-back clause, which would have helped dealers more easily dispose of any supplies of armor-piercing they might have; and certain identification and notification responsibilities of the Treasury Secretary. These provisions would have helped to better protect police against armor-piercing bullets, but they also threatened the passage of any legislation on this issue.

But enough is enough. The history of this legislation is typical of the law enforcement officers' plight in general—they are always asked and expected to sacrifice more than their fair share. The bill all the major national law enforcement organizations have endorsed—H.R. 4—represents the minimum amount of protection against "cop killer" bullets that they are willing to accept. It includes a ban on sale, and virtually nothing more than what was proposed by the Administration and endorsed by the National Rifle Association. To ask them to agree to a bill without a ban on sale provision would be asking too much.

At this time, Mr. Chairman, I wish to insert a letter signed by nine of our nation's major police organizations clearly stating their full support of H.R. 4. Those organizations include the Federal Law Enforcement Officers Association; the International Association of Chiefs of Police; the International Brotherhood of Police Officers; the International Union of Police Associations/AFL-CIO; the National Association of Police Organizations; the National Sheriffs' Association; the National Troopers' Coalition; the Police Executive Research Forum; and the United Federation of Police. I would also like to note that the Fraternal Order of Police has subsequently expressed their total endorsement of H.R. 4.

Mr. Chairman, this hearing appropriately comes just a few days before the start of National Police Week, a time to pay tribute to those brave men and women who made the supreme sacrifice in the name of public safety, and to salute those who continue to protect us. During the past 10 years, some 1,600 law enforcement officers have lost their lives in the line of duty, with 142 of those deaths occurring in 1984. In my opinion, there is no better way to honor those fallen heroes and help to prevent future senseless tragedies than to enact the Law Enforcement Officers Protection Act of 1985, without any weakening amendments.

20

Mr. HUGHES. Thank you very much, Mario, for a very incisive and comprehensive statement. Your full statement was excellent and it is a part of the record. We appreciate your effort to summarize what is contained in your full statement.

As I understand it, the arguments made by the critics of H.R. 4 fall into several categories, two main categories. One is that there really isn't a very large supply of armor-piercing ammunition out there on the shelves. That seems to be the one argument.

I have a couple concerns with that. First of all, if there is not that much out there, then it shouldn't present a problem to very many dealers. That is the one sentiment that I have.

The second sentiment is, it only takes a few rounds of that ammunition to kill a police officer, and in the final analysis, why shouldn't we take those steps to protect lives? If we save one life, it will have been worth the effort.

Do you want to comment on my own observations relative to supply?

Mr. BIAGGI. Sure.

Mr. HUGHES. Of course—before I invite you to comment—of course, I don't frankly know what supply is out there and I am not sure ATF knows or that anybody knows and I am not sure it would be an easy task to try to find out what is available in a reasonable period of time.

Mr. BIAGGI. Let's assume the contention that there are only a few rounds out there is accurate, and I don't—only for the purpose of discussion, let's assume that that is accurate. Then why would anyone want to resist the enactment of this legislation? If it provides nothing else, it provides symbolic recognition of the fact that police officers are exposed to this peril.

It would be a heartening piece of legislation. We in the Congress oftentimes enact resolutions, simple resolutions developing a sense of the Congress to assure one group or another the sentiments of the Congress. Those resolutions have no real effect in law, but it is encouraging; it is symbolic; it is inspirational.

That is the very least that can be said. That is the most that can be said about that argument, and I don't think it is worthy of consideration. But on the other side, dealing with reality, the Treasury has testified, and the records indicate, that in the 1970's, there were 30 million rounds of Czechoslovakian armor-piercing bullets coming to America. Clearly, I don't think anyone for a minute believes that those 30 million rounds have been spent.

Just last July, one man fired 192 rounds of those Czechoslovakian bullets. To think that that might be the last 192 bullets of Czech origin defies credibility, really.

The fact is, we have a problem. We have a problem and it should be met. The Acosta gang is just the tip of the iceberg. The felons are out there wearing bullet-proof vests, Mr. Chairman. This is very interesting. It is ironic, but this is the scenario that is developing. One, the felons are aware of the armor-piercing bullets and the bullet-resistant vests, and they make a very studied effort to obtain them and they have been found with them. I think there were some 50 arrests in the New York area of criminals wearing bullet-resistant vests, so now you have a new scenario developing.

You have the felon wearing a bullet-proof vest and the policeman wearing a bullet-proof vest. The police officer is using a traditional bullet and the felon is using an armor-piercing bullet. They exchange fire. You know what the results are. The police officer dies; the felon escapes; he survives. That is what is coming down the pike.

Mr. HUGHES. I think the gentleman makes an extremely important point and I have a copy of the message that was sent through the El Paso Intelligence Center dealing with this particular gang, the Pablo Acosta drug trafficking organization, and it does point out that there is a general familiarity with the potential for this particular ammunition. We kid ourselves if we are led to believe that there are not organizations around this country and throughout the world that are acquainted with the potential for this ammunition and are bent on using it.

It would be interesting—I am going to ask, when we get Treasury before us, how in the world we ever imported so much Czechoslovakian ammunition. As I understand the law that existed during that period of time, it was that we would not import ammunition that did not have some sporting value. I haven't heard anybody suggest that that ammunition had any sporting value, so it will be interesting to see how that was imported under the law at that time.

Be that as it may, the second argument that is used is that basically it would be very hard for a dealer to identify a........r-piercing ammunition. Now that seems to be the second major argument that we have heard in this particular round of debate.

I have a number of different concerns about that argument. First of all, a basic one, I am not sure anybody should be in the position of selling ammunition, or for that matter, much of anything else, if they don't know what they are selling. I can't believe, as you suggest, that dealers don't know what type of ammunition they are selling. They know ammunition fairly well, but even if you accept that as a premise, under existing law, every dealer, every licensed dealer throughout this country is required to keep a record of all ammunition that they acquire, that ends up in their inventory or that they sell.

Under the law, they have got to keep a record that has to show the name of the manufacturer, the transfer, the type, the caliber or gauge, the quantity of the ammunition. It is a detailed description of the ammunition.

I am going to ask Treasury about this when they testify. It would seem to me that Treasury should be able to identify what ammunition really is armor-piercing ammunition. It should be a fairly easy task by memo or notice to alert dealers to what ammunition is proscribed by statute if, in fact, we do enact legislation. It seems to me it would be fairly easy for ATF, in the event of question, to set up a hot line for dealers to communicate with ATF.

If there is some question beyond that; if there is a commingling of ammunition, which I understand does happen occasionally, I don't know that it would present any major problems for ATF to provide laboratory services in the event of some question about ammunition, if a dealer conscientiously, and we hope they would all

22

be conscientious, attempted to find out if ammunition really does fall within any ban.

What is your observation with regard to some of these issues which I think go to the heart of the question of sale and ability to identify?

Mr. BIAGGI. There are three areas that you have touched on, Mr. Chairman. One is that I couldn't agree with you more and I thought I had made it clear in my previous presentation. The gun dealers are experts. They are experts. I just don't understand what notion is trying to be portrayed here.

A gun dealer is not a saleslady or a salesman in the lingerie department. The gun dealer is an expert. They can take a gun apart and put it back together. Many of them can do it in the dark. They can make their own bullets with just the proper amount of powder to satisfy a customer's requirement. They know what the guns are. I mean it boggles my mind to think that someone is trying to sell us a bill of goods that the dealers are not in a position to identify the bullets they sell. That argument is out of touch with complete reality, No. 1.

No. 2, dealers have magazines and literature sent to them every day, every day, with advertisements and articles about the special features of this gun, that bullet, whatever, whatever has to do with sporting and law enforcement and other gun users. Every day. So they are thoroughly informed. They are probably more informed than many of the people who work for government. I don't know if people who work for the Government can make bullets properly and can do what these experts can do with guns.

You made reference to those 30 million rounds that came in. I don't know what the history was, but at the time they came in, there wasn't a problem. We didn't have the bulletproof vest. This problem only developed with the advent of the bulletproof vest. They were provided for the purpose of protecting police officers and clearly they were on a collision course with the armor-piercing bullets and that is where we are today.

Now, the NRA has been critical of our effort, yours, and mine, other Members of the Congress and others who have to waged this fight. They say, "Well, by making this a fight, we have informed the criminals what is out there." Well, to begin with, I don't think it is necessary for me to repeat my background, but I have been in the street long enough to know that those criminals know what is out there before most law enforcement officials know what is out there. To a large extent, they are responsible for what is out there. They have a communications system that defies belief.

Mr. HUGHES. I just want to say to my colleague that I don't really attach too much significance to that statement. I mean, it is almost offensive. When I read that statement, my first reaction was one of anger. I mean, if we were to accept that as a basic premise, we wouldn't be talking about the problems of cocaine, money laundering, computer crime, credit card fraud. I could go on and on, and provide a litany of new or updated criminal offenses that this subcommittee reported out last year. I look at that argument as not just shallow, but almost offensive.

Mr. BIAGGI. I point to the advertising. They know. The NRA gets all the literature and ofttimes they provide assistance in the prepa-

ration. They get all of the literature. They are in all the magazines, all the gun clubs, all the hunting lodges. They know all of this and they know there has been advertising going on for years and years and years. That is part of that whole structure and I don't fault it. It is a business. Out of that business developed the problem with the advent of the bullet-proof vest. Now we are trying to resolve it. That is all. It is as simple as that.

Mr. Chairman, you have been very patient and I appreciate that and you have been most helpful in our mutual efforts to get this bill toward enactment. I would exhort the Treasury Department inasmuch as they have come this far, to support a ban on sale. They have called for a ban on importation and manufacture, and that is a substantial step forward; and also to ban the sale prospectively, a very substantial step forward. But, I don't think it has the full meaning that a total ban would provide. I would suggest that they review their position.

Obviously they have given this a lot of thought. Clearly they are as concerned as we are. They may have had some questionable positions at the outset. Happily they are not intractable. I know in the end they would like to provide the same kind of protection to law enforcement as you and I and other members of this committee would.

Mr. HUGHES. Thank you.

The gentleman from Florida.

Mr. MCCOLLUM. Thank you, Mr. Chairman.

Mr. Biaggi, I am one of the early cosponsors of your legislation, but I must admit I wasn't sitting in this seat so I didn't have the privilege of hearing the testimony last time and I am very fascinated by it.

I have had the opportunity to look at the Administration's testimony that is going to be given later today and it triggers some questions that I very briefly would like to ask you. They do talk in here about the questions that were raised of identification and knowledge and so on in terms of whether a dealer would know it or not, and I certainly respect your opinion that most dealers are expert.

Looking at this from the standpoint of trying to reach some middle ground, if you will, I think I might be going in the direction—I am going to listen to what they have to say—of being with you on the idea that what is on the shelf ought to be banned, whether it has been manufactured or not, but there is an element of willfulness or knowingness or whatever that pervades their testimony that makes some sense to me.

I am wondering if maybe there could be an amendment to the legislation which just sticks in a couple of words, knowingly or recklessly or something like that? As you know, in the criminal law, at each stage you have a different standard, and this is pretty much a strict liability statute now in the sense that if you make the transfer after the notice went out, you lose your license and whatever else happens to you happens.

What do you think of putting in a—not necessarily as high-level at "intentional," but a word like knowingly or recklessly to modify the word "transfer," or something of that nature that could give

24

some help to the administration and still not go as far as they want to go?

Mr. BIAGGI. Right. I appreciate your concern. I share that concern. It is not our intent to unfairly penalize a dealer who really is ignorant of the fact that a bullet may or may not be armor-piercing. The occasion may develop. A member of the family may be at the store at the time and not the expert. All of these possibilities are there and I appreciate that.

If we are talking about the same thing, sure, language could be crafted to deal with our concern. It is a mutual concern.

Mr. MCCOLLUM. I just was curious. I know we are all going to have to run to vote. I have a broad question that I am going to ask very quickly.

In the administration's testimony, they draw a technical distinction with regard to the definition in H.R. 13 and the definition that you have in your bill of an armor-piercing bullet, and express some concern—that your definition would not encompass the unput-together projectile, the one that might come in parts or in pieces. I don't completely follow that, so I am going to wait their testimony——

Mr. BIAGGI. I don't follow——

Mr. MCCOLLUM. Have you examined that——

Mr. BIAGGI [continuing]. It, either.

Mr. MCCOLLUM. OK. Well, I am sure you will be like me, open-minded about any refinement that——

Mr. BIAGGI. Absolutely.

Mr. MCCOLLUM. Apparently what they are suggesting is their language would be a stricter ban and I would think, based on—if it is true, I am sure you would want to go along with the toughest one in this case——

Mr. BIAGGI. Of course.

Mr. MCCOLLUM. Whatever it is.

Mr. BIAGGI. Whatever is better.

Mr. MCCOLLUM. I am not going to get into the rest. If I had any other questions, I don't want to belabor the point. The main I wanted to ask, I have asked, and i appreciate very much what all you have put into this.

Thank you very much, Mr. Chairman.

Mr. BIAGGI. Thank you very much, Mr. Chairman.

Mr. HUGHES. I just want to say—before we recess to catch this vote—I really think that the administration has misread the bill because H.R. 4, as my colleague well knows, recites that a licensed dealer transferring armor-piercing ammunition is not held accountable before that dealer has received notice, actual notice.

Mr. BIAGGI. The contention is that many of these armor-piercing bullets are somehow unidentifiable. I do not agree, but let me reemphasize that I don't think it is anyone's intention to unfairly penalize a dealer.

Mr. HUGHES. I quite agree. And I think it is an area that we are going to take a close look at because I am sensitive to the concerns. I want to make sure that we are abundantly fair on this issue.

Mario, let me just conclude by thanking you once again. You have been the leader for a number of years on this and many other issues affecting the law enforcement community. Your contribu-

25

tions are just untold and we thank you once again. You have made another significant contribution to this hearing and it is my hope that we can conclude the hearing process and get on with the business of protecting the law enforcement community.

Mr. BIAGGI. Thank you very much, Mr. Chairman.

Mr. HUGHES. Thank you.

The subcommittee is going to receive into the record the telex, without objection, the telex from FBI to U.S. Customs Headquarters dealing with the Pablo Acosta drug trafficking organization. Is there objection?

Hearing none, so ordered.

[The telex referred to follows:]

APR 29, 1985  1533  PACIFIC TIME

7E4
ADMIN MESSAGE 04142

FM OADC/HEADQUARTERS US CUSTOMS SERVICE WASH DC
TO GOOO/ALL STATIONS

FOLLOWING MESSAGE FROM EPIC IS PASSED FOR YOUR ACTION/INFO:

QUOTE
3378 EPIC 04-29-85
FM DEA EL PASO INTELLIGENCE CENTER
TO US CUSTOMS HQS WASHDC

RE:  ETRL-#334 04-29-85

SUBJECT:  TEFLON COATED BULLETS TO BE UTILIZED BY THE PABLO
          ACOSTA DRUG TRAFFICKING ORGANIZATION

INFORMATION FROM DEA INDICATES THAT THE PABLO ACOSTA DRUG
TRAFFICKING ORGANIZATION HAS BEGUN TO ARM ITS MEMBERS WITH
TEFLON COATEDD AMMUNITION IN 45 CALIBER, AS WELL AS 380
MILLIMETER AND 9 MILLIMETER.

TEFLON COATED BULLETS ARE CAPABLE OF PENETRATING BODY ARMOR
TYPE BULLET-PROOF VESTS UTILIZED BY LAW OFFICERS.

THIS INFORMATION IS BEING PASSED TO ALL CUSTOMS TECS TERMINALS
FOR ANY ACTION DEEMED APPROPRIATE.

RELATED L/O #-NONE

IF EPIC CAN BE OF FURTHER ASSISTANCE, PLEASE CALL FTS 572-7942,
COM 915-541-7942.

M JACKSON, ACTING DUTY WATCH COMMANDER
EPIC 03378

Mr. HUGHES. The subcommittee stands recessed for 10 minutes.
[Recess.]

Mr. HUGHES. The committee has received the testimony of the
Honorable Harold L. Volkmer on H.R. 4. Unfortunately, Congress-
man Volkmer has a conflict and without objection, the subcommit-
tee will receive his testimony into the record in full.

[The statement of Mr. Volkmer follows:]

28

TESTIMONY OF
THE HONORABLE HAROLD L. VOLKMER

SUBMITTED TO THE

HOUSE JUDICIARY COMMITTEE
SUBCOMMITTEE ON CRIME

HEARINGS ON H.R. 4

MAY 8, 1985

1

MR. CHAIRMAN, MEMBERS OF THE SUBCOMMITTEE, I WANT TO THANK YOU FOR THE OPPORTUNITY TO PRESENT MY VIEWS REGARDING THE "ARMOR PIERCING" BULLET LEGISLATION WHICH YOU ARE CONSIDERING.

AS YOU ARE AWARE I AM A COSPONSOR OF H.R. 13 INTRODUCED BY OUR COLLEAGUE, MR. BROOKS OF TEXAS. I HAVE SUPPORTED THIS LEGISLATION, RATHER THAN H.R. 4 SPONSORED BY YOU MR. CHAIRMAN AND THE GENTLEMAN FROM NEW YORK, MR. BIAGGI, BECAUSE I AM TROUBLED BY THE RAMIFICATIONS OF THE "SALES" PROVISION WHICH YOU HAVE INCLUDED IN H.R. 4. I WOULD LIKE TO BRIEFLY DISCUSS THE ISSUES WHICH THIS "SALES" PROVISION RAISE.

FIRST OF ALL MR. CHAIRMAN, THE QUESTION OF INTENT IS OF MAJOR CONCERN. UNDER THE PROVISIONS OF H.R. 4, THE INADVERTENT SALE BY A LICENSED DEALER OF EVEN ONE ROUND OF ARMOR PIERCING AMMUNITION WOULD MAKE THIS DEALER SUBJECT TO REVOCATION OF HIS LICENSE TO DO BUSINESS.

BECAUSE THE COMMITTEE'S REPORT WHICH ACCOMPANIED H.R. 6067, LAST CONGRESS NOTED, "--- THE DIFFICULTY IN VISUALLY DISTINGUISHING AN ARMOR PIERCING ROUND FROM A NON-ARMOR PIERCING ROUND---" THE QUESTION OF INTENT BECOMES VERY IMPORTANT. WHILE I AGREE THAT LICENSED DEALERS WILL KNOW WHAT TYPE AMMUNITION THEY PURCHASE FROM THEIR WHOLESALERS AND DISTRIBUTERS, THERE IS STILL THE DISTINCT POSSIBILITY THAT "LOOSE" ROUNDS, ACQUIRED IN TRADE COULD BE OFFERED FOR SALE. IN FACT, THIS IS A RELATIVELY COMMON

2

PRACTICE. OFTEN YOU CAN WALK INTO A LICENSED DEALERS SHOP AND SEE A BOX OF LOOSE AMMUNITION WITH A SIGN SAYING "YOUR CHOICE, .25¢ A ROUND" OR SOMETHING TO THAT EFFECT.

AS YOUR REPORT NOTES, THESE LOOSE ROUNDS ARE VISUALLY INDISTINGUISHABLE WHEN VIEWED IN TERMS OF ARMOR PIERCING CAPABILITIES. IT DOES NOT SEEM APPROPRIATE TO PLACE A PERSON'S LIVELIHOOD IN JEOPARDY BECAUSE AN ARMOR PIERCING ROUND COULD BE INADVERTENTLY SOLD UNDER THESE CIRCUMSTANCES.

AS YOU KNOW, THE ENTIRE SECTION OF CURRENT LAW DEALING WITH LICENSE REVOCATION WOULD BE AMENDED BY A PROVISION CONTAINED IN H.R. 945, WHICH I INTRODUCED EARLIER THIS YEAR. THE KEY ELEMENT OF THE CHANGE MY LEGISLATION SUGGESTS IN THIS SUBJECT AREA IS THE INCLUSION OF AN INTENT STANDARD WHICH THE SECRETARY OF TREASURY WOULD HAVE TO PROVE BEFORE A LICENSE COULD BE REVOKED.

THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS HAS ENDORSED THIS CHANGE AND I WOULD URGE THE SUBCOMMITTEE TO INCLUDE IT, PARTICULARLY IF THE "SALES" PROVISION IS TO REMAIN IN THE LEGISLATION. HONEST ERRORS COULD OCCUR. IF TWO LOOSE ROUNDS OF AMMUNITION -- ONE ARMOR PIERCING, ONE NON ARMOR PIERCING -- CANNOT BE DISTINGUISHED BY VISUAL INSPECTION, IT IS UNFAIR TO SUBJECT A PERSON TO THE LOSS OF HIS LIVELIHOOD UNLESS CRIMINAL INTENT IS SHOWN.

ALSO OF CONCERN IS AN AMBIGUITY WHICH APPEARS TO BE BUILT INTO THE SALES PROVISION OF H.R. 4. SINCE THIS PROVISION IS NEARLY IDENTICAL TO THAT CONTAINED IN H.R. 6067, IT WOULD FOLLOW

31

3

THAT WE CAN TURN TO LAST YEARS COMMITTEE REPORT FOR GUIDANCE.

ON PAGE 8 THE REPORT STATES: "THIS LIMITATION ON SALE OR TRANSFER IN THE COURSE OF BUSINESS WILL NOT APPLY TO TRANSFERS OR SALES OF ARMOR PIERCING AMMUNITION BETWEEN COLLECTORS OR BY LICENSED DEALERS OUTSIDE THE COURSE OF BUSINESS." ON ITS FACE THIS IS A REASONABLE APPROACH, HOWEVER, THERE IS REAL DOUBT AS THE LAW EXISTS TODAY THAT A LICENSED DEALER CAN EVER MAINTAIN A PERSONAL COLLECTION OF FIREARMS OR AMMUNITION, SEPARATE, DISTINCT AND OUTSIDE THE COURSE OF BUSINESS.

I WOULD REFER THE SUBCOMMITTEE TO TESTIMONY GIVEN BY RICHARD BOULIN BEFORE THE SENATE JUDICIARY COMMITTEE IN 1982 DURING CONSIDERATION OF THE SENATE COUNTERPART TO MY LEGISLATION (S. 1030, 97TH CONGRESS). THE SENATE COMMITTEE HEARD THAT MR. BOULIN HAD BEEN TOLD BY FEDERAL AGENTS FROM BATF THAT SALES FROM HIS PERSONAL COLLECTION DID NOT HAVE TO BE RECORDED AND YET ON THE OTHER HAND, MR. BOULIN WAS ARRESTED AND CONVICTED FOR FAILURE TO RECORD SUCH SALES IN HIS BUSINESS RECORDS. THE COMMITTEE ALSO RECEIVED DOCUMENTATION THAT BATF, THE ENFORCING AGENCY, ITSELF VACILLATED ON THE ISSUE OF WHETHER AND HOW SUCH SALES MUST BE RECORDED.

IN ANY EVENT, EXISTING REQUIREMENTS THAT LICENSEES MAINTAIN INVENTORY AND DISPOSITION RECORDS ON THE BUSINESS PREMISES, HAVE LED TO THE CONSTRUCTION THAT ALL SALES BY A LICENSEE, EVEN OF FIREARMS SOLD FROM HIS OWN PERSONAL COLLECTION, KEPT IN HIS HOME,

32

4

AND NEVER PART OF A BUSINESS INVENTORY, MUST BE RECORDED IN THE BUSINESS RECORDS. IT WOULD LOGICALLY FOLLOW THAT THIS CONSTRUCTION WOULD APPLY TO SALE OF AMMUNITION FROM A "PRIVATE COLLECTION". UNFORTUNATELY THIS CONSTRUCTION STATES THAT A LICENSEE CAN NEVER HAVE A PRIVATE COLLECTION OUTSIDE OF THE COURSE OF BUSINESS. AT BEST THE SALES PROVISION CONTAINED IN H.R. 4, PROVIDES ONLY AN ALLUSIONARY PROTECTION TO LICENSEES WHO HAVE PRIVATE COLLECTIONS.

WHILE H.R. 945 INCLUDES GUIDANCE FOR COLLECTING OF FIREARMS BY THOSE WHO ARE ALSO LICENSEES, AMMUNITION COLLECTIONS COULD REQUIRE A DIFFERENT TREATMENT. IN ANY EVENT, I WOULD URGE THE COMMITTEE TO INCLUDE LANGUAGE WHICH WOULD ONCE AND FOR ALL CLARIFY AND SPELL OUT THE POSITION OF A LICENSEE AND HIS PERSONAL COLLECTION OF FIREARMS AND AMMUNITION, AND GUARANTEE THE RIGHT FOR THE LICENSEE TO OWN AND TRADE FROM THEIR PRIVATE COLLECTIONS.

MR. CHAIRMAN, I HAVE BEEN SAYING FOR SEVERAL YEARS NOW THAT THE 1968 GUN CONTROL ACT IS IN NEED OF REFORM. BECAUSE THE LEGISLATION YOU ARE HEARING TESTIMONY ON TODAY AMENDS THIS COMPLICATED AND TECHNICAL ACT, I BELIEVE THAT COMMITTEE ACTION ON THIS MATTER PROVIDES THE PERFECT OPPORTUNITY TO AT LEAST ADDRESS SOME OF THE ISSUES I HAVE RAISED OVER THESE PAST FEW YEARS. I SAY THIS BECAUSE H.R. 4 AND THE SALES PROVISION, WHICH IS INCLUDED, RAISE TWO OF THESE ISSUES.

33

—

5

To date, there have been no hearings on these issues, despite at various times over 40% of the House sponsoring my legislation. There has been no consideration of these issues despite the Senate counterpart to this legislation, twice being reported by the Senate Judiciary Committee. I would note that the Senate counterpart of H.R. 945 (S. 49) has been held at the desk this year and is number three on the Senate calendar.

Unless these issues are considered I fear that the Committee will only add to the complexities and vagueness of an act which has a proven track record of enslaving innocent citizens in its tangle of redtape.

Thank you for the opportunity to raise these important issues this morning, and I urge the Committee to consider this in their deliberations.

Mr. HUGHES. Our next witness is Edward T. Stevenson. Mr. Stevenson is currently the Deputy Assistant Secretary for Operations in the Office of Enforcement and Operations, U.S Department of the Treasury. In this capacity, he participates in the operations and management of the four Treasury law enforcement agencies: the Bureau of Alcohol, Tobacco, and Firearms; the U.S. Customs Service; the Secret Service; and the Federal Law Enforcement Training Center.

Prior to his appointment in January of 1984, he served for some 2½ years as Special Assistant to the Deputy Secretary for Legislative Affairs at Treasury. He is a graduate of the University of Maryland and holds a bachelor of science in business and public administration and the American University, for which he holds an master of arts in communications.

He is certainly no stranger to the work of this subcommittee and we are just delighted to welcome him for the first time as a witness on behalf of the administration. Mr. Stevenson, your prepared statement has been received and will be made a part of the record in full and you may proceed as you see fit.

Welcome.

**STATEMENT OF EDWARD T. STEVENSON, DEPUTY ASSISTANT SECRETARY OF THE TREASURY FOR OPERATIONS, U.S. DEPARTMENT OF THE TREASURY, ACCOMPANIED BY EDWARD M. OWEN, JR., CHIEF, FIREARMS TECHNOLOGY BRANCH, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS, U.S. DEPARTMENT OF THE TREASURY; AND JACK B. PATTERSON, ASSISTANT CHIEF COUNSEL (FIREARMS AND EXPLOSIVES), BUREAU OF ALCOHOL, TOBACCO, AND FIREARMS, U.S. DEPARTMENT OF THE TREASURY**

Mr. STEVENSON. Thank you, Mr. Chairman. I am accompanied today by Ed Owen, Chief of the Firearms Technology Branch of the Bureau of Alcohol, Tobacco, and Firearms on my right, and Jack Patterson, ATF Assistant Chief Counsel for Firearms and Explosives.

Mr. Chairman, and members of the subcommittee, we are pleased to appear before you today to discuss again the subject of armor-piercing ammunition and certain legislative proposals to address the threat that this ammunition poses to the safety of law enforcement personnel.

Both H.R. 4, introduced by Mr. Biaggi, and H.R. 13, the administration's bill, as introduced by Mr. Brooks, are similar to legislation formulated by the administration and introduced into the 98th Congress. Other bills similar in intent were introduced in the 98th Congress and one of these, H.R. 6067, was reported favorably by the House Judiciary Committee.

We are pleased to find that there are even fewer differences between H.R. 4 and H.R. 13 than there were among the various armor-piercing ammunition bills introduced during the 98th and prior Congresses. Those of us who have worked on this issue so long are gratified by this progress.

As you know, H.R. 4 and H.R. 13 are the culmination of a long and strenuous effort by this subcommittee, other members of the

Congress and the administration to find an appropriate and enforceable definition of armor-piercing projectiles. We applaud the efforts of the chairman and the members of this subcommittee in seeking to resolve the differences in the legislative proposals and to formulate strong, effective legislation dealing with this program.

The definitions of the term "armor-piercing ammunition" in H.R. 4 and H.R. 13, which are substantially the same, successfully balance the needs of law-abiding sportsmen and hunters with the important law enforcement goal of providing police officers with assurance that their soft body armor will afford greater protection against gunfire from the criminal element.

To the best of our knowledge, to date, no police officer has been killed due to armor-piercing ammunition penetrating his protective body armor. Even without the aid of legislation, progress has been made in keeping armor-piercing ammunition out of the marketplace. As we previously testified before this subcommittee, we achieved substantial control over this type of ammunition 3 years ago by securing the voluntary compliance of manufacturers and importers.

As you know, Treasury sought and obtained voluntary agreements with manufacturers and importers of ammunition specifically designed as armor-piercing. Under the agreements, manufacturers and importers agree to sell the ammunition only to the military establishment and to Federal, State and local law enforcement agencies or to foreign governments.

To the best of our knowledge, and to their credit, these manufacturers and importers have either agreed to our proposition or have gone out of the business of importing or producing armor-piercing ammunition. Pursuant to these agreements, we believe that the quantities of armor-piercing ammunition commercially available in the country today are minimal.

In March 1985, a survey was conducted at my request by the Bureau of Alcohol, Tobacco, and Firearms and it was found that all three known current distributors of armor-piercing ammunition voluntarily restrict sales to police and military. To the best of our knowledge, a total of 15 to 19 boxes, 10 rounds each, or less than 200 cartridges are distributed per month.

In addition, new legislation enacted by the 98th Congress has provided a strong deterrent to the criminal misuse of armor-piercing ammunition. As part of the Comprehensive Crime Control Act of 1984, a new provision of the Gun Control Act of 1968 provides for a mandatory penalty of at least 5 years in prison for persons who commit Federal crimes of violence while carrying or using a handgun loaded with armor-piercing ammunition. The penalty is applicable when a handgun loaded with armor-piercing ammunition is carried or used during and in relation to a Federal crime of violence, even if the crime in which the loaded handgun is used is one for which enhanced punishment is otherwise provided if committed with a dangerous weapon.

Finally, the statute provides that the defendant is not to be given a suspended sentence, placed on probation or made eligible for parole.

The difficulty facing drafters of legislation to address armor-piercing bullets has been in fashioning a definition that would

36

achieve a balance between law enforcement and long-established recreational use. The definition of these bills reached after discussion last year with the White House, Justice Department, Treasury Department, and representatives of organizations representing police officers or police management organizations and sporting interests accomplishes two essential goals. It minimizes Government testing necessary to determine whether ammunition would be subject to restrictions under Federal law and defines the term in a way that can be easily understood by industry and the public.

Both H.R. 4 and H.R. 13 accomplish basically the same objectives; namely, prohibiting the manufacture and importation of armor-piercing ammunition with certain narrow exceptions. However, there are differences in the two bills. Beginning with the definition, we would like to note that H.R. 13, the administration's proposal, covers solid projectiles or projectile cores containing tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium.

On the other hand, Mr. Biaggi's bill, H.R. 4, would cover ammunition containing a projectile or projectile core constructed entirely out of one or more of the described materials. This means that the entire cartridge or round of ammunition must be assembled before the restriction on its manufacture or sale would be applicable.

The administration's bill would reach the projectile alone; thus ensuring that the restrictions on manufacture and importation apply to the projectile even before it has been assembled as part of a cartridge. The definition in H.R. 13 is a broader definition of armor-piercing ammunition and would preclude importers and manufacturers' unregulated distribution of armor-piercing projectiles yet to be assembled into complete cartridges. Thus, we believe that the definition in H.R. 13 closes a significant loophole appearing in H.R. 4.

Both bills ban the manufacture and importation of armor-piercing ammunition except for the use of Government entities or for exportation. H.R. 4 adds an additional exception where the ammunition is needed for purposes of testing or experimentation authorized by the Secretary. We understand that this exception was added to allow ballistics researchers, testing services, and soft body armor manufacturers who have a legitimate need for armor-piercing ammunition to obtain it. This is a worthwhile addition to the original legislative proposal.

Our major concern with H.R. 4 is its sale provision, which constitutes the only substantial difference remaining between H.R. 4 and the administration's proposed approach in H.R. 13.

Section 5 of H.R. 4 would provide for revocation of a dealer's Federal firearms license if armor-piercing ammunition is transferred for any purpose except to governments, for testing or for export and the dealer has notice that the ammunition transferred was armor-piercing.

While we have previously opposed such a sale provision, we believe that a viable alternative could be suggested which would satisfy all parties. Our main concern with the sale provision is that dealers could be penalized by facing revocation of their licenses because of inadvertent sales of existing armor-piercing ammunition which may look like conventional ammunition. Many of the com-

mercial armor-piercing ammunition cartridges of current manufacture have manufacturer's head stamps the same as those on conventional cartridges. These cases are identical to those used for nonarmor-piercing bullets. Many of the foreign military surplus armor-piercing bullets, as defined in your proposed legislation, are indistinguishable from conventional nonarmor-piercing ammunition. The only reliable method of identifying armor-piercing ammunition currently available is through expert analysis to determine the metallic content of the bullet.

Therefore, we would propose that any dealer sale prohibition become operative on the willful sale to anyone of armor-piercing ammunition manufactured after the date of enactment. This would add an element of knowledge that is presently lacking in the bill and would also serve to protect dealers from inadvertent sales of armor-piercing ammunition that cannot be readily identified as such.

Merely stating that the dealer have notice from the Secretary that this specific brand of ammunition is armor-piercing is insufficient, in our view, in that there may be some time lag between a new bullet coming on the market and when the Secretary issues a notice to dealers about the projectile.

Instead, we would propose that provision be added to the bill which would mandate marking of the armor-piercing ammunition projectiles and packages of ammunition with distinctive markings or a description unique to armor-piercing ammunition. These provisions will help ensure that dealers will not make inadvertent sales of armor-piercing ammunition.

The bill should also provide that the Secretary promulgate regulations prescribing the manner in which projectiles and their packages for their distribution are marked. The bill might also provide that the Secretary periodically make available lists of currently manufactured armor-piercing ammunition to members of the firearms and ammunition industry.

In conclusion, in view of the few differences between H.R. 4 and H.R. 13, we believe that a compromise may be reached that can be supported by all parties concerned. We would be glad to work with the subcommittee staff on legislative language contained in our suggestion.

Thank you, Mr. Chairman. We are prepared to answer your questions.

[The statement of Mr. Stevenson follows:]

38

STATEMENT OF THE HONORABLE EDWARD T. STEVENSON
DEPUTY ASSISTANT SECRETARY (OPERATIONS)
DEPARTMENT OF THE TREASURY
BEFORE THE
HOUSE COMMITTEE ON THE JUDICIARY
SUBCOMMITTEE ON CRIME
MAY 9, 1985

Mr. Chairman and members of the Subcommittee, we are pleased to appear before you today to discuss again the subject of armor-piercing ammunition and certain legislative proposals to address the threat that this ammunition poses to the safety of law enforcement personnel.  Both H.R. 4, introduced by Mr. Biaggi, and H.R. 13, the Administration bill as introduced by Mr. Brooks, are similar to legislation formulated by the Administration and introduced into the 98th Congress. Other bills, similar in intent, were introduced in the 98th Congress, and one of these, H.R. 6067, was reported out by the House Judiciary Committee.  We are pleased to find that there are even fewer differences between H.R. 4 and H.R. 13, than there were among the various armor-piercing ammunition bills introduced during the 98th and prior Congresses.  Those of us who have worked on this issue so long are gratified by this progress.

As you know, H.R. 4 and H.R. 13 are the culmination of a long and strenuous effort by this Subcommittee, other members of Congress and the Administration, to find an

- 2 -

appropriate and enforceable definition of armor-piercing
projectiles.  We applaud the efforts of the Chairman and
the members of the Subcommittee in seeking to resolve the
differences in the legislative proposals and to formulate
strong, effective legislation dealing with this problem.
The definitions of the term armor-piercing ammunition in
H.R. 4 and H.R. 13, which are substantially the same,
successfully balance the needs of law-abiding sportsmen
and hunters with the important law enforcement goal of
providing police officers with assurance that their
soft-body armor will afford greater protection against
gunfire from the criminal element.  To the best of our
knowledge, to date no police officer has been killed due
to armor-piercing ammunition penetrating his protective
body armor.

Even without the aid of legislation, progress has been
made in keeping armor-piercing ammunition out of the
marketplace.  As we previously testified before the
Subcommittee, we achieved substantial control over this
type of ammunition 3 years ago by securing the voluntary
compliance of manufacturers and importers.  As you know,
Treasury sought and obtained voluntary agreements with
manufacturers and importers of ammunition specifically

**40**

- 3 -

designed as armor-piercing.  Under the agreements,
manufacturers and importers agreed to sell the ammunition
only to the military establishment and to Federal, State
and local law enforcement agencies, or to foreign
governments.  To the best of our knowledge, these
manufacturers and importers have either agreed to our
proposition or have gone out of the business of importing
or producing armor-piercing ammunition.  Pursuant to these
agreements, we believe that the quantities of armor-
piercing ammunition commercially available in the country
today are minimal.  In March of 1985, a survey was
conducted by the Bureau of Alcohol, Tobacco and Firearms,
and it was found that all three current distributors of
armor-piercing ammunition voluntarily restrict sales to
police and military.  A total of 15 to 19 boxes (10 rounds
each or less than 200 cartridges) are distributed per
month.

In addition, new legislation enacted by the 98th
Congress has provided a strong deterrent to the criminal
misuse of armor-piercing ammunition.  As part of the
Comprehensive Crime Control Act of 1984, a new provision
of the Gun Control Act of 1968 provides for a mandatory
penalty of at least 5 years imprisonment for persons who

41

- 4 -

commit Federal crimes of violence while carrying or using
a handgun loaded with armor-piercing ammunition.  The
penalty is applicable when a handgun loaded with
armor-piercing ammunition is carried or used during, and
in relation to, a Federal crime of violence, even if the
crime in which the loaded handgun is used is one for which
enhanced punishment is otherwise provided if committed
with a dangerous weapon.  Finally, the statute provides
that the defendant is not to be given a suspended
sentence, placed on probation or made eligible for parole.

The difficulty facing drafters of legislation to
address armor-piercing bullets has been in fashioning a
definition that would achieve a balance between law
enforcement and long-established, recreational use.  The
definition in these bills, reached after discussion last
year with the White House, Justice Department, Treasury
Department, and representatives of organizations
representing police officers, or police management
organizations, and sporting interests, accomplishes two
essential goals.  It minimizes Government testing
necessary to determine whether ammunition would be subject
to restriction under Federal law, and defines the term in
a way that can be easily understood by industry and the
public.

42

- 5 -

Both H.R. 4 and H.R. 13 accomplish basically the same objectives, namely, prohibiting the manufacture and importation of armor-piercing ammunition, with certain narrow exceptions. However, there are differences in the two bills. Beginning with the definition, we would like to note that H.R. 13, the Administration proposal, covers the solid projectiles or projectile cores containing tungsten alloys, steel, iron, brass, bronze, beyrllium copper or depleted uranium.

On the other hand, Mr. Biaggi's bill, H.R. 4, would cover "ammunition containing a projectile or projectile core" constructed entirely of one or more of the described materials. This means that the entire cartridge or round of ammunition must be assembled before the restrictions on its manufacture or sale would be applicable. The Administration's bill would reach the projectile alone, thus ensuring that the restrictions on manufacture and importation apply to the projectile even before it has been assembled as part of a cartridge. The definition in H.R. 13 is a broader definition of armor-piercing ammunition and would preclude importers' and manufacturers' unregulated distribution of armor-piercing projectiles yet to be assembled into complete cartridges. Thus, we

**43**

- 6 -

believe that the definition in H.R. 13 closes a signifi-
cant loophole appearing in H.R. 4.

Both bills ban the manufacture and importation of
armor-piercing ammunition except for the use of govern-
mental entities or for exportation.  H.R. 4 adds an
additional exception where the ammunition is needed for
purposes of testing or experimentation authorized by the
Secretary.  We understand that this exception was added to
allow ballistics researchers, testing services, and
soft-body armor manufacturers who have a legitimate need
for armor-piercing ammunition to obtain it.  This is a
worthwhile addition to the original legislative proposal.

Our major concern with H.R. 4 is its sale provision,
which constitutes the only substantial difference remaining
between H.R. 4 and the Administration's approach in
H.R. 13.  Section 5 of H.R. 4 would provide for revocation
of a dealer's Federal firearms license if armor-piercing
ammunition is transferred for any purpose, subject to
certain narrow exceptions, and the dealer has notice that
the ammunition transferred was armor-piercing.  While we
have previously opposed such a sale provision, we believe
that a viable alternative could be suggested which would
satisfy all parties.  Our main concern with a sale

44

- 7 -

provision is that dealers could be penalized by facing
revocation of their licenses because of inadvertent sales
of this ammunition.  Many of the commercial armor-piercing
ammunition cartridges of current manufacture have
manufacturer's head stamps the same as those on
conventional cartridge cases.  These cases are identical
to those used for non-armor-piercing bullets.  Many of the
foreign military surplus armor-piercing bullets, as
defined in the proposed legislation, are indistinguishable
from conventional non-armor-piercing ammunition.  The only
reliable method of identifying armor-piercing ammunition
currently available is through expert analysis to
determine the metallic content of the bullet.

   Therefore, we would propose that any sale prohibition
become operative upon the willful sale of armor-piercing
ammunition manufactured after the date of enactment.  This
would add an element of knowledge that is presently
lacking in the bill and would also serve to protect
dealers from inadvertent sales of armor-piercing ammunition
that cannot be readily identified as such.  Merely stating
that the dealer have notice from the Secretary that the
ammunition is armor-piercing is insufficient, in our view,
in that there may be some lag time between a new bullet

- 8 -

coming on the market and when the Secretary issues a
notice to dealers about the projectile.  Instead, we
propose that a provision be added to the bill which would
mandate marking of the armor-piercing ammunition
projectiles and packages of ammunition with distinctive
markings unique to armor-piercing ammunition.  These
provisions will help ensure that dealers will not make
inadvertent sales of armor-piercing ammunition.  The bill
should also provide that the Secretary promulgate
regulations prescribing the manner in which projectiles
and the packages for their distribution are marked.  The
bill might also provide that the Secretary periodically
make available lists of currently manufactured armor-
piercing ammunition to members of the firearms and
ammunition industry.

In conclusion, in view of the few differences between
H.R. 4 and H.R. 13, we believe that a compromise may be
reached that can be supported by all parties concerned.
We would be glad to work with the Subcommittee staff on
legislative language containing our suggestions.

Mr. Chairman and members of the subcommittee, this
concludes my prepared statement.  I would be most pleased
to answer any questions you may have.

46

PROPOSED STATUTORY LANGUAGE

"923(k)   Licensed importers and manufacturers shall mark
all armor-piercing projectiles and packages for their
distribution in such manner as the Secretary by
regulation shall prescribe.  The Secretary shall
furnish to each dealer licensed under this chapter
information as to what projectiles are considered as
armor-piercing ammunition as defined in section
921(a)(17)(B)."

H.R. 4 as revised:

SEC. 3.   (new (A)(8) added):

"(8) for any manufacturer or importer to sell or
deliver armor-piercing ammunition, except that
this paragraph shall not apply to -

"(A)   the sale or delivery by a manufacturer
or importer of such ammunition for the use of
the United States or any department or agency
thereof or any State or any department,
agency, or political subdivision thereof;

"(B)   the sale or delivery by a manufacturer
or importer of such ammunition for the purpose
of exportation;

"(C)   any sale or delivery by a manufacturer
or importer of such ammunition for the purposes
of testing or experimentation authorized by the
Secretary.

SEC 5.   The first sentence of section 923(c) of
title 18, United States Code, is amended by striking out
"under this section" and all that follows through the end
of the sentence and inserting in lieu thereof the
following:

"under this section, if the holder of such license -

(1)   being a licensed dealer, willfully transfers
armor-piercing ammunition. manufactured or imported
after the effective date of this section."

[(2) would remain the same].

47

Mr. HUGHES. Thank you very much, Mr. Stevenson.[1]

I think that you probably have, in one section of your testimony, I think, focused in on just exactly what the major difference is and that is on the question of sale. I think the other problems can be remedied rather easily.

I think the biggest hang-up, as I see it, is whether or not sale should be proscribed, and if so, under what circumstances. I wonder if I can just walk you through some basics on which I am operating and maybe you can assist me in seeing where I am in error on any of the premises upon which I have based my conclusions thus far. That is one of the purposes of the hearings in any event.

One of the premises upon which I operate is that dealers, licensed dealers, have a duty to know what they are selling. Is that an unfair assumption on my part?

Mr. STEVENSON. I am not sure, Mr. Chairman, I understand what you mean by "duty." I think a lot of the ammunition that is sold may not be readily identified by the dealers. There are 240,000 licensed firearms dealers. Not all sell ammunition, but perhaps a lot of them do. It involves clerks and others who may be accepting shipments of ammunition and just routinely placing it on the shelves for purchase.

You also have a lot of "military surplus" ammunition that may or may not be readily identified and sold perhaps loosely at so much per round.

Mr. HUGHES. Generally speaking, we hold any merchant accountable for what they sell. Anyone in the business of selling merchandise or services is presumed to know what the merchandise is that they are trafficking in. That is a basic principle upon which we operate and I would find it hard to believe that ammunition, which has some additional risk involved——

Mr. STEVENSON. I think their concern would be for liability. Would they be sued because of defective ammunition or something like that. Apparently that has not been a problem from their perspective. Defective ammunition—I don't think they really know the nature of the ammunition beyond——

Mr. HUGHES. I would think that they would be held strictly accountable. I mean, if you sell something and it, in fact, is not marketable or merchantable, generally speaking, you know, you are held accountable for any damage it causes. You are presumed to know the nature of what you are selling; whether or not it can be used for the purposes for which it is sold.

But certainly you would agree that this is probably one of the most highly regulated industries in Government. We talk about firearms and ammunition; it is fairly severely regulated.

Mr. STEVENSON. There are regulations dealing with the manufacture of the ammunition, cartridge designations and things of that nature, but for the cartridge itself, often the markings are not too clear or readily understandable by the purchaser or the seller.

Mr. HUGHES. Let's work on the assumption that a dealer doesn't know what is in, for instance, an ammunition bin that might have a lot of ammunition. I understand that is not an unusual practice. I would assume that at one time or another that ammunition was

48

acquired by that dealer and a record kept of the source of that ammunition.

Mr. STEVENSON. Yes.

Mr. HUGHES. In fact, you require it by regulation, the regulation I cited to Mr. Biaggi. I would assume, also, that it is not very difficult for the ATF to determine what is a solid projectile containing the alloys that are mentioned in the legislation. That is something you can identify.

Mr. STEVENSON. Yes. If you have——

Mr. HUGHES. You could identify that, I would assume, by manufacturer, by type, by caliber. Am I incorrect?

Mr. STEVENSON. Well, I am not sure exactly to what extent. They would have to take the cartridge apart to analyze the bullet. They may not be able to tell too much about the powder. There may be some head stamps which they can identify or there may not. There is some question about some of the obscure ammunition that is produced in the world and has been imported into the United States.

It is not as clearly defined for some ammunition as it might be for others. For example, a box of Remington ammunition may have a number stamped on it. That could be readily traced and identified. Others may not.

Mr. HUGHES. We can work on the assumption that ammunition already in boxes should not present a problem, should it?

Mr. STEVENSON. I am advised that some ammunition bought in bulk was repacked by the distributor with different kinds of boxes. It may or may not have marks that are appropriate or identifiable.

Mr. HUGHES. Is that identifiable by ATF?

Mr. STEVENSON. I will ask Ed Owen to address that question.

Mr. OWEN. Mr. Chairman, part of the problem—I think we have talked about the Czechoslovakian cartridge for several years. There are basically two different varieties of it; one which has a hard core and another which has a lead core. Externally, the cartridges are basically identical.

When the ammunition was initially imported, a great deal of it was removed from its original military packaging, placed in commercial packaging in this country, so you run the risk or have the problem of having both the hard core projectile and a lead projectile packed in the same box.

Mr. HUGHES. If a dealer has some doubt as to whether or not ammunition is caught up in the ban, would there be—would it be difficult for the dealer to have it analyzed by ATF or by a laboratory to determine the substance contained in the projectile?

Mr. STEVENSON. He could certainly have it analyzed, but he might have to have every round analyzed. Every round destroyed for analysis in order to determine which cores were lead or which were steel.

Mr. HUGHES. That is working under the assumption that it falls in this category you are talking about. How much of that type of ammunition is out there? Do you know?

Mr. STEVENSON. We are talking about 13 million rounds of the Czech ammunition imported, some of which we are now calling armor-piercing and some we are not, but no one knows how much is out there, how much is left.

49

Mr. HUGHES. My difficulty with your position is that it is going to be difficult for us to ban it and, at the same time, give notice to the dealer that that ammunition is caught up in the ban.

In essence your alternative is to not ban the sale of that ammunition. I mean, that is your alternative.

Mr. STEVENSON. Yes, we are working with a prospective ban on ammunition that can be readily identified because of——

Mr. HUGHES. A prospective ban, I would say, Mr. Stevenson, is rather nominal because if, in fact, you ban the manufacture and you have already banned the importation of that type of ammunition, then I think we have to work on the assumption that since we already have voluntary restraints, there isn't going to be very much of that type of ammunition which is caught up in the sale.

The problem, once again, is not with the manufacture prospectively because we are satisfied that between the voluntary constraints and what this committee is going to be doing, that we are going to ban manufacture. The problem is with ammunition that has already been manufactured, that is out there on the shelves.

Let me back you up a little further. Although we can't tell how much ammunition we are talking about—and I assume that is the case—we just don't know how much ammunition of this type is on the shelves. Is that a fair assumption?

Mr. STEVENSON. Yes, we assume a very limited amount, but no one knows. That is correct.

Mr. HUGHES. When you say limited amount, you know, it could be 10,000 rounds; it could be 100,000 rounds. It could be 2 million rounds, for all we know. Isn't that correct?

Mr. STEVENSON. That is correct.

Mr. HUGHES. Now, we do agree that this ammunition does have the capacity to pierce body armor. I mean, that is why we call it armor piercing. There is no question about that. It has that capacity.

Mr. STEVENSON. If I could interject, Mr. Chairman, some of this ammunition with the steel core will penetrate soft body armor; some will not, and it does tend to be very erratic due to it's age.

Mr. HUGHES. The body armor—the ammunition that will pierce obviously does have the capacity to kill. Is it a fair assumption to suggest that it only takes actually just one round of that ammunition to kill one police officer?

Mr. STEVENSON. Presumably.

Mr. HUGHES. What do you mean "presumably"? Is there any question about that?

Mr. STEVENSON. No, sir. If the vest is penetrated and the bullet penetrates a vital organ, obviously death will ensue.

Mr. HUGHES. So the next question is: If that is the case, and the ammunition really has little sporting value, shouldn't we be making every effort to try to prevent the transfer of that ammunition? I mean, if we save one life, one life, will that not be worth the effort? In view of the fact that it has so little—I mean, the ammunition has so little value aside from piercing armor, has no sporting value, nobody quarrels with that—if we can save one life, isn't that worth the effort? I mean, that is the central issue because I think once we answer that, then we can deal with how we are going to arrive at a just result.

50

Would you agree that that is the central issue?

Mr. STEVENSON. The central issue is saving the lives of police-men, yes, sir, I would agree. We struggled with this question for some time, as you know, as we all have. If we can come up with a good viable alternative, we are certainly willing to consider it.

Mr. HUGHES. There is a viable alternative. See, we are worried now about the possibility of some dealer not understanding your notice, not taking the time and the effort to try to determine what he has in inventory, to see whether it falls within proscription, we are concerned about that and what we are going to do is—we have decided that we are going to let that outweigh the factor that if we don't attempt to ban the transfer and get this ammunition out of the hands of felons—the potential for getting in the hands of felons, that we could save some lives.

Isn't that the major issue?

Mr. STEVENSON. Yes, sir.

Mr. HUGHES. Your remedy is to give up on the effort to try to, in fact, prevent that transfer. Your remedy—as I say, "we won't deal with the transfer of that ammunition that is already on the shelves," and yet that is what presents the greatest risk to the law enforcement community. It is not the manufacturers that are going to be manufacturing this ammunition prospectively or the sale of that ammunition; that is not the major risk. The risk is from the ammunition that already exists in inventory.

Mr. STEVENSON. Very little of this is turning up in crime, Mr. Chairman. There have been no police fatalities with the Czech ammunition; fatalities of police officers wearing the protective clothing.

Mr. HUGHES. We could have had police fatalities at San Diego. Mr. Huberty fired almost 200 rounds of armor-piercing ammunition. Thank God no police officer arrived early—even with body armor because it wouldn't have protected him. How many fatalities do we have to have before we, in fact, admit that there is a problem? I mean, that is the point.

Mr. STEVENSON. Hopefully zero.

Mr. HUGHES. That is precisely what we are trying to get at.

The gentleman from Florida.

Mr. MCCOLLUM. Thank you, Mr. Chairman. I appreciate very much your testimony today, Mr. Stevenson. I had read it, as you may have noted, before you testified and I found it to be very interesting and I think very important.

As I have said to other witnesses, I come to this very openmindedly with regard to the details of what legislation we pass and from reading your testimony and listening to Mr. Biaggi, it occurred to me that there might be some grounds for a compromise of sorts. Of course, that assumes that there would be some willingness on the part of the administration to allow us to prohibit the sale in some way or another of those rounds of ammunition that might still be on the shelf if they are somewhere, which Mr. Biaggi obviously sincerely believes that there is and there are.

That occurred to me that using your language, or something similar to it, you have got "willfully transfers" in here. Perhaps knowingly and/or recklessly or something like that, putting that in and making that kind of modification, that kind of change in the

51

H.R. 4 without limiting it to newly manufactured bullets and allowing the ones that are already out there to be covered by it. We might really do what you are attempting to do and really concerned about doing and that is to protect the truly innocent dealer who doesn't know this.

I know this is probably something that you either have kicked around or else you haven't thought about a lot, but would you consider something like that?

Mr. STEVENSON. We certainly would discuss it and would be glad to talk to you about this. The element "willful" that we are talking about here also includes knowing.

Mr. McCOLLUM. Sure.

Mr. STEVENSON. The question, of course, goes back to the retroactivity of the language that we are talking about, the crux of the difference we have, which brings the same problems back into focus.

We would certainly be glad to talk to you about it.

Mr. McCOLLUM. I would very much like for you to because that—the prior knowledge is the key thing that I see in this particular case.

I have read what you have testified to in formal testimony and listened to what you have said in the answer to Mr. Hughes' question. It seems to me that the point is being made pretty clearly by you that if I am a gun dealer, I may be just as knowledgeable as I possibly can be about bullets and guns and still physically, because of the nature of some manufacturers of some bullets, particularly overseas, not be able to distinguish and know that a particular bullet is armor-piercing unless it is taken to the lab and analyzed.

Is that correct?

Mr. STEVENSON. That is correct.

Mr. McCOLLUM. So, unless the package is marked very clearly, or unless the actual bullet has something on it that tells me that, if it is just in a plain casing that looks like any other plain old casing, I am not going to be able to look at that bullet and tell that it is an armor-piercing bullet, is that correct?

Mr. STEVENSON. That is correct. A case in point is the KTW cartridge which has a Remington case. The cartridge itself is composed of four components: the bullet; the powder; the primer which detonates the powder and the cartridge case, which holds it all together, and KTW, as well as some others, use commercially manufactured cases to assemble their rounds.

The only way you recognize this as a KTW is because it has the apple green Teflon coating. If a manufacturer were to make one with the usual bullet configuration and didn't coat it or paint it, it might look like a regular full metal case bullet, or a military round, for example, or a common commercial round. Then you will begin to have trouble with the average seller knowing exactly what he has, unless it is designated.

We are proposing, by the way, the marking of cartridges, or marking projectiles and boxes. We are considering requiring that a black paint be put on the tip, which is the usual NATO and military designation of armor-piercing, along with some notification on the cartridge box that sale of this ammunition is regulated and punishable by penalties, prohibited by law.

52

Mr. McCollum. You have also indicated that you think that there should be some regulation or some requirement, maybe even in the statute, of regulation for the marking of armor-piercing projectile boxes and so forth.

Mr. Stevenson. That is right.

Mr. McCollum. It is not required now, I guess.

Mr. Stevenson. The language that we are suggesting would require—would permit the Secretary, by regulation, to make those designations as to marking.

Mr. McCollum. The Secretary does not presently make those designations?

Mr. Stevenson. I believe he does not have the authority, in our opinion.

Mr. McCollum. He doesn't have the authority to do that?

Mr. Stevenson. Not at this point, no.

Mr. McCollum. So, since he doesn't have the authority, he doesn't do it and it isn't being done. All right. Nobody is doing it. I mean——

Mr. Stevenson. Well, some—no, not generally. However, it is common to come across black-tipped cartridges which indicate armor-piercing ammunition. Generally they are military rounds, often sold as surplus.

Mr. McCollum. I think it is important, as I understand it, under anybody's legislation here, Biaggi's or the administration's or anybody's, there would be still armor-piercing bullets produced for certain purposes.

Mr. Stevenson. The military would produce armor-piercing bullets, as they have for many years.

Mr. McCollum. So we would want markings very clearly on those that are being produced as best we can to protect everybody, I would think. So your request for that kind of relief seems very logical to me.

One last area I would like to explore with you is the distinction of the definition that you make between the Biaggi bill and the administration or the Brooks bill. I read that; I listened to that when you said it, and I am still not too sure that I understand it. The conclusion I understand, but I am not too sure how the language fits into this.

As I understand it, what I do understand is that, in your opinion, under the Biaggi bill, could be the possiblity that a not-yet-put-together projectile wouldn't be banned.

Mr. Stevenson. Yes. I think H.R. 4 regulates ammunition or the cartridge itself. Ours goes beyond that and regulates the projectile so that you could not have commerce of projectiles only for yet-to-be-assembled cartridges.

Mr. McCollum. Maybe that is a little ignorance on my part. I didn't come from a law enforcement background. What is the difference between a cartridge and a projectile?

Mr. Stevenson. The cartridge is the whole thing, the bullet, the powder, the primer and the cartridge case. The bullet or the projectile is one element. That is what leaves the end of the barrel.

Mr. McCollum. Just the tip. Yes, OK, I follow you. I can see the distinction.

53

Thank you very much, your testimony has been very enlighten-
ing.

Mr. STEVENSON. Thank you, sir.

Mr. HUGHES. Mr. Stevenson, what is the purpose of section
178.125 of the Code of Federal Regulations, requiring licensed deal-
ers to keep a record of receipt and disposition of ammunition?
What is the rationale for that?

Mr. STEVENSON. Let me ask Jack Patterson to answer that ques-
tion.

Mr. HUGHES. Mr. Patterson.

Mr. PATTERSON. Section 178.125 implements the provision of the
Gun Control Act, section 923(g) of title 18 of the United States
Code, which provides that there shall be a record kept by licensed
manufacturers, importers and dealers of their acquisition and dis-
position of firearms and ammunition.

Mr. HUGHES. It seems to me that inherent in the purpose is to
require licensed dealers to know the ammunition that they receive.
Isn't that inherent in that requirement, recordkeeping, to segre-
gate it, to keep a record of it? I mean, if you don't keep a record of
what you have, how can you keep a record of what you dispose of?
Isn't that inherent in that?

Mr. PATTERSON. Certainly it is, and the recordkeeping require-
ments pertain to handgun ammunition and ammunition that is
interchangeable between handguns and long guns. It does not per-
tain to ammunition for long guns or .22 caliber rim fire. Liscensed
dealers are required to keep a record identifying ammunition by
name if the manufacturer, caliber, or gauge, quantity sold, and in-
formation identifying the purchaser.

Mr. HUGHES. But bear with me, the rational for the section is to
require a record of receipt and disposition but if that ammunition
is commingled, how can they comply with that section of the stat-
ute or the regulation?

Mr. STEVENSON. I think, Mr. Chairman, that the various ammu-
nition is recorded as so many rounds of 38 special, so many rounds
of 9 millimeter. I think this was part of the 1968 Gun Act and pri-
marily intended to identify the purchasers of ammunition.

Mr. HUGHES. I read the regulation to require that they have got
to keep a record of the specific ammunition, manufacturer, the
gauge or caliber, the quantity when it comes in and when it leaves
the shop.

Mr. STEVENSON. Yes, sir.

Mr. HUGHES. Now, if it is commingled, how can they, in fact,
keep a record of what is disposed of? They don't know the ammuni-
tion that they are disposing of.

Mr. STEVENSON. I am not sure what you mean by "commin-
gling," Mr. Chairman.

Mr. HUGHES. Well, if it is thrown into a bin with a lot of other
ammunition. One of the suggestions is it is repackaged or it is
thrown into an ammunition bin and it is sold in odd lots and I
must concede, I had never heard that before and it may not even
be accurate that that is a practice. It may not be a practice, I am
not sure, but it has been suggested to me that that happens and
that dealers end up sometimes with lots and they are not sure just
exactly who the manufacturer was, the type of ammunition.