Mr. STEVENSON. I am told the existing law doesn't preclude the commingling. I would think the designation on the record may be by so many rounds of this caliber and so many rounds of another, but usually the lots or the bins are pretty much uniform in what they have. It may be uniform from bin to bin, for example, or from lot to lot.

So the purchaser of 50 rounds of 9 millimeter would probably end up with the same kind for all 50 rounds, but when he goes back a week from now, it may be something similar but different.

Mr. HUGHES. How could you determine at any given time whether or not the records are accurate if the dealer can't identify the ammunition that was acquired from a particular manufacturer that he had in inventory?

Mr. STEVENSON. There is some question about the accuracy of the gun-dealer records. Primarily, the reason for this requirement was the identification of the purchaser of the ammunition rather than the exact types or manufacture of the ammunition sold to him.

I would guess that most of the records are accurate, but as to the total accuracy, there might be some question.

Mr. HUGHES. We don't know that because we don't really do very much inspecting these days, do we? You are probably lucky if you inspect a dealer once in 12, 15 years at this point. It is just incomprehensible to me that you wouldn't require, at the very least, that the dealer have knowledge of exactly what he bought or imported, and what he sold and be able to trace that and segregate it in the shop as part of inventory.

I don't know how, you know, in the world you are being provided with any information that would be entirely useful if you didn't at least require that at a minimum. Working on the assumption that that is the case, what would be wrong with ATF identifying a particular type of manufacturer, particular type of gauge, particular type of ammunition, describing it and alerting the dealers to the fact that this ammunition is now banned. Any question about it—if you have ammunition and you are not sure whether or not you fit within this ban, contact one of our regional offices.

Why wouldn't that be a feasible way to deal with that ammunition? Apparently dealers don't know what they have; they don't know what they are selling and they want to be good law-abiding citizens—and I presume they all do—and obviously they don't want their licenses suspended or revoked.

Mr. STEVENSON. I think at this——

Mr. HUGHES. Why couldn't that service be provided?

Mr. STEVENSON. Absent the legislation, it might be difficult for us to do that, or to have the authority to do it.

Mr. HUGHES. You are in the right place. We can pass the legislation to do that.

Mr. STEVENSON. If the legislation were passed, I assume we would have to find some way to do it, and do it the best way possible, but as we indicate, there are problems in this that we see down the road.

Mr. HUGHES. You know, I am not so sure that we can't approach the problem from a number of angles. I mean, the concern is over revocation. Maybe we ought to be looking at other sanctions. Maybe suspension. Maybe for willful violation for revocation. You

55

know, we have a lot of ways we can go, but I think the central point is that I don't think we should give up just because it might be, somewhat difficult trying to prevent the transfer of this ammunition. If, in fact, we are going to save lives, it is worth the effort, I would think, wouldn't you?

Mr. STEVENSON. If it can be done properly, yes.

Mr. HUGHES. I think the approach that the administration has taken is, "Well, it is difficult to do that so what we are going to do is we are going to prospectively ban the sale." You know, that is not going to reach the ammunition that presents the real risk to police officers. It is that ammunition that is already in inventory.

I think some of the other suggestions you made are very positive. I think the suggestion that we write into the legislation authorizing language to enable you to identify in some way, by color or otherwise, armor-piercing ammunition is a very positive, constructive suggestion and that sounds like something that we can certainly do. But it doesn't get back to the central problem dealing with the sale or transfer of that ammunition that is already there; that is not going to be manufactured prospectively.

Well, in any event, the gentleman from Florida.

Mr. McCOLLUM. I just wanted to ask one more question or let you think about it a little bit. It has occurred to me, because I am an old civil trial lawyer, that the term "projectile," while meaning something as a word of art in the world of ammunition, means a variety of things in terms of the general use of the English language. For example, when I was practicing trial law, I can recall vividly a case in which a young girl was seated in a car and a large mowing machine was coming along in an open field beside the car and picked up a bolt and threw it through her eye. Throughout the trial, and, in fact, in all of the proceedings, the bolt was referred to as a projectile.

I don't know enough about this to be certain of myself, but perhaps there is some definition in law I am not familiar with, but in the administration's bill, it says: "The term 'armor-piercing ammunition' means solid projectiles or projectile cores constructed from" and I am wondering if that wouldn't be broader than, perhaps, you want to ban.

Mr. STEVENSON. This is referring to projectile, which, for purpose of the 1968 Gun Control Act and the regulations, constitutes ammunition. Ammunition is defined to include bullets, among other things designed for use in any firearm.

Mr. McCOLLUM. OK, as long as that is really clear. In the 1968 Gun Act, it does cover a projectile.

That is all I wanted to ask. I am not always familiar with every source of where you get these definitions, so I want to be perfectly clear we weren't doing something more broadly if we adopted your definition.

Thank you. I have no further questions, Mr. Chairman.

Mr. HUGHES. I just want to, before you leave, just make a couple observations.

I was a trial practitioner for a number of years before I came to the Congress, in addition to being a prosecutor. I wouldn't want to be a dealer that sold armor-piercing ammunition to a citizen, not knowing what I sold. I would like to be the plaintiff in a case

against such a dealer. I just find it incomprehensible that anybody in the business of selling ammunition doesn't know exactly what they are selling. I take it at face value that there are dealers who don't know what kind of ammunition they are selling, and that they are selling it at their peril. That is the first observation that I make.

The second observation I would like to make is that I don't think that ATF is fulfilling its responsibility to the public under the law when it doesn't make sure that dealers know exactly what they are selling; that they are maintaining the ammunition that they import or that they acquire from wholesalers and others; keep that information intact so that when they dispose of it, they can identify for an ATF agent when they come in to look at the records what ammunition has come in, what has been sold and indicate what is in inventory.

If they can't identify that ammunition, in my judgment they are not fulfilling their duty and ATF is not fulfilling its duty under the statute because, as I read the statute, inherent in the recordkeeping is the requirement that they do, in fact, keep that information. So I just hope that out of this will come some better practices so that we can protect the public and the dealer from charges because of the inability to identify what they are actually selling.

Mr. Stevenson, thank you. I don't want to be entirely negative. I think the steps that the administration have made are very positive ones. I welcome the testimony today because it does demonstrate to me that the administration does recognize that there are other problems besides the banning of manufacture. That is what it suggests to me, so we look forward to working with you to see if we can't fashion legislation that will address some of these other concerns.

Thank you very much.

Mr. STEVENSON. Thank you, Mr. Chairman.

Mr. HUGHES. The next witnesses are a panel representing the major national association of law enforcement personnel. At this time, I would like to welcome Mr. David Green, chief of police, of Sioux Falls, SD, on behalf of the Fraternal Order of Police; Mr. John J. Norton, chief of police, of Parkersburg, WV, first vice president of the International Association of Chiefs of Police; Mr. Edward Murphy, legislative counsel, the International Brotherhood of Police Officers; Mr. David Baker, treasurer of the International Union of Police Associations; Mr. Ira Lechner, legislative counsel, National Association of Police Organizations; Sergeant Michael Muth, who is substituting for Lieutenant Tom Carr, the Maryland State Police, representing the National Troopers Association; and Mr. David Konstantin, Research Associate, Police Executive Research Forum.

Gentlemen, welcome, on behalf of the Subcommittee on Crime. I note that all of you have extensive and distinguished experience in law enforcement and in the service of your profession. I am going to, without objection, insert into the record the distinguished years of service that each of you have had in public life. It is just so extensive that we would take another hour trying to describe your respective backgrounds.

[The information follows:]

**57**

Biographical data

DAVID F. GREEN
Sioux Falls, South Dakota

David F. Green is the Chief of Police in Sioux Falls, SD.   Born in Sioux
Falls November 13, 1935, he received his B.A. degree Summa Cum Laude from
Augustana College in Sioux Falls, and has done graduate work in Public
Administration at the University of South Dakota.

Chief Green joined the Sioux Falls Police Department in 1958 and worked
his way through the ranks until being appointed as Chief of Police in
1982.   He is a graduate of a number of law enforcement schools, including
the FBI National Academy in Quantico, Virginia (where he was awarded the
J. Edgar Hoover Award for Scholastic Excellence), the Bureau of Narcotics
School in Washington, D.C. and the Juvenile Officer's Institute at the
University of Minnesota.   Chief Green served eight years with the U.S.
Navy Reserve.

Chief Green has served on a number of local, state and national boards and
committees including VOLUNTEER: The National Center for Citizen Involvement
in Washington, D.C., and the Fraternal Order of Police, where he was a
member of the national board for thirteen years, with four of these as
Chairman of the Board of Trustees.  He currently serves as a special advisor
to the National President of the FOP.  Chief Green has been selected for
the 20th Edition of Who's Who in the Midwest.

Chief Green is married to the former Renata Kapperman, and is the father of
three grown children, Toby, a graduate of the U.S. Military Academy at West
Point who is serving with the U.S. Army in Hawaii, Tom, who is serving with
the U.S. Army at the Presidio of Monterey, California, and Tony, who is in
private business in Las Vegas, Nevada.

**58**

### JOHN J. NORTON

John J. Norton is the Chief of Police for the Parkersburg, West Virginia, Police Department. He is the former Chief of Police for the Foster City, California, Police Department and formerly served with the San Jose and San Francisco, California Police Departments, and as a special agent, Federal Bureau of Investigation, and most recently as Chief of Police of the California State Police.

Chief Norton received a B.A. at San Jose State, an MPA from the University of Southern California, and holds the Police Executive Certificate.

Chief Norton is the First Vice President of the International Association of Chiefs of Police and Past President of the California Police Chiefs Association, the California Peace Officers Association, the San Mateo County Police Chiefs Association, of the San Francisco Bay Counties Peace Officers Association, of the San Francisco Bay Area Law Enforcement/Security Liaison Group, and of the San Francisco Bay Area Society of Former FBI Agents.

As a Marine officer in Vietnam, he received the Navy Cross for Heroism during the 1968 TET Offensive, together with several bronze stars and purple hearts and has been subsequently promoted to Lieutenant Colonel. A former judo champion, he holds the second degree black belt, and he recently received medals in judo and swimming in the Police Olympics.

59

BIOGRAPHY EDWARD L. MURPHY  - LEGISLATIVE COUNSEL
OF THE NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES


Edward L. Murphy is an 1975 graduate from Boston College.
In 1979 he graduated from Suffolk University Law School.
During the years 1979 to through 1982 he served as staff
counsel to the International Brotherhood of Police Officers in
Boston, Massachusetts.  From 1983 to present he has served as
legislative Counsel to the United States Congress for the
National Association of Government Employees (AFL-CIO) of
which the International Brotherhood of Police Officers is a
part.

He is admitted to the Massachusetts and Federal District
Court Bar.  He is a member of the Labor, and Administrative
Sections of the American Bar Association and is a member of
the Society of Federal Labor Relations Professionals.

60

 **INTERNATIONAL UNION OF POLICE ASSOCIATIONS AFL-CIO**

*THE ONLY UNION FOR LAW ENFORCEMENT OFFICERS*

National Headquarters ● 815 16th Street, N.W. ● #307 ● Washington, D.C 20006 ● (202) 628-2740

Robert B. Kliesmet
*President*

David E. Baker
*Secretary-Treasurer*

BIOGRAPHY
DAVID E. BAKER
SECRETARY-TREASURER
INTERNATIONAL UNION OF POLICE ASSOCIATIONS

David E. Baker was elected Secretary-Treasurer of the International Union of Police Associations in July, 1982. The I.U.P.A., with 16,000 members in 29 states in every region of the U.S., was chartered by the AFL-CIO as the first solely police union in 1979.

Due to his outstanding record of achievement at the grassroots level of the police union movement, Mr. Baker quickly rose to national prominence in the I.U.P.A. He organized the Memphis Police Local Union in 1973 and was elected its first President. He subsequently bargained the first contract for the Memphis union, and in 1978 led the union in its first strike -- also the first major city police strike in the South.

Shortly after becoming President of the Memphis police local, Mr. Baker was elected in 1973 to the national board of the International Conference of Police Associations, the predecessor organization of the I.U.P.A.

In 1981, Mr. Baker was elected Vice President of I.U.P.A. He currently serves on the Steering Committee of the National Crime Prevention Association and is Secretary-Treasurer of the Institute for Police Research. In addition, he has been a lecturer at Memphis State University.

He currently resides in Springfield, Virginia with his family.

*AFFILIATED WITH THE PUBLIC EMPLOYEE DEPARTMENT, AFL-CIO*

## 61

## BIOGRAPHICAL SKETCH

David N. Konstantin is a Research Associate with the Police Executive Research Forum in Washington, D.C. He is currently Project Director of the Forum's Crime Classification System. Mr. Konstantin received his B.A. in Sociology from the University of Connecticut and his M.S. in Justice from the American University.

61-780 O - 86 - 3

62

Mr. HUGHES. We also have your statements which will be made a part of the record in full and we hope that you can summarize for us.

I understand that Tom Doyle cannot testify on behalf of the Federal Law Enforcement Officers Association. He is a 14-year veteran with Secret Service and is on the Vice President's personal detail this afternoon. His statement, likewise, will be made a part of the record in full.

[The statement of Mr. Doyle follows:]

63

 **Federal Law Enforcement
Officers Association**

170 Old Country Road - Suite 310
Mineola, N.Y. 11501
(516) 248-1355

**DATE:**

**CONTACT:**

TESTIMONY BY

THOMAS W. DOYLE

FLEOA NATIONAL EXECUTIVE VICE PRESIDENT &

LEGISLATIVE CO-CHAIRMAN

BEFORE THE

U.S. HOUSE OF REPRESENTATIVES'

COMMITTEE ON THE JUDICIARY

ON

H.R. 4

MAY 8, 1985

**"A Professional Association for Federal Law Enforcement Officers"**

**64**

My name is Thomas W. Doyle.  I am the National Executive Vice-
President of the Federal Law Enforcement Officers Association
and its Legislative Co-Chairman.  I wish to thank the House
Committee on the Judiciary for the opportunity to testify on
H.R.4. Such legislation is absolutely vital to those in public
safety involved in straight law enforcement and protective
duties.  Passage of H.R. 4 would benefit not only federal officers,
but state, county and local law enforcement as well.

Let me state from the outset that the Federal Law Enforcement
Officers Association, representing some 6000 men and women
from 26 federal agencies, fully endorses H.R. 4.  We believe
the bill is an important first step in ridding the country of
armor piercing ammunition, ammunition which serves no useful
purpose to the lawful sportsman or gun collector.  The ban on
manufacture and importation of such ammunition is both practical
and enforceable.  More importantly, the bill provides sanctions
for those who knowingly sell armor  piercing ammunition illegally.

According to Treasury Department estimates, armor piercing
ammunition constitutes less than 1 percent of the some 200,000,000
rounds of ammunition currently available for sale in the United
States.  But even 1 percent of 200,000,000 means that as many
as 2-million "cop killer" bullets are waiting for purchasers in
the American marketplace.  With law enforcement facing rising
violence from criminals and right and left-wing extremists,
2-million rounds is just too many to be out there.

**65**

-2-

It is also true that many legitimate gun  dealers, today,
may be unaware that a round they are offering for sale is defined
as an armor piercing round.  To counter this the bill appropriately
offers all dealers notice of the ammunition covered by the
definition of armor piercing ammunition.  It also states
quite specifically who are legitimate purchasers for the
armor rounds dealers currently hold in stock -- eg.
military, police, and other government agencies who use
such rounds for testing and research.

Our position on this piece of legislation has been developed
after much thought and discussion within FLEOA and between FLEOA
and our colleague organizations.  On January 10, 1985,
FLEOA National President Robert E. Van Etten joined the Presidents,
Chairmen and Executive Directors of the International Brotherhood
of Police Officers, the International Association of Chiefs
of Police, the International Union of Police Associations,
the National Association of Police Organizations, the
National Sheriffs Association, the National Troopers Coalition,
the Police Executive Research Forum and the United Federation
of Police  in urging President Reagan to support the "Law
Enforcement Officers Protection Act of 1985.  Our support has
not lessened since that time.

H.R. 4 has managed to overcome the definitional problems as to

**66**

-3-

what constitutes an armor piercing bullet.  It is substantially
the same ban on manufacture and importation that the Administration
and the gun lobby agreed upon last year.  It includes safeguards
to insure that the ban on sale does not arbitrarily and capriciously
injure legitimate dealers.  Because of this we in the Federal
Law Enforcement Officers Association believe H.R. 4 is a bill
whose time for passage has arrived.  We urge this Committee to
swiftly move it forward to passage.


Thank you.


♦ ♦ ♦

67

Mr. HUGHES. I want to welcome you on behalf of the committee. Why don't we start with you, Mr. David Green, chief of police of Sioux Falls, SD.

Mr. Green.

**STATEMENTS OF DAVID GREEN, CHIEF OF POLICE, SIOUX FALLS, SD, ON BEHALF OF THE FRATERNAL ORDER OF POLICE; JOHN J. NORTON, CHIEF OF POLICE, PARKERSBURG, WV, FIRST VICE PRESIDENT OF THE INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE; EDWARD MURPHY, LEGISLATIVE COUNSEL, INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS; DAVID BAKER, TREASURER, INTERNATIONAL UNION OF POLICE ASSOCIATIONS; IRA LECHNER, LEGISLATIVE ADVISER, NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS; MICHAEL D. MUTH, MARYLAND STATE POLICE, REPRESENTING THE NATIONAL TROOPERS COALITION; AND DAVID KONSTANTIN, RESEARCH ASSOCIATE, POLICE EXECUTIVE RESEARCH FORUM**

Mr. GREEN. Thank you, Mr. Chairman.

I testify on behalf of the Fraternal Order of Police, which is a national police organization with over 170,000 members in the United States, but in addition to my police role, I am also an avid outdoorsman, hunter, and shooter. I am a member of the National Rifle Association, a certified firearms instructor with them, and I support that organization. I want to make it clear that I am not an antigun person and have consistently opposed legislation which unduly restricts the rights of responsible firearms owners. I think you would find that position representative of the members of our organization.

Yet we support H.R. 4, which regulates the manufacture and importation and also the sale of armor-piercing ammunition. We see this legislation as increasing the safety of police officers and others without hampering legitimate use of ammunition by sportsmen, target shooters, the police, or the military.

As has been discussed, the police officers and agencies have begun in the past few years equipping themselves with soft protective body armor, which are lightweight garments which can sustain an impact from a significant share of the firearms which police officers commonly encounter. We supply them in our department to any officer who requests them, and there is good reason for it. There have been in the past 15 years 80 to 134 law enforcement officers killed each year in the line of duty. In fact, I just came here from the funeral of a South Dakota highway patrolman who was killed this past week in the line of duty.

These particular devices we are talking about—the protective body armors—help a great deal and have saved many lives, but they are not a panacea because there are weapons of sufficient power that they will penetrate these vests. But more importantly, there is ammunition available which, when fired in firearms which with conventional ammunition would not pose the threat, do pose the threat, and it is this specific ammunition, of course, that we are concerned about with this legislation.

68

The ammunition we are talking about here is specialized armor-piercing ammunition and it has no other practical use. One would be hard-pressed to explain to any police officer the need any sportsman or target shooter would have for this ammunition.

The major distinction that has been discussed between the two bills being considered here today is that H.R. 4 includes limiting the sale of such ammunition and this purportedly puts America's firearms dealers in jeopardy. However, I note that a letter recently distributed to Members of Congress by the National Rifle Association, in opposition to H.R. 4 states, and I quote: "Some Federal firearms dealers used to stock this ammunition for purchase by police officers upon showing of identification. However, even this is no longer the case."

This suggests to me that the existing stocks are rather limited and if that is the case, then I feel that H.R. 4 has adequate notification provisions to deal with the limited existing stock that is there. I certainly concur with comments made earlier that a dealer should know what he is selling when he is selling ammunition.

In conclusion, let me say that as a shooter and a firearms owner, I perceive no threat to my legitimate ownership and use of firearms or ammunition in this bill and as a police officer, I see a potential reduction of death and injury to men and women engaged in a very dangerous occupation.

I think it needs to be highlighted that this ammunition isn't only a hazard to law enforcement officers, it is a hazard to the President and to Congressmen and to the fellow next door to you.

Finally, as a citizen, I see in this legislation the proper exercise of the legislative function, and that is the promotion of order and safety in our Nation without undue restriction of individual rights. So on behalf of the Fraternal Order of Police, we support this bill and would urge its favorable consideration.

[The statement of Mr. Green follows:]

**69**

Testimony of

DAVID F. GREEN
FRATERNAL ORDER OF POLICE

before the

U. S. House of Representatives
JUDICIARY SUBCOMMITTEE ON CRIME

May 8, 1985

70

My name is David F. Green, and I am the Chief of Police in Sioux Falls, South Dakota. I testify today on behalf of the Fraternal Order of Police, which is a national police organization with over 170,000 members throughout the United States. The Fraternal Order of Police has been actively concerned with this legislation for over ten years.

In addition to my police role, I am an avid outdoorsman, hunter and shooter. I've been a member of the National Rifle Association for twenty-five years, and I'm an NRA Certified Police Firearms Instructor. I support that organization. I also reload ammunition, have competed in both conventional and muzzle-loader target matches, and currently hold a department marksmanship rating of Distinguished Expert. I am not an anti-gun person, and I have consistently opposed legislation which unduly restricts the rights of responsible firearms owners.

Yet I speak in support of HR-4, regulating the manufacture, importation and sale of certain armor-piercing ammunition. The effect of this legislation is to increase the safety of police officers and others, without hampering legitimate use of ammunition by sportsmen, target shooters, the police or the military.

Several years ago police officers and agencies began equipping themselves with soft protective body armor--lightweight garments which have the ability to sustain an impact from a significant share of the firearms police officers commonly face. Our department supplies them to any of our officers who request them. There is good reason for such caution. Over the past fifteen years, eighty to one-hundred thirty-four law enforcement officers have been killed each year in the line of duty. Many officers' lives have been spared because they were wearing such protective garments when attacked. But while the protective devices we speak of help, they are admittedly not a panacea. Some weapons are of sufficient power that their projectiles can penetrate these garments. Moreover, specialized bullets are currently available which can penetrate such soft armor, even when fired from weapons which, with conventional ammunition, would not pose such a threat. It is this specific ammunition which the bill seeks to control.

The Fraternal Order of Police has never supported what is commonly referred to as anti-gun legislation, nor do we advocate in any way the elimination of practical sporting ammunition of any type. The ammunition addressed here involves projectiles which are specialized armor-piercing rounds. They have no other practical use. One would be hard pressed to explain to police officers the use any sportsman or target shooter would have for such ammunition.

Other criticisms have been leveled at this legislation. One objection is that it includes the sale of such ammunition. This purportedly puts America's firearms

Page Two

dealers in jeopardy. However, I note that a letter recently distributed to members of
Congress by the National Rifle Association in opposition to HR-4 states, "Some federal
firearms dealers used to stock this ammunition for purchase by police officers upon
showing of identification. However, even this is no longer the case." If it's no
longer the case that dealers stock such ammunition, I fail to see the threat this
bill might pose to such dealers.

Another criticism is that it is inappropriate to legislate in regard to inanimate
objects. For over forty years our nation has had laws controlling machine guns and
silencers, as well as other exotic firearms and devices. These are inanimate objects,
but I don't believe any responsible legislature would repeal such regulations. Machine
guns and silencers have no legitimate or conventional use which would outweigh the
dangers they pose. The ammunition HR-4 addresses falls into the same category.
Poisons and explosives are inanimate objects as well. It is absurd to argue that
they should not be regulated.

Finally, it has been suggested that this legislation is a facade.....that baser
motives are involved, and that proponents are merely using the police protection issue
as a vehicle to promote an ultimate goal of restriction or elimination of private
firearms ownership. I have no crystal ball, nor any miraculous powers of insight. I
can only read the words contained in this bill and consider their fair import. I read
no sinister designs in these words. I find only the sensible regulation of a dangerous
and unnecessary projectile.

As a lifelong firearm owner and shooter, I perceive no threat to my legitimate
ownership and use of firearms in this bill. As a police officer, I see a potential
reduction of death and injury to men and women engaged in a dangerous occupation. (And
it should be noted that this type of ammunition isn't just capable of killing law
enforcement officers. It can kill presidents and congressmen, and the fellow next door).
Finally, as a citizen, I see in this legislation the proper exercise of the legislative
function -- the promotion of order and safety in our nation without undue restriction
of individual rights.

On behalf of the thousands upon thousands of police officers in the Fraternal
Order of Police I support this bill, and recommend its favorable consideration by
this committee.

Mr. HUGHES. Thank you very much, Mr. Green.

Mr. Norton.

Mr. NORTON. Thank you, sir.

On behalf of the International Association of Chiefs of Police, I would like to thank you very much and your subcommittee for inviting us to express our association's view on legislation to ban manufacture, importation, and sale of armor-piercing ammunition. The IACP, as you know, is a voluntary professional organization that was established about 100 years ago, composed of chiefs of police that lead and manage some 480,000 police officers in the United States at the Federal, State, and local level.

Throughout our existence, we have striven to achieve proper, conscientious, and resolute law enforcement in the United States and we have been devoted to the steady advancement of our Nation's welfare and well-being. In that regard, today we address the subcommittee on behalf of the chiefs of police and all the police officers in the United States, whose lives are threatened by the availability of bullets that are capable of penetrating soft body armor.

As an organization we have conceptually supported legislation to ban the manufacture, the importation, and sale of bullets since it was first introduced by Mr. Biaggi several years ago. The Congressman is to be commended for his boundless determination to get this legislation enacted into law. We also applaud your efforts, Mr. Hughes, and your subcommittee because you have brought us so close to making that a reality. It has got to come to fruition.

Many issues have been debated and resolved over the years. The definitional issue was resolved last year. Our association supported a compromise bill that prohibited the manufacture and importation of armor-piercing ammunition. Although we did not believe that legislation was as extensive as required, we did support its passage, but, of course, the time ran out and nothing was enacted.

So bullet-proof, or bullet-resistant vests, as was stated before, have been available for some period of time. However, the early versions were bulky, uncomfortable, officers didn't wear them routinely. But the rapid increase in police injuries and deaths during the period from 1960 to 1970 prompted the National Institute of Law Enforcement and Criminal Justice to sponsor a program to develop lightweight body armor which an officer could wear continuously while on duty.

The program was very successful; thus the problem. So it is recognized that in order to produce a vest an officer will wear—and we want them to wear these vests continuously—it is impossible to completely protect them from all threats. In order to aid police agencies in selecting garments that are appropriate for their particular officers, we, in 1978, completed a comprehensive report entitled, "A Ballistic Evaluation of Police Body Armor." In this study, soft body armor was classified according to five threat levels. At each threat level, the bullets and calibers which the armor was capable of protecting against were identified.

Each department could then decide which vests were needed to provide full-time protection against the threat most likely to be faced by its officers. As a result of this research, approximately 50 percent of all law enforcement officers in this country today currently wear bullet-resistant vests.

73

The record since soft body armor came into regular use by law enforcement officers has been impressive. Officer fatalities have been sharply reduced since 1975 when the lightweight vests were first introduced in quantity, even though the assault rate has not been reduced at all.

It is estimated that the vests are credited with saving the lives of more than 700 police officers across the country to date and that is a figure that we think is minimal. We think it is a figure that is in excess of 700.

In addition to members of the law enforcement community, the use of bullet-resistant vests, as the chief before me just mentioned, is being used by politicians, other high-level Government officials and this usage has grown in recent years due to the increasing exposure and the vulnerability to acts of violence.

However, the security that bullet-resistant apparel provides is being violated. A real and immediate threat has been posed to the lives and safety of persons relying on such protective equipment.

I won't get into the Huberty business; we have already discussed that. We can imagine, out of the 245 rounds fired by Huberty, 192 of them being armor-piercing, thank God no police officers were shot there, but if they had been, their vests would have been no match for these bullets at all. I think that, of course, has been pretty well kicked to death.

Unofficial tests have shown that certain calibers of the Teflon-coated KTW bullet can penetrate up to 72 layers of Kevlar. The most popular soft body armor worn by police officers is composed of only 18 layers of Kevlar. In a test conducted by the Los Angeles police of a 38-caliber KTW bullet at a measured velocity of 1,051 feet per second, the bullet penetrated the front panel of the department's body armor and continued through 3½ inches of Duxseal, a substance with a density similar to that of human flesh. So in order to protect themselves against a menace, officers would have to wear extremely bulky and heavy protection, and as experience has shown, these vests would not be worn except in extraordinary circumstances and we want them worn.

Furthermore, in an average police department, the threat normally encountered is very expensive to equip all officers with these types of protection.

Currently, Federal law does not restrict the sale of any type of ammunition, despite the fact that manufacturers of ammunition, specifically designed to penetrate bullet-resistant apparel, claim their bullets are for police and military use only. There has not been any attempt to legally prevent their availability to the public. Indeed, packaging labels on boxes of these rounds are merely a ludicrous ploy to gain market acceptability since no enforcement of the regulation is possible.

Furthermore, these bullets are not used in handguns by law enforcement because of their incredible penetrability and the great risk that they will ricochet and strike an innocent bystander, as well as their lack of stopping power. These bullets have been found unacceptable for use by law enforcement agencies. There is no valid purpose or use for this type of ammunition by law enforcement in the United States.

74

As I have stated previously, significant progress was made during the 98th Congress in resolving definitional problems that have plagued the legislation since its introduction. Instead of attempting to identify the banned bullets by a standard of penetration, the new language more narrowly defines armor-piercing ammunition in terms of its design. This definition avoids the administrative burden of testing every type of ammunition on the market. It also lays to rest the concern that ammunition used for sporting purposes will inadvertently be banned. I believe that the National Rifle Association expressed support for this definition last year.

We are optimistic that during this session of Congress, all other differences will be resolved so that we can finally provide our law enforcement officers with the protection that they deserve. Essentially, what remains at issue is the question of whether the sale of these bullets should be outlawed. We believe that not only must the manufacture and importation of armor-piercing ammunition be controlled, but sales should be limited to Government agencies only, for purpose of export or for purpose of testing and research. That and that alone.

Proposals that do not address the problem of sale deny the law enforcement community a critical element of protection against armor-piercing ammunition. It is argued that there are very few of the offending bullets on the market and that dealers would have difficulty in identifying them.

The number of armor-piercing bullets currently available is irrelevant as far as we are concerned. The availability of just one bullet in the wrong hands would cost a police officer his or her life. If there are so few, then there should be no problem banning the present stock and possibly letting the dealer absorb the insignificant cost if that is such a small number.

With regard to firearms dealers, we do not believe that any problem exists. We are not asking them to analyze every bullet in their shops to determine if they can penetrate soft body armor. Under Mr. Biaggi's proposal, each dealer is to receive written notification from the Bureau of Alcohol, Tobacco, and Firearms telling them exactly which ammunition is marked or designated as banned.

No one wants to prosecute innocent firearms dealers, but we don't want police officers killed either. The record reflects that there have been at least two police officers killed in Broward County, FL, killed by a KTW bullet. No one wants to prosecute innocent firearms dealers. We do want to have prosecuted those few dealers who willfully sell armor-piercing ammunition. It certainly would display willfulness or wanton disregard for the law to sell marked or designated as banned ammunition. We are only asking those dealers to join with us in making these type bullets unavailable.

The International Association of Chiefs of Police can find no legitimate use, either in or out of law enforcement, for this type of ammunition. As long as the manufacture and importation and sale of armor-piercing ammunition remains unregulated, a possibility that a police officer will be killed or seriously wounded remains unacceptably and unnecessarily high. We are very grateful to the manufacturers and dealers who have voluntarily taken themselves

75

out of the armor-piercing bullet business, but such voluntary actions are not enough.

Huberty, obviously, had no trouble obtaining these bullets, so Federal legislation is essential to ensure that the police do not come up against such a dangerously armed killer again. I ask you and urge you to take immediate action on the legislation before you and not to let this matter remain unsettled through another term of Congress.

I appreciate your consideration in letting us give you our views.

[The statement of Mr. Norton follows:]

76

STATEMENT

OF

THE

INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE

BEFORE THE

SUBCOMMITTEE ON CRIME

OF THE

HOUSE COMMITTEE ON THE JUDICIARY

REGARDING

ARMOR PIERCING AMMUNITION

MAY 9, 1985

77

ON BEHALF OF THE INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, I WOULD LIKE TO THANK CHAIRMAN HUGHES AND THE SUBCOMMITTEE FOR INVITING ME TO EXPRESS THE ASSOCIATION'S VIEWS ON LEGISLATION TO BAN THE MANUFACTURE, IMPORTATION AND SALE OF ARMOR PIERCING AMMUNITION.

THE IACP IS A VOLUNTARY PROFESSIONAL ORGANIZATION ESTABLISHED IN 1893.  IT IS COMPRISED OF CHIEFS OF POLICE AND OTHER LAW ENFORCEMENT PERSONNEL FROM ALL SECTIONS OF THE UNITED STATES AND MORE THAN SIXTY NATIONS.  COMMAND PERSONNEL WITHIN THE UNITED STATES CONSTITUTE MORE THAN SEVENTY PERCENT OF THE MORE THAN 14,500 MEMBERS.  THROUGHOUT ITS EXISTENCE, THE IACP HAS STRIVEN TO ACHIEVE PROPER, CONSCIENTIOUS AND RESOLUTE LAW ENFORCEMENT.  IN ALL OF ITS ACTIVITIES, THE IACP HAS BEEN CONSTANTLY DEVOTED TO THE STEADY ADVANCEMENT OF THE NATION'S BEST WELFARE AND WELL-BEING.  WE ADDRESS THIS SUBCOMMITTEE TODAY ON BEHALF OF OUR MEMBERS AND THE THOUSANDS OF LAW ENFORCEMENT OFFICERS WHOSE LIVES ARE THREATENED BY THE AVAILABILITY OF BULLETS CAPABLE OF PENETRATING THEIR SOFT-BODY ARMOR.

IACP HAS CONCEPTIONALLY SUPPORTED LEGISLATION TO BAN THE MANUFACTURE, IMPORTATION AND SALE OF THESE BULLETS SINCE IT WAS FIRST INTRODUCED BY MR. BIAGGI SEVERAL YEARS AGO.  THE CONGRESSMAN IS TO BE COMMENDED FOR HIS BOUNDLESS DETERMINATION TO GET THIS LEGISLATION ENACTED INTO LAW.  WE ALSO APPLAUD THE EFFORTS OF MR. HUGHES AND THIS SUBCOMMITTEE AND ALL WHO HAVE BROUGHT US SO CLOSE TO MAKING THAT A REALITY.  MANY ISSUES HAVE BEEN DEBATED AND RESOLVED OVER THE YEARS.  THE DEFINITIONAL ISSUE WAS RESOLVED LAST YEAR.  THE IACP SUPPORTED A COMPROMISE BILL LAST YEAR THAT PROHIBITED THE MANUFACTURE AND IMPORTATION OF ARMOR-PIERCING AMMUNITION.  ALTHOUGH WE DID NOT BELIEVE THAT LEGISLATION WAS AS EXTENSIVE AS REQUIRED, WE SUPPORTED ITS PASSAGE.  UNFORTUNATELY, TIME RAN OUT AND NOTHING WAS ENACTED.  I URGE THIS SUB-COMMITTEE TO CONTINUE YOUR EFFORTS.

1

BULLET-RESISTANT VESTS HAVE BEEN AVAILABLE FOR QUITE SOME TIME. HOWEVER, THE EARLY VERSIONS WERE SO BULKY AND UNCOMFORTABLE, OFFICERS DID NOT WEAR THEM ROUTINELY. THE RAPID INCREASE IN POLICE INJURIES AND DEATHS DURING THE PERIOD FROM 1960 TO 1970 PROMPTED THE NATIONAL INSTITUTE OF LAW ENFORCEMENT AND CRIMINAL JUSTICE (NOW THE NATIONAL INSTITUTE OF JUSTICE) TO SPONSOR A PROGRAM TO DEVELOP LIGHTWEIGHT BODY ARMOR WHICH AN OFFICER COULD WEAR CONTINUOUSLY WHILE ON DUTY. THIS PROJECT WAS VERY SUCCESSFUL.

IT IS RECOGNIZED THAT IN ORDER TO PRODUCE A VEST THAT OFFICERS WILL WEAR CONTINUOUSLY, IT IS IMPOSSIBLE TO COMPLETELY PROTECT THEM FROM ALL THREATS. IN ORDER TO AID POLICE AGENCIES IN SELECTING GARMENTS APPROPRIATE FOR THEIR PARTICULAR OFFICERS, IACP, IN 1978, COMPLETED A COMPREHENSIVE REPORT ENTITLED "A BALLISTIC EVALUATION OF POLICE BODY ARMOR." IN THIS STUDY, SOFT-BODY ARMOR WAS CLASSIFIED ACCORDING TO FIVE THREAT LEVELS. AT EACH THREAT LEVEL, THE BULLETS AND CALIBERS WHICH THE ARMOR WAS CAPABLE OF PROTECTING AGAINST WERE IDENTIFIED. EACH DEPARTMENT COULD THEN DECIDE WHICH VESTS WERE NEEDED TO PROVIDE FULL-TIME PROTECTION AGAINST THE THREAT MOST LIKELY TO BE FACED BY ITS OFFICERS.

AS A RESULT OF THIS RESEARCH, APPROXIMATELY FIFTY PERCENT OF ALL LAW ENFORCEMENT OFFICERS IN THIS COUNTRY CURRENTLY WEAR BULLET-RESISTANT VESTS. THE RECORD SINCE SOFT-BODY ARMOR CAME INTO REGULAR USE BY LAW ENFORCEMENT OFFICERS HAS BEEN IMPRESSIVE. OFFICER FATALITIES HAVE BEEN SHARPLY REDUCED SINCE 1975, WHEN THE LIGHTWEIGHT VESTS WERE FIRST INTRODUCED IN QUANTITY, EVEN THOUGH THE ASSAULT RATE HAS NOT BEEN REDUCED. THE VESTS ARE CREDITED WITH SAVING THE LIVES OF MORE THAN FOUR HUNDRED POLICE OFFICERS ACROSS THE COUNTRY. IN ADDITION TO MEMBERS OF THE LAW ENFORCEMENT COMMUNITY, THE USE OF BULLET-RESISTANT APPAREL BY POLITICIANS AND OTHER HIGH-LEVEL GOVERNMENT OFFICIALS HAS GROWN IN RECENT YEARS DUE TO THEIR INCREASING EXPOSURE AND

2

79

VULNERABILITY TO ACTS OF VIOLENCE.  HOWEVER, THE SECURITY THAT BULLET-RESISTANT APPAREL PROVIDES IS BEING VIOLATED.  A REAL AND IMMEDIATE THREAT HAS BEEN POSED TO THE LIVES AND SAFETY OF PERSONS RELYING ON SUCH PROTECTIVE EQUIPMENT.

WE WERE ALL HORRIFIED TO LEARN LAST SUMMER THAT JAMES HUBERTY HAD KILLED 21 PEOPLE AND WOUNDED 11 OTHERS WHEN HE OPENED FIRE IN A CROWDED MCDONALD'S RESTAURANT IN SAN YSIDRO, CALIFORNIA.  POLICE OFFICERS RUSHED TO THE SCENE EQUIPPED WITH BULLET RESISTANT VESTS FOR MAXIMUM PROTECTION.  DESPITE THAT FACT, THEY WERE ALMOST AS VULNERABLE AS THE RESTAURANT PATRONS AND PASSERSBY. OF THE 245 ROUNDS FIRED BY HUBERTY, 192 WERE ARMOR PIERCING BULLETS.  FOR-TUNATELY, NO POLICE OFFICERS WERE SHOT, BUT IF THEY HAD BEEN, THEIR VESTS WOULD HAVE BEEN NO MATCH FOR THESE BULLETS.

UNOFFICIAL TESTS HAVE SHOWN THAT CERTAIN CALIBERS OF THE TEFLON- COATED KTW BULLET CAN PENETRATE UP TO SEVENTY-TWO LAYERS OF KEVLAR.  THE MOST POPULAR SOFT-BODY ARMOR WORN BY POLICE OFFICERS IS COMPOSED OF ONLY EIGHTEEN LAYERS OF KEVLAR.  IN A TEST CONDUCTED BY THE LOS ANGELES POLICE DEPARTMENT OF A .38-CALIBER KTW BULLET AT A MEASURED VELOCITY OF 1,051 FEET PER SECOND, THE BULLET PENETRATED THE FRONT PANEL OF THE DEPARTMENT'S BODY ARMOR AND CONTINUED THROUGH THREE AND ONE-HALF INCHES OF "DUXSEAL," A SUBSTANCE WITH A DENSITY SIMILAR TO THAT OF HUMAN FLESH.  IN ORDER TO PROTECT THEMSELVES AGAINST SUCH A MENACE, OFFICERS WOULD HAVE TO WEAR EXTREMELY BULKY, HEAVY PROTECTION.  AS EXPERIENCE HAS SHOWN, THESE VESTS WOULD NOT BE WORN EXCEPT IN EXTRAORDINARY CIRCUMSTANCES.  FURTHERMORE, IN AN AVERAGE POLICE DEPARTMENT SUCH AS THE SAN YSIDRO POLICE DEPARTMENT, THE THREAT NORMALLY ENCOUNTERED WOULD NOT JUSTIFY EQUIPPING ALL OFFICERS WITH THIS COSTLY PROTECTION.

CURRENTLY, FEDERAL LAW DOES NOT RESTRICT THE SALE OF ANY TYPE OF AMMUNITION. DESPITE THE FACT THAT MANUFACTURERS OF AMMUNITION SPECIFICALLY DESIGNED TO PENETRATE BULLET-RESISTANT APPAREL CLAIM THEIR BULLETS ARE FOR POLICE AND

3

80

MILITARY USE ONLY. THERE HAS NOT BEEN ANY ATTEMPT TO LEGALLY PREVENT THEIR AVAILABILITY TO THE PUBLIC.   INDEED, THESE PACKAGING LABELS ARE MERELY A LUDICROUS PLOY TO GAIN MARKET ACCEPTABILITY, SINCE NO ENFORCEMENT OF THE REGULATION IS POSSIBLE. FURTHERMORE, THESE BULLETS ARE NOT USED IN HANDGUNS BY LAW ENFORCEMENT. BECAUSE OF THEIR INCREDIBLE PENETRABILITY AND THE GREAT RISK THAT THEY MAY RICOCHET AND STRIKE AN INNOCENT BYSTANDER, AS WELL AS THEIR LACK OF STOPPING POWER, THESE BULLETS HAVE BEEN FOUND UNACCEPTABLE FOR USE BY LAW ENFORCEMENT AGENCIES.

AS I STATED PREVIOUSLY, SIGNIFICANT PROGRESS WAS MADE DURING THE 98TH CONGRESS IN RESOLVING DEFINITIONAL PROBLEMS THAT HAVE PLAGUED THE LEGISLATION SINCE ITS INTRODUCTION.    INSTEAD OF ATTEMPTING TO IDENTIFY THE BANNED BULLETS BY A STANDARD OF PENETRATION, THE NEW LANGUAGE MORE NARROWLY DEFINES "ARMOR PIERCING AMMUNITION" IN TERMS OF ITS DESIGN. THIS DEFINITION AVOIDS THE ADMINISTRATIVE BURDEN OF TESTING EVERY TYPE OF AMMUNITION ON THE MARKET. IT ALSO LAYS TO REST THE CONCERN THAT AMMUNITION USED FOR SPORTING PURPOSES WILL INADVERTENTLY BE BANNED. EVEN THE NATIONAL RIFLE ASSOCIATION EXPRESSED SUPPORT FOR THIS DEFINITION LAST YEAR.

WE ARE OPTIMISTIC THAT DURING THIS SESSION OF CONGRESS ALL OTHER DIFFERENCES WILL BE RESOLVED SO THAT WE CAN FINALLY PROVIDE OUR LAW ENFORCEMENT OFFICERS WITH THE PROTECTION THEY DESERVE.  ESSENTIALLY WHAT REMAINS AT ISSUE IS THE QUESTION OF WHETHER THE SALE OF THESE BULLETS SHOULD BE OUTLAWED. WE BELIEVE THAT NOT ONLY MUST THE MANUFACTURE AND IMPORTATION OF ARMOR-PIERCING AMMUNITION BE CONTROLLED, BUT SALES SHOULD BE LIMITED TO GOVERNMENT AGENCIES ONLY, FOR PURPOSE OF EXPORT, OR FOR PURPOSE OF TESTING AND RESEARCH.  PROPOSALS THAT DO NOT ADDRESS THE PROBLEM OF SALE DENY THE LAW ENFORCEMENT COMMUNITY A CRUCIAL ELEMENT OF PROTECTION AGAINST ARMOR-PIERCING AMMUNITION.

4

IT IS ARGUED THAT THERE ARE VERY FEW OF THE OFFENDING BULLETS ON THE MARKET AND THAT DEALERS WOULD HAVE DIFFICULTY IN IDENTIFYING THEM.  THE NUMBER OF ARMOR PIERCING BULLETS CURRENTLY AVAILABLE IS IRRELEVANT.  THE AVAILABILITY OF JUST ONE BULLET IN THE WRONG HANDS COULD COST A POLICE OFFICER HIS OR HER LIFE.

WITH REGARD TO FIREARMS DEALERS, WE DO NOT BELIEVE THAT ANY PROBLEM EXISTS.  WE ARE NOT ASKING THEM TO ANALYZE EVERY BULLET IN THEIR SHOPS TO DETERMINE IF THEY CAN PENETRATE SOFT BODY ARMOR.  UNDER MR. BIAGGI'S PROPOSAL, EACH DEALER IS TO RECEIVE WRITTEN NOTIFICATION FROM THE BUREAU OF ALCOHOL, TOBACCO AND FIREARMS TELLING THEM EXACTLY WHICH AMMUNITION IS BANNED.  NO ONE WANTS TO PROSECUTE INNOCENT FIREARMS DEALERS.  WE ARE ONLY ASKING THEM TO JOIN WITH US IN MAKING THESE BULLETS UNAVAILABLE.

THE INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE CAN FIND NO LEGITIMATE USE, EITHER IN OR OUT OF LAW ENFORCEMENT, FOR THIS TYPE OF AMMUNITION.  AS LONG AS THE MANUFACTURE AND IMPORTATION AND SALE OF ARMOR PIERCING AMMUNITION REMAINS UNREGULATED, THE POSSIBILITY THAT A POLICE OFFICER WILL BE KILLED OR SERIOUSLY WOUNDED REMAINS UNACCEPTABLY AND UNNECESSARILY HIGH.  WE ARE VERY GRATEFUL TO THE MANUFACTURERS AND DEALERS WHO HAVE VOLUNTARILY TAKEN THEMSELVES OUT OF THE ARMOR-PIERCING BULLET BUSINESS BUT SUCH VOLUNTARY ACTIONS ARE NOT ENOUGH. JAMES HUBERTY OBVIOUSLY HAD NO TROUBLE PURCHASING THESE BULLETS.  FEDERAL LEGISLATION IS ESSENTIAL TO INSURE THAT THE POLICE DO NOT COME UP AGAINST SUCH A DANGEROUSLY ARMED KILLER AGAIN. I URGE YOU TO TAKE IMMEDIATE ACTION ON THE LEGISLATION BEFORE YOU.  PLEASE DO NOT LET THIS MATTER REMAIN UNSETTLED THROUGH ANOTHER TERM OF CONGRESS.

THANK YOU FOR GIVING OUR VIEWS YOUR CONSIDERATION.  I WILL BE HAPPY TO ANSWER ANY QUESTIONS YOU MAY HAVE.

5

82

Mr. Hughes. Thank you very much, Chief, for a very fine statement. We are running rather late. I know some of the witnesses are from out of town. Does anybody have any pressing transportation or other problems?

If not, we will take Mr. Murphy's testimony at this time and I would urge the witnesses to summarize where that is possible. We have your statements which, we have read, and they will be made a part of the record.

Mr. Murphy, welcome.

Mr. Murphy. Good afternoon, Mr. Chairman.

The International Brotherhood of Police Officers is an affiliate of the Service Employees Union International, AFL-CIO. We are pleased for this opportunity to testify in support of H.R. 4, legislation which will limit access of criminals in so-called copkiller bullets.

From 1981 to 1984, Congressman Mario Biaggi introduced and aggressively supported legislation which would limit the availability of the so-called copkiller bullets. During this time period, this legislation was delayed by disputes over the definition of armor-piercing ammunition. The concern with the definition is directed at the effect it would have on legitimate sportsmen. During this time period, the administration vowed its support for preventing criminals access to these bullets and promised to provide a more workable definition.

Last year, the administration advanced a long-promised definition of armor-piercing ammunition. The definition of armor-piercing ammunition advanced by the administration is limited to those projectiles that are constructed entirely from any of eight different specific metals which have the capacity to penetrate body armor. Specifically excluded from this definition would be any ammunition which the Secretary determines is primarily intended for sporting purposes. This would provide the Secretary with a broad-based authority to protect against infringement of the legitimate rights of sportsmen.

The Law Enforcement Officers Protection Act of 1985 incorporates the definition of armor-piercing ammunition developed by the administration. This compromise should resolve the major controversy which has impeded passage of this bill up to now.

The final area of disagreement concerns limitations on the sale of the bullets. Under the terms of H.R. 4, it is unlawful to manufacture, import or sell armor-piercing ammunition. The prohibition on the sale of these bullets is, from our perspective, the key provision. It is our understanding that currently few of these bullets are being manufactured or imported into this country. The danger to police officers comes from those bullets already stored on the shelves of gun dealers, and dealers throughout the country.

These bullets are, in many States, readily available to the general public. In fact, last July, as has been discussed today, the mass murderer James Huberty fired 192 rounds of armor-piercing ammunition when he killed 21 people at the McDonald's in California. In addition to this tragic crime, there is evidence of 16 other cases of criminals using copkiller bullets, including three police shootings.

83

It makes little sense to outlaw the manufacture and importation of these bullets, but allow for their sale. Legislation which allows for the sale of these bullets is misleading the police community and the American public into believing that a measure of protection is provided by such legislation.

Legislation which does not outlaw the sale of these bullets can only be seen as an attempt to stem the rising tide of public outrage over the continued availability of these bullets.

Mr. Chairman, the law enforcement community is solidly behind H.R. 4. At least 10 of the largest organizations representing the law enforcement community have endorsed H.R. 4 and are committed to passing legislation which prohibits the sale of these bullets.

With the help of the committee and other friends of the police community, we are optimistic of finally passing the Law Enforcement Officers Protection Act in this Congress. Mr. Chairman, we would like to thank Congressman Biaggi and yourself for your continued advocacy on behalf of the law enforcement community. We would like to thank you once again for this opportunity to appear and present our views on this important legislation.

[The statement of Mr. Murphy follows:]



**NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES**

AFFILIATED WITH SERVICE EMPLOYEES INTERNATIONAL UNION,   AFL/CIO

1313 ''L'' STREET, N.W., WASHINGTON, D.C. 20005
202/371-6644

INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS

BEFORE THE

SUBCOMMITTEE ON CRIME

OF THE

HOUSE JUDICIARY COMMITTEE

IN REGARDS TO

THE LAW ENFORCEMENT OFFICERS PROTECTION

ACT OF 1985

MAY 8, 1985

-2-

The   International   Brotherhood   of   Police   Officers
(I.B.P.O.)   is   an   affilliate   of   the   Service   Employees
International Union (AFL-CIO).   The I.B.P.O. is one of the
largest unions in the country representing police officers.
We represent police officers in federal, state, and local
governments nationwide.   Our union has long been a leader in
efforts to improve the safety and working conditions of police
officers nationwide.   Over the last several years our union
has   been   a   strong   supporter   of   legislation   to   ban   the
manufacture, importation and sale of the so called cop killer
bullets.

We are pleased to testify in support of HR (4) legislation
which will limit the access of criminals to the so called "Cop
Killer   Bullets".   This   legislation   provides   the   best
protection to police officers from the dangers of these
bullets.

It is well documented that the police officer has one of
the most dangerous occupations in the nation.   During the last
ten years more than 1600 police officers have been killed in
the line of duty.   Each year during this time period an
average of more than 150 police officers have been killed in
the line of duty.   One of the major dangers faced by police
officers has been injury and death from gunshots.   During 1982
for instance almost 440 police officers were injured as a
result of gunshot wounds.

-3-

To a large extent the nature of police work demands exposure to risk of injury from criminals which cannot be reasonably controlled. A society concerned about fighting crime must however do all that is reasonable to protect those individuals fighting in the front lines in the war against crime. Since 1970 when soft body armor was first developed increasing numbers of police officers have turned to vests as a means of protecting themselves against gunshots. It is estimated, in fact, that up to 50% of the nation's police community uses body armor. With improvements in the comfort and reliability of the vests, it is expected that the number of officers who recieve the physical and psychological security these vests provide will continue to rise.

This trend has been endangered however by the so called "Cop Killer Bullets" which have the capacity to penetrate soft body armor. In late 1981 it came to widespread public attention that certain classes of bullets were being manufactured, imported and sold whose sole purpose was to penetrate body armor. These bullets were doubly threatening to police officers, first because it had the potential to penetrate the armor and defeat the physical and psychological security provided by the vests and secondly the existence of these bullets had the potential to undermine police efforts to gain broader community support for the purchase of these vests.

87

-4-

Our union was heartened by the prompt attention this threat to police security received in Congress. In 1981, through 1984 Congressman Mario Biaggi introduced and aggressively supported legislation which would limit the availability of "Cop Killer Bullets." The so called Law Enforcement Officers Protection Act would limit the availability of this ammunition by preventing the manufacture, importation or sale of bullets which when fired by a handgun with a barrell five inches or less in length is capable of pentrating body armor. This Subcommittee promptly scheduled hearings on this problem and has been instrumental in maintaining public focus on the problem ever since.

During this time period legislation was delayed by disputes over the definition of armor piercing ammunition. The concern with the definition was directed at the effect it would have on legitimate sportsmen. During this time period the Administration vowed it's support for preventing criminals access to these bullets and promised to provide a more workable definition.

-5-

Last year the Administration finally advanced the long promised refinement of the definition of armor piercing ammunition. This definition which was contained in HR 5845 was supported by such opponents of the Law Enforcement Protection Act as the National Rifle Association. The definition of armor piecing ammunition advanced by the Administration is limited to those projectiles that are constructed entirely from any of eight different specific metals which have the capacity to penetrate body armor. Specifically excluded from this definition would be any ammunition which the Secretary determines is primarily intended for sporting purposes. This would provide the Secretary with a broad based authority to protect against the infringement of the legitimate rights of sportsmen. This definition thus strikes a neat balance between protecting the rights of legitimate sportsmen, and protecting the lives of policemen.

The Law Enforcement Officers Protection Act of 1985 incorporates the definition of armor piercing ammunition developed by the NRA, and the Administration. This compromise should resolve the major controversy impeding passage of the bill. The final area of disagreement concerns limitations on the sale of the bullets. Under the terms of HR-4 it is unlawful to manufacture or import armor piercing ammunition.

89

-6-

The provision in the bill most important to this union and to the police community in general is the prohibition on the unauthorized sale of these bullets. Section 5 of the legislation would authorize the Secretary to penalize liscensed dealers for the unauthorized transfer of armor piercing ammunition where the dealer has been put on notice by the Secretary that such ammunition is armor piercing.

As we have stated this prohibition on the sale of these bullets is, from our perspective, the key provision. It is our understanding that currently none of these bullets are being manufactured or imported into this country. The danger to police officers comes from those bullets already stored on the shelves of dealers throughout the country. These bullets are in many states readily available to the general public. In fact last July the mass murderer James Hubert fired 192 rounds of armor piercing ammunition when he killed 21 people at the San Ysidro (California) McDonalds. In addition to this tragic crime, there is evidence of 16 other cases of criminals using "Cop Killer Bullets" including three police shootings. It makes little sense to outlaw the manufacture and importation of these bullets but allow for their sale. Legislation which allows for the sale of these bullets is misleading the police community and the american public into believing that a measure of protection is provided by such legislation.                                                        The

90

-7-

purpose of legislation, which does not outlaw the sale of
these bullets, can only be seen as an attempt to stem the
rising tide of public outrage over the continued availabilty
of these bullets.

Mr. Chairman the law enforcement community is solidly
behind HR-4. At least ten of the largest organizations
representing the law enforcement community have endorsed HR-4
and are committed to passing legislation which will prohibit
the sale of these bullets. With the help of the Committee,
and other friends of the police community we are optimistic of
finally passing the Law Enforcement Protection Act in this
Congress.

Mr. Chairman we'd like to thank Congressman Biaggi and
yourself for your continued advocacy on behalf of law
enforcement personnel. We'd like to thank you once again for
this opportunity to appear, and present our views on this
important piece of testimony.

91

Mr. HUGHES. Mr. Murphy, thank you once again for an excellent statement.

The next witness is Mr. David Baker, on behalf of the International Union of Police Associations.

Welcome, Mr. Baker.

Mr. BAKER. Thank you, Mr. Chairman, for once again providing the opportunity to the International Union of Police Associations, AFL–CIO, to address the subject of protecting our Nation's law enforcement officers.

I am David Baker, the secretary-treasurer of the International Union of Police Associations, AFL–ClO, representing 16,000 police officers in 29 States. I was a police officer with the Memphis, TN police department for 14 years, where I worked as a patrol officer, and investigator in some of the highest crime areas of that city.

I was, by the way, Mr. Chairman, one of the first officers in that city to purchase and utilize soft-body armor and I have worn soft-body armor on a daily basis for approximately 5 years of my police career.

The IUPA supports the passage of H.R. 4, the Law Enforcement Officers Protection Act. This subcommittee has heard many hours of testimony and compiled a voluminous record on the subject of banning armor-piercing ammunition in previous hearings. I will not impose on this committee by restating many of the technical issues involved in consideration of this legislation.

I would like to state for the record some of the general principles the IUPA supports. First, there is no practical legitimate law enforcement use for this ammunition. In the rare instance when a police department is confronted with a need for an armor-piercing capability, standard rifle ammunition will fill this need. The idea of arming police officers with armor-piercing handgun ammunition is preposterous.

Second, there is no legitimate sporting use for this ammunition. Congress has seen fit to restrict the private ownership of machine guns and other military weapons, in part because of an absence of legitimate sporting purposes. These bullets should not be an exception to that logic.

Third, there is a need for this legislation. In spite of the voluntary restraint on the part of some manufacturers and importers, these bullets are still readily available to the criminal element in our country. Only through the adoption of this legislation can we start restricting this supply.

Mr. Chairman, there seems to be a sense that there is really not a problem out in the country. We hear about the San Diego case. Just yesterday, I found out from sources in the ATF that there have been cases as recently as last November in Chicago where large volumes of KTW ammunition were found in the home of a convicted felon. They were executing a search warrant, so the ATF itself knows that this is a legitimate problem that is out there.

Fourth, the ban on sale is essential if this legislation is to have any meaning. The last remaining issue of controversy is whether to ban sale. The ban of sale of these dangerous devices is what puts teeth in this bill. Without the ban on sale, the many years of effort by Members of Congress would be meaningless.

92

I agree with the statement you made earlier, Mr. Chairman. No one would argue that a ban on the manufacture and import of heroin would make sense without a ban on the sale. If this ammunition deserves the attention it has been getting from this committee and Congress as a whole, which it surely does, a ban on sale is an important, indeed, fundamental element in removing this threat to the safety of law enforcement officers from the streets of our country.

Finally, Mr. Chairman, I would be remiss if I did not once again express the deep sincere appreciation of my members to you and Congressman Mario Biaggi for your efforts in getting this important legislation moving toward becoming the law of the land. Congressman Biaggi deserves particular praise from his colleagues in law enforcement. As a veteran police officer, he knows the challenges faced in this country faced by our men and women in blue. He knows how important this legislation is to making our job safer.

The advent of effective wearable soft body armor has done much to improve the safety of police officers. A ban on armor-piercing ammunition will assure those officers that this Congress is committed to making their job as safe as possible.

Thank you, Mr. Chairman.

[The statement of Mr. Baker follows:]



**INTERNATIONAL UNION
OF POLICE ASSOCIATIONS
AFL-CIO**
*THE ONLY UNION FOR LAW ENFORCEMENT OFFICERS*

Robert B. Kliesmet
*President*

David E. Baker
*Secretary-Treasurer*

National Headquarters • 815 16th Street, N.W., #307 • Washington, D.C. 20006 • (202) 628-2740

Testimony of

DAVID E. BAKER

Secretary-Treasurer

INTERNATIONAL UNION OF POLICE ASSOCIATIONS, AFL-CIO

before the

SUBCOMMITTEE ON CRIME

of the

HOUSE JUDICIARY COMMITTEE

on

H.R. 4

LAW ENFORCEMENT OFFICERS PROTECTION ACT

May 9, 1985

*AFFILIATED WITH THE PUBLIC EMPLOYEE DEPARTMENT, AFL-CIO*

94

Thank you, Mr. Chairman, for once again providing the opportunity to the International Union of Police Associations, APL-CIO, to address the subject of protecting our nation's law enforcement officers.

I am David Baker, the Secretary-Treasurer of the International Union of Police Associations, APL-CIO, representing 16,000 police officers in 29 states.  I was a police officer with the Memphis Police Department for fourteen years, where I worked as a patrol officer and investigator in some of the highest crime areas of that city.

The IUPA supports the passage of H.R. 4, the Law Enforcement Officers Protection Act.  This subcommittee has heard many hours of testimony and compiled a voluminous record on the subject of banning armor piercing handgun ammunition in previous hearings.  I will not impose on this committee by restating many of the technical issues involved in consideration of this legislation.  I would like to state for the record some of the general principles the IUPA supports.

First, there is no legitimate law enforcement use for this ammunition.  In the rare instance when a police department is confronted with the need for an armor piercing capability, standard rifle ammunition will fill the need.  The idea of arming police officers with armor piercing handgun ammunition is preposterous.  I have contacted many of the firearms training officers and SWAT officers in our union who confirm the lack of legitimate use in general police work.

Second, there is no legitimate sporting use for this ammunition.  Congress has seen fit to restrict the private ownership of machine guns and other military weapons, in part because of an absence of legitimate sporting purposes.  These bullets should not be an exception to that logic.

Third, there is a need for this legislation.  In spite of the voluntary restraint on the part of some manufacturers and importers, these bullets are still readily available to the criminal element in our country.  Only through the adoption of this legislation can we start restricting the supply.

Fourth, a ban on sale is essential if this legislation is to have any meaning.  As you know, Mr. Chairman, this bill has gone through many incarnations.  For years, a ban on armor piercing ammunition was hung up on finding an acceptable definition.  In the closing days of the 98th Congress, a solution to that problem was reached and is incorporated in this bill.  Other issues involving government buy-back of existing inventories, banning possession and potentially broadening the definition have been dropped from this proposal in order to speed passage.  The last remaining issue of controversy is whether to ban sale.  A ban of sale of these dangerous devices is what puts teeth in this bill.  Without the ban on sale, the many years of effort by members of Congress would be meaningless.

95

No one would argue that a ban on the manufacture and import of heroine would make sense without a further ban on sale.  If this ammunition deserves the attention it has been getting from this committee and Congress as a whole, which it surely does, a ban on sale is an important, indeed fundamental, element in removing this threat to the safety of law enforcement officers from the streets of our country.

Finally, Mr. Chairman, I would be remiss if I did not once again express the deep, sincere appreciation of my members to you and Congressman Mario Biaggi for your efforts in getting this important legislation moving toward becoming the law of the land.  Congressman Biaggi deserves particular praise from his colleagues in law enforcement.  As a veteran police officer he knows the challenges faced in this country by our men and women in blue.  He knows how important this legislation is to making our jobs safer.

The advent of effective, wearable, soft body armor has done much to improve the safety of police officers.  A ban on armor piercing ammunition will assure those officers that this Congress is committed to making their job as safe as possible.

Thank you, Mr. Chairman.

Mr. HUGHES. Thank you for a very fine statement, Mr. Baker.

Our next witness is Ira Lechner, the legislative adviser to the National Association of Police Organizations. Welcome again, Mr. Lechner.

Mr. LECHNER. Thank you, Mr. Chairman. In the interest of time and all of our sanity, I think I will abandon my written statement and just try to get to the issue that you and Mr. McCollum have been dealing with today, and that is, what kind of knowledge does the law-abiding gun dealer operating in good faith required to have under the law?

This morning, I ventured out here into Arlington, VA, and stopped by two gunshops to see whether I could purchase any armor-piercing ammunition. While I am sure that there is armor-piercing ammunition for sale all over this country, in that certainly Mr. Stevenson acknowledges that those 30 million rounds of Czech ammunition have clearly not been expended, in both cases, I spoke to clerks in a store and quickly identified myself and said that—as a customer—that I would like to purchase armor-piercing ammunition. In both cases, they said, "We don't have any." They knew they didn't have any on their shelves.

It seems to me that any licensed gun dealer can easily segregate the ammunition that he knows that he has from the ammunition that he has some question about. What you are trying to do in this legislation is not to catch unwaringly some gun dealer and try to get rid of his license; what you are trying to do is provide a deterrent in the legislation from the sale of armor-piercing ammunition. That is all. If this Congress can't fashion an effective deterrent under these circumstances—well, I am sure the Congress can. Maybe the deterrent has to appear in a variety of means.

One, if on two occasions that a licensed gun dealer is discovered to have sold armor-piercing ammunition, the Government is not going to accept the defense of unknowing, unwilling, unreckless kind of sale. Two, otherwise, the Government would accept the defense of nonknowledge and nonrecklessness; it would have to be a knowing sale and it would have to be not through any misadventure on the part of the dealer.

The question really comes down, finally, to who bears the risk in the society? Should it be the police officer, many hundreds of thousands of them across this country? Should they bear the risk of a misapplication of an armor-piercing round or should the dealer who is selling it and who is licensed to sell it and who is making a profit from it, shouldn't he bear the risk of at least segregating in his stock those rounds that he knows from those rounds that he doesn't know?

I don't think that is an awfully big burden to ask any licensed dealer to have to obey and I am sure this Congress can fashion those kinds of deterrents that will protect police lives because apparently now, everyone agrees that the sale should be banned. The administration came a long way today; they agreed sales should be banned. I can hardly believe the Members of Congress would support a bill that would say that the sale of a bullet that was manufactured the day after the effective date of the legislation is banned, but a bullet that was manufactured the day before the effective date of the legislation is not banned.

97

Clearly, everyone should agree now that the sale should be banned and it is simply up to us to fashion a deterrent that works.
[The statement of Mr. Lechner follows:]

**TESTIMONY OF IRA M. LECHNER,**
**LEGISLATIVE COUNSEL REPRESENTING**
**THE NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS (NAPO)**
**BEFORE THE SUBCOMMITTEE ON CRIME**
**COMMITTEE ON THE JUDICIARY**
**ON H.R. 4**

**May 9, 1985**

TESTIMONY OF IRA M. LECHNER,
LEGISLATIVE COUNSEL REPRESENTING
THE NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS (NAPO)
BEFORE THE SUBCOMMITTEE ON CRIME
COMMITTEE ON THE JUDICIARY
ON H.R. 4

MR. CHAIRMAN AND DISTINGUISHED MEMBERS OF THE SUBCOMMITTEE:

I am Ira M. Lechner, Legislative Counsel to,and representing, the National Association of Police Organizations (NAPO). It gives me great pleasure to testify before this Subcommittee because the Bill under consideration, H.R. 4, involves the potential saving of lives.

NAPO is an organization made up exclusively of rank and file police officers...60,000 strong all across this country. NAPO represents police officers who put their lives on the line each day that they go to work. That is why H.R. 4 is so strongly endorsed by NAPO.

Mr. Chairman, there is really only one issue which separates this Bill from all other Bills involving "cop-killer" bullets. And that is the issue of prohibiting the "sale" of these bullets. It is really quite simple; H.R. 4 bans the "sale" of "cop-killer" bullets as well as their manufacture and importation. All other legislation which has been introduced, or amendments which will be offered, do not ban the "sale" of the bullets.

The public, the newspaper editorial writers, and the law enforcement community ask: how can you not ban the "sale" of those bullets after you have declared as a matter of public policy that gun manufacturers can not make them or import them? It clearly makes no sense to establish a manufacturing and importation ban but not to ban the "sale" of the bullets. As the President of NAPO, Robert Scully of the Detroit Police Officers' Association, put it recently: "Not to ban the sale of 'cop-killer bullets' would be like banning the manufacture and importation of heroin but not its sale."

The law enforcement community speaks with one voice on this issue: please stop the senseless potential murder of police officers as a result of "cop-killer" bullets. Please vote out H.R. 4 and then take it the rest of the way through Congress.

We are confident that the President will sign such legislation. The American public signed on to ban the manufacture, importation, and sale of "cop-killer" bullets a long time ago. It's time for Congress to act!

Mr. Chairman, I have been Legislative Counsel to NAPO for the past five years. We have considered supporting or opposing many pieces of legislation over those years. I have never seen each and every police officer within NAPO so unanimously in favor of a Bill as they are of H.R. 4. I believe each police officer in America knows that there is no legitimate sporting purpose for these bullets; their only purpose is to kill cops.

Don't let the criminals win one from Congress at the expense of police lives in the name of "sporting" ammunition when it is not "sporting" ammunition.

Thank you on behalf of NAPO and the rest of the law enforcement community.

Mr. HUGHES. Thank you, Mr. Lechner. I think you have done a good job of crystalizing one of the major issues and we appreciate that. We are indebted to you.

Mr. LECHNER. Thank you.

Mr. HUGHES. Our next witness is Sgt. Michael Muth, on behalf of the National Troopers Coalition.

Sgt. Muth, welcome.

Sergeant MUTH. Thank you, sir.

Mr. Chairman, honorable members of this distinguished committee, I will be brief.

I am Michael Muth; I am testifying on behalf of Thomas J. Iskrzycki, the chairman of the National Troopers Coalition.

The National Troopers Coalition is composed of troopers from State police and highway patrol organizations thoughout the United States and we are over 38,000 members strong currently. The National Troopers Coalition would like to go on record as fully supporting H.R. 4, the Law Enforcement Officers Protection Act of 1985. This legislation is vital to the interests of the members of the National Troopers Coalition.

Between September 1976 and June 30, 1984, there were 142 State troopers who were killed in the line of duty across this country. Forty-seven of those troopers were shot to death while on duty and of these 47, 19 were killed in traffic stops. Because of the increased assaults on troopers, many agencies have issued protective body armor to the troopers in order to give them maximum protection. Today's trooper is, in most instances, outgunned by his opponent and the protection afforded him by his protective body armor is completely negated by the use of the armor-piercing ammunition by the criminal element.

Many tests have shown that the ability of the protective body armor to stop hostile rounds does not apply to this type of ammunition. Banning the sale and importation of this type of ammunition would provide insurance to the troopers working our highways and responding to criminal calls for service.

We can ill afford the potential loss of life and grief to the families of our dedicated troopers. The National Troopers Coalition does not object to the legitimate use of this ammunition for a controlled sporting event, government use, testing or research. Activities of this type present no danger to our troopers and research may well benefit the law enforcement community overall. We would, therefore, request a favorable report on this Act in order to safeguard our troopers and give them the protection they deserve and need.

Thank you very much.

[The statement of Sergeant Muth follows:]

102



## NATIONAL TROOPERS COALITION

112 STATE STREET, 12TH FLOOR, ALBANY, N Y 12207  518-462-7448

*CHAIRMAN*
THOMAS J SKRZYCKI
50 NEWPORT DRIVE
HOWELL, N J 07731

*1ST VICE CHAIRMAN*
STANLEY RODGERS
P O BOX 246
BLOUNTSTOWN FL 32424

*2ND VICE CHAIRMAN*
PETER W PARKER
2030 V STREET
SACRAMENTO CA 91818

*SECRETARY*
TIMOTHY B WYKERT
834 N CAPITOL
LANSING MICH 48906

*TREASURER*
JOHN F HERMAN
P O BOX 956
IRWICH CONN 06360

*LEGAL COUNSEL*
MICHAEL G O ROURKE
127 SUMMIT AVENUE
BUFFALO, NY 14214

BEFORE THE

UNITED STATES HOUSE OF REPRESENTATIVES

JUDICIARY SUB-COMMITTEE ON CRIME


HEARING FOR HR-4

THE LAW ENFORCEMENT OFFICERS

PROTECTION ACT OF 1985


SPEAKING IN FAVOR OF HR-4

THE NATIONAL TROOPERS COALITION

JOHNNY L. HUGHES

MARYLAND AFFILIATE PRESIDENT

PARTICIPATING MEMBER, NATIONAL LAW

ENFORCEMENT COUNCIL.

REPRESENTING OVER 30,000 TROOPERS SERVING 200 MILLION AMERICANS

-2-

THE UNITED STATES HOUSE OF REPRESENTATIVES SUB-COMMITTEE ON
CRIME, MAY 8, 1985.

HEARING FOR HR-4, THE LAW ENFORCEMENT OFFICERS PROTECTION ACT
OF 1985.

TESTIFYING:          2nd/LT. JOHNNY L. HUGHES
                     MARYLAND STATE POLICE
                     1201 REISTERSTOWN ROAD
                     PIKESVILLE, MARYLAND  21208
                     (301)486-3101
                     (301)679-6276

LIEUTENANT HUGHES IS AN EIGHTEEN YEAR VETERAN OF THE MARYLAND
STATE POLICE.  HUGHES IS PRESIDENT OF THE MARYLAND TROOPERS
ASSOCIATION, AFFILIATE MEMBER OF THE NATIONAL TROOPERS COALI-
TION.  THE NATIONAL TROOPERS COALITION IS COMPOSED OF STATE
POLICE AND HIGHWAY PATROL ORGANIZATIONS THROUGHOUT THE UNITED
STATES.  OUR MEMBERSHIP IS APPROXIMATELY 38,000 TROOPERS OF
ALL RANKS.

TESTIMONY:           MR. CHAIRMAN

                     HONORABLE MEMBERS OF THIS DISTINGUISHED
                     COMMITTEE,

      I am Johnny L. Hughes, testifying on behalf of Thomas J.
Iskrzycki, Chairman of the National Troopers Coalition.  The
National Troopers Coalition is composed of Troopers from
State Police and Highway Patrol Organizations throughout
the United States.  These Troopers are from all ranks and
consist of approximately 38,000 Members.

      The National Troopers Coalition would like to go on record
as fully supporting HR-4, the Law Enforcement Officers Protection
Act of 1985.  This legislation is vital to the interests of the
members of the National Troopers Coalition, an organization
representing over 38,000 State Police and Highway Patrol Troopers.

      Between September 1976 and June 30, 1984, 142 State Troopers
were killed in the line of duty.  Forty-seven Troopers were shot
to death while on duty, and of these forty percent (19) were killed
in traffic stops.  Because of these increased assaults on Troopers,
many agencies have issued protective body armor to their Troopers
in order to give maximum protection to their personnel.  Today's
Trooper is, in most instances, outgunned by his opponent and the

-3-

protection afforded him by his protective body armor is completely
negated by the use of armor-piercing ammunition by the criminal
element. Many tests have shown the ability of protective body
armor to stop hostile rounds does not apply to armor-piercing
ammunition. Banning the sale and importation of this type of
ammunition would provide insurance to the Troopers working our
highways and responding to criminal calls for service. We can
ill afford the potential loss of life and grief to the families
of our dedicated Troopers.

The National Troopers Coalition does not object to the
legitimate use of ammunition of this type for controlled sporting
events, Government use, or testing and research. Activities
of this type present no danger to our Troopers and research may
well benefit the law enforcement community overall. We would
therefore request a favorable report on this act in order to
safeguard our Troopers and give them the protection they deserve
and need.

Thank you.

105

Mr. HUGHES. Thank you very much, Sergeant Muth.

Our next witness, and final witness in this panel, is Mr. David Konstantin, research associate, Police Executive Research Forum. Welcome.

Mr. KONSTANTIN. Thank you, Mr. Chairman. I will get right to the point. The Police Executive Research Forum is a membership and research organization whose members are police chiefs and sheriffs from the Nation's largest jurisdictions. Our members overwhelmingly support H.R. 4 and especially emphasize the importance of a ban on sale.

We would also like to thank you, Mr. Chairman, and Mr. Biaggi, for all of your efforts on behalf of the law enforcement community.

Thank you.

[The statement of Mr. Konstantin follows:]

106

2300 M STREET N.W., SUITE 910
WASHINGTON, D.C. 20037

(202) 466-7820



**POLICE EXECUTIVE
RESEARCH FORUM**

GARY P HAYES
EXECUTIVE DIRECTOR

TESTIMONY OF

DAVID N. KONSTANTIN
Research Associate

ON BEHALF OF THE
POLICE EXECUTIVE RESEARCH FORUM

CONCERNING
LEGISLATION TO REGULATE
THE MANUFACTURE, IMPORTATION, AND SALE
OF ARMOR-PIERCING AMMUNITION

BEFORE THE
SUBCOMMITTEE ON CRIME
COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES

May 9, 1985

107

Mr. Chairman, members of the Subcommittee, thank you for giving the members of the Police Executive Research Forum an opportunity to express their views on this important issue. We are pleased to see legislation that would regulate the manufacture, importation, and sale of armor-piercing ammunition. This last item is very significant, for we feel that any bill that does not include limitations on the sale of these bullets will be self-defeating.

As an organization comprised of police chiefs and sheriffs from the nation's largest jurisdictions, we are intimately concerned with any measures that will protect the lives and well-being of America's police officers, and support this legislation as an important step in that direction. Today's law enforcement officer is already subjected to numerous threats, and cannot afford to have the protection provided by newly developed soft body armor breached by the so-called "cop-killer" bullet. Any legislation that would restrict the availability of this ammunition, as H.R. 4 would, will help to ensure the safety of those who have dedicated their lives to protecting the public against crime. It is imperative that this legislation be passed, as it will serve as a signal to all police officers that their elected representatives in Washington are interested in their welfare and are aware of and concerned about the risks that they face daily. Passage of this bill will be a vote of support for the cop on the street.

Although we have known about the availability and devastating potential of armor-piercing bullets for some time, all efforts to impose controls on them have, until now, been thwarted.

108

- 2 -

Representative Mario Biaggi, in fact, has been wisely and strongly advocating legislation in this area for the last six years. Not until now have the parties concerned been able to compromise on a bill whose wording and intent are agreeable to the diverse interests that they represent. The fact that Mr. Biaggi, Representative William Hughes, and the Administration have come together on this issue is encouraging to our members, in that it shows that political differences can be set aside when the matter at hand is as important as the saving of police officers' lives.

Our membership fully intends to monitor the effectiveness of this legislation once it is passed, and we suggest that a formal mechanism be instituted at the federal level to ensure that the new law is being enforced and that its intentions are indeed being realized.

In closing, we endorse this valuable legislation to limit the availability of "cop-killer" bullets, and look forward to seeing its speedy passage on the House floor.

Thank you very much, Mr. Chairman.

Mr. HUGHES. Thank you very much. I think that completes the testimony.

I don't really have any specific questions and I have read all your statements. I had your statements last evening, for the most part, and read them, and I think they all focus in on the critical issues.

I just want to assure you that I share your concern. There is no higher priority. It is my hope that this can be the first legislative initiative that we can move through the process because it enjoys a high priority. It is something that we should have done in the last Congress and I regret that we weren't able to pass legislation in the 98th Congress.

The second assurance I want to make to you is that I think sale is important and I am not going to bargain away sale. We met last year on a couple of occasions and I assured you then that we are not going to do anything meaningless. I want to do something that is positive and meaningful and it is my belief, firmly held, that legislation without a prohibition on sale, doesn't get at the root of the risk problem.

I think you, Mr. Lechner, put your finger on my own sentiments. It is a matter of risk assessment. I don't think it is an unreasonable risk to place upon the dealers. We are talking about saving lives.

I don't know of any other business that is not required to know the merchandise they sell. I think it is a flimsy excuse to suggest that in this instance we are going to make an exception because it is difficult for them.

As a matter of public import, I think it is important for dealers, like any other merchant, to know the business that they are about. That is part of the regulatory process; that is one of the reasons why we have such detailed recordkeeping, and particularly when you are talking about ammunition.

I think inherent in the notice requirement is the duty to know what you are selling. It is implicit in the notice. I am prepared to look at how we can provide adequate notice. Under the bill, the notice is a notice by ATF. The sanctions are not triggered until the individual receives a specific notice.

If, in our discussions with ATF and others during this process, we learn that there is some ambiguity and some basic unfairness, then we will look at other options at that point, but I think the bottom line is that I share your concern over the risk that is involved.

I don't think we have to have one or five or a dozen—God forbid—police officers killed before we do something about a situation that we know has that great capacity, particularly when you look and balance it against how much of a burden it has placed upon the dealers. If, in fact, the testimony we have heard is correct, that there is little ammunition, then the task is going to be a lot simpler than we once envisioned and I hope that that is the case.

The gentleman from Florida.

Mr. McCOLLUM. Thank you, Mr. Chairman.

I don't want to pursue individual questions. I think that you gentlemen have been sitting here long enough, as we have, and you

110

have been through this issue a lot longer than I have. I have been a supporter, as some of you may have heard me say earlier, of the concept in the initial legislation that Congressman Biaggi introduced, but I did not sit on this panel and I did not get involved with the detailed debate and, I gather, rather emotional differences that occured at the committee, subcommittee level and within the various factions of interest last time, so I come to it relatively fresh and open-minded and I am pleased, from what I am absorbing today, with apparently the progress that has been made to get to legislation. There seems to be a lot less emotional component in this today than there was. There seems to be more agreement than disagreement and we are down to one or two issues, it seems, and that is great progress.

It means we are going to have a bill and I think it means it is going to be one where we can work out whatever differences there are. I particularly appreciate Mr. Lechner's comments with regard to the question of intent and knowledge and so on, and I would say that from listening to you and using some commonsense, I would have to concur that better than 98 percent, probably, of all dealers do know precisely what is on their shelves.

I am always an individual rights type guy, even though I am pretty conservative, and that label doesn't mean we don't care about individual rights, so I am going to be open-minded throughout the rest of the proceedings to see if we can't listen real hard about any kind of a compromise that will allow us to protect those who might be in the 2 percent without harming the general intent of this legislation, which I don't want to do and I am sure no one else does.

Thank you, again, for the opportunity to hear your testimony. I appreciate very much the input that you have and the personal contact you have got with this issue.

Mr. HUGHES. Thank you.

Thank you once again. We appreciate your patience. We have taken a little longer than we intended today and for those who traveled long distances, we really do appreciate your taking the time to be with us today.

Our next and final witness is J. Warren Cassidy, the executive director of the National Rifle Association, Institute for Legislative Action.

Mr. Cassidy, welcome. Again, I apologize to you, Mr. Cassidy. We have really gone way over today. Between the votes and the number of witnesses, why, we have taken longer than we anticipated.

## STATEMENT OF J. WARREN CASSIDY, EXECUTIVE DIRECTOR, IN-STITUTE FOR LEGISLATIVE ACTION, NATIONAL RIFLE ASSO-CIATION

Mr. CASSIDY. Thank you, Mr. Chairman.

In the interest of brevity, you have my statement and I ask simply——

Mr. HUGHES. Yes, and without objection, it will be made a part of the record and we have read your statement.

111

Mr. CASSIDY [continuing]. Made a part of the record, with one correction. The information we had received originally, on page 2, the second page in the second paragraph of my statement, the expression "per month" should be in there. "We show only a miniscule total of 150 to 190 cartridges have been produced and imported." That should be per month, as you have heard from the Treasury Department.

Mr. HUGHES. Yes. The correction will be so noted.

Mr. CASSIDY. If there are any questions, I will certainly entertain them.

[The statement of Mr. Cassidy follows:]

112

## TESTIMONY OF J. WARREN CASSIDY
## EXECUTIVE DIRECTOR

## NATIONAL RIFLE ASSOCIATION
## INSTITUTE FOR LEGISLATIVE ACTION

SUBMITTED TO THE

## HOUSE JUDICIARY COMMITTEE
## SUBCOMMITTEE ON CRIME

## HEARINGS ON H.R. 4 AND H.R. 13

MAY 9, 1985

MR. CHAIRMAN & MEMBERS OF THE SUBCOMMITTEE ON CRIME:

I APPRECIATE THE OPPORTUNITY TO TESTIFY ON BEHALF OF THE MORE THAN 3 MILLION MEMBERS OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA.

MR. CHAIRMAN, AS YOU ARE AWARE, OVER THE LAST THREE YEARS THE NATIONAL RIFLE ASSOCIATION HAS CONSISTENTLY OPPOSED LEGISLATIVE PROPOSALS DESIGNED TO OUTLAW ARMOR PIERCING AMMUNITION THAT INCLUDED NOT ONLY ARMOR PIERCING AMMUNITION, BUT POTENTIALLY, NUMEROUS CONVENTIONAL ROUNDS OF AMMUNITION USED BY NRA MEMBERS AND OTHER LAW ABIDING CITIZENS FOR HUNTING AND TARGET SHOOTING AS WELL.

SINCE WE LAST TESTIFIED ON THIS ISSUE, IN JUNE OF 1984, THERE HAVE BEEN SEVERAL SIGNIFICANT DEVELOPMENTS. FIRST AND MOST IMPORTANTLY IS THE PASSAGE OF PL 98-473. SECTION 1006(A) OF THE BILL PROVIDES FOR MANDATORY PENALTIES FOR MISUSE OF ARMOR

114

PIERCING AMMUNITION DURING THE COMMISSION OF A CRIME OF VIOLENCE. THE NATIONAL RIFLE ASSOCIATION HAS SUPPORTED THIS CONCEPT SINCE ITS INCEPTION, AND WE CONTINUE TO BELIEVE THAT THE ONLY EFFECTIVE METHOD FOR CONTROLLING CRIME IS BY CONTROLLING THE CRIMINAL. WE ARE PLEASED THAT THIS LEGISLATION HAS BECOME LAW, AND ENCOURAGE THE VIGOROUS ENFORCEMENT OF ITS PROVISIONS.

SECOND, A RECENT SURVEY BY THE DEPARTMENT OF THE TREASURY OF MANUFACTURERS AND IMPORTERS OF ARMOR PIERCING AMMUNITION INDICATES THAT THE VOLUNTARY AGREEMENTS SECURED BY THE DEPARTMENT OF THE TREASURY ARE EFFECTIVE AND IN FORCE. FURTHER, THE SURVEY RESULTS SHOW ONLY A MINISCULE TOTAL OF 150 TO 190 CARTRIDGES HAVE BEEN PRODUCED AND IMPORTED BY ALL MANUFACTURERS.

GIVEN THE NEW MANDATORY SENTENCING LAW RECENTLY ENACTED AND THE COMPLIANCE OBTAINED BY THE DEPARTMENT OF THE TREASURY FROM ARMOR PIERCING BULLET MANUFACTURERS AND IMPORTERS, THE NATIONAL RIFLE ASSOCIATION QUESTIONS THE NEED FOR FURTHER LEGISLATION ON THIS ISSUE.

HOWEVER, THE NRA IS ACUTELY AWARE OF THE CONCERNS OF OUR NATION'S LAW ENFORCEMENT COMMUNITY REGARDING ARMOR-PIERCING AMMUNITION. NRA POLICE INSTRUCTORS HAVE TRAINED THOUSANDS OF LAW ENFORCEMENT PERSONNEL IN THE

SHOOTING SKILLS AND HAVE CONSISTENTLY MAINTAINED A
CLOSE WORKING RELATIONSHIP WITH INDIVIDUAL OFFICERS
THROUGHOUT AMERICA. POLICE GROUPS SEEK TO HAVE THE
VOLUNTARY COMPLIANCE AGREEMENTS SECURED BY THE
DEPARTMENT OF TREASURY WRITTEN INTO LAW. IN THIS
REGARD, H.R. 13, LIKE H.R. 5845 IN THE 98TH CONGRESS,
ADEQUATELY ADDRESSES THE CONCERNS OF LAW ENFORCEMENT
REGARDING THE MANUFACTURE AND IMPORTATION OF ARMOR
PIERCING AMMUNITION, WITHOUT UNNECESSARILY INFRINGING
ON THE RIGHTS OF LAW ABIDING GUN OWNERS AND DEALERS.
THE SPECIFIC PROVISIONS CONTAINED IN H.R. 13, LIKE H.R.
5845 LAST YEAR, HAVE IN THE PAST CONGRESS BEEN ENDORSED
BY EVERY MAJOR POLICE FRATERNAL ORGANIZATION, OVER 100
UNITED STATES CONGRESSMEN, OVER 90 UNITED STATES
SENATORS AND CONGRESSMAN BIAGGI.

THE NATIONAL RIFLE ASSOCIATION SUPPORTS H.R. 13,
BECAUSE IT WOULD IMPACT ONLY ON UNAVAILABLE ARMOR
PIERCING AMMUNITION; ALL CONVENTIONAL AMMUNITION USED
FOR HUNTING, SPORTING, AND PERSONAL PROTECTION PURPOSES
BY AMERICAN GUNOWNERS REMAINS UNTOUCHED.

MR. CHAIRMAN, THE NATIONAL RIFLE ASSOCIATION
OPPOSES H.R. 4 BECAUSE OF THE SALES PROVISION. GIVEN
THE LOOK-ALIKE NATURE OF SOME AMMUNITION, TO MAKE
FIREARMS DEALERS THE GUARANTOR OF THE METALLURGICAL
CONTENT OF THE AMMUNITION THEY SELL, BOTH NEW AND USED,

IS UNFAIR TO THE DEALER AND WOULD RESULT IN AN ENFORCEMENT NIGHTMARE. IF IN FACT THERE IS A PROBLEM WITH ARMOR PIERCING AMMUNITION THE LIMITATIONS ON MANUFACTURE AND IMPORTATION CONTAINED IN H.R. 13 WILL FORMALIZE THE VOLUNTARY AGREEMENTS ALREADY IN EFFECT AND FURTHER UNENFORCEABLE RESTRICTIONS ON FIREARMS DEALERS ARE NOT NEEDED.

MR. CHAIRMAN, I WOULD BE REMISS IF I DID NOT PROFFER FOR YOUR CONSIDERATION THE FOLLOWING INFORMATION. A RECENT SURVEY BY THE DUPONT CORPORATION MAKERS OF THE KEVLAR FABRIC FOR BULLET RESISTANT VESTS, INDICATES THAT ONLY ONE-HALF OF THE NATIONS 570,000 SWORN OFFICERS OWN BULLET-RESISTANT VESTS. FURTHER, ONLY ABOUT 15% OF THE OFFICERS WHO DO HAVE VESTS WEAR THEM REGULARLY. WE WOULD RESPECTFULLY SUGGEST THAT IF THE PROTECTION OF LAW ENFORCEMENT OFFICERS IS THE SUBJECT MATTER OF THIS HEARING, THE SURVEY CONDUCTED BY DUPONT SUGGESTS SOME VERY CLEAR PRIORITIES THAT COULD BE THE SUBJECT OF LEGISLATION. THE NUMBER OF OFFICERS SAVED FROM CRIMINAL ASSAULTS COULD BE SUBSTANTIALLY INCREASED IF EVERY OFFICER WERE ISSUED A VEST AND REQUIRED TO WEAR IT; WITHOUT THE ACCOMPANYING PUBLICITY ATTENDANT TO A MEDIA BLITZ OR TO HEARINGS SUCH AS THIS.

MR. CHAIRMAN, THANK YOU FOR THIS OPPORTUNITY TO TESTIFY.

117

Mr. HUGHES. Mr. Cassidy, I note that you support H.R. 13 because it would impact only on unavailable armor-piercing ammunition. That is on page 3, second paragraph of your statement.

I assume you are referring to ammunition that is already covered by agreements with the Treasury Department?

Mr. CASSIDY. That is correct, Mr. Chairman.

Mr. HUGHES. What you are saying in essence is that you support the bill because it really doesn't do much new, in essence.

Mr. CASSIDY. Would you repeat that, sir.

Mr. HUGHES. In essence, it doesn't really do very much additional to what the previous bill envisioned.

Mr. CASSIDY. It is the opinion of the National Rifle Association that this legislation basically will not do what most of the proponents wish it to do, and that is, reduce mortality among police officers, reduce fatalities, reduce injuries per se.

The National Rifle Association became involved last year because we have a sincere interest in law enforcement. We have been natural allies for many years and we credit the law enforcement community with our many successes on referendums in various States. They feel they have a concern. If they have a concern, we are interested in their concerns.

According to the Treasury Department and the Justice Department, the voluntary agreements reached between and among the manufacturers and the Federal law enforcement agencies has worked. The ammunition is not being used. There have been no police officers killed with armor-piercing ammunition penetrating the vest. The two Broward County officials were head shots and a 22-lead short bullet would have, unfortunately, killed both officers.

You are correct in saying that what we state here, that if the intent and the wish of the law enforcement is to place into law the voluntary agreement of nonavailable ammunition that is currently there, then we encourage the support of Congressman Brooks' legislation.

Mr. HUGHES. Mr. Cassidy, how many police officers do we have to see killed before it is a problem?

Mr. CASSIDY. I would hope none, Mr. Chairman. The fact is that none have been and——

Mr. HUGHES. Does that mean that there is no risk, then?

Mr. CASSIDY. Oh, no, of course, there is risk. As long as a man or woman is going to be a police officer, there is always going to be risk.

Mr. HUGHES. Would you agree that if we can take reasonable steps to save one life, that that in itself is a reasonable endeavor?

Mr. CASSIDY. I think there has to—I heard you say that earlier, Mr. Chairman, and respectfully, I am sure you mean that in the best manner.

Mr. HUGHES. I hope so.

Mr. CASSIDY. I know you did, but back a few years ago when I was the mayor of a city in Massachusetts, I used to debate this issue of gun control with Senator Kennedy and others and that comment was made. If one life could be saved: first it was, wouldn't you ban short-barrel handguns; wouldn't you agree to ban hollow-point bullets and so forth, and I said to the Senator, I could save more lives by closing Lynn Beach every summer, as the mayor of

Ocean City could save more lives in Maryland, but is the purpose just to save lives?

Mr. HUGHES. You see, the difference between that argument and the argument that we are engaged in today is that most folks agree that this ammunition has no sporting value. The argument that you were engaged in was a balancing of the right of legitimate ownership of weapons to protecting lives.

There is a fundamental difference between the two. If there was a valid argument that this ammunition had some value, even the law enforcement community agrees that it has no law enforcement value, because the ammunition is very dangerous. It ricochets and for that reason, they don't even use it in law enforcement missions. So there is a fundamental difference.

Getting back to the issue of saving lives, your argument is that nobody, no police officers have been killed. Thank God. We know enough about incidents, however, to know that but for the grace of God, police officers haven't been injured or killed.

In the Huberty case, for instance, if police officers had arrived at the scene early and Huberty had shot at them—even if they were wearing body armor, that wouldn't have protected them and they would have been injured presumably or killed.

I don't know that we have to wait until that occurs before we anticipate a problem, particularly where life is involved. It is a balancing; it is a matter of risk assessment.

I think Mr. Lechner put it pretty well. I think he was very articulate on this point. It is a matter of risk assessment. What is the risk to the dealer if we take reasonable steps to try to proscribe the transfer of this ammunition, as opposed to the risk to the police officer if we do nothing?

Mr. CASSIDY. Mr. Chairman, respectfully, I am not here as a defender or an apologist of the dealer, per se. I don't understand the analogy with the Huberty situation in San Ysidro. All of those citizens in there—none of them, rather, would have been used with—had armored vests regardless of what the situation was. Those people would have been killed by armor-piercing, by lead, by copper, any type of ammunition——

Mr. HUGHES. No, no, you missed the point; you missed the point entirely.

My point was, if a police officer had arrived on the scene early on while Huberty was killing people, feeling he was protected because he had body armor and had moved into that establishment, that fast-food restaurant, and Huberty had taken a shot at him with one of those rounds of Czechoslovakian ammunition that Huberty had, the chances are that police officer would either be injured or probably killed because Huberty was extremely accurate, was a very good marksman.

Mr. CASSIDY. I wouldn't debate a—I would not want to see any officer killed, but we are talking a little bit of abstract thinking. Huberty also had a shotgun. Any shooting at the police officers in the head with a shotgun would have eliminated them quickly anyway.

I would like to point out, Mr. Chairman, I am not defending a piece of ammunition or a bullet or a projectile. The Congressman

119

mentioned that he is one concerned with the civil rights of individuals, as well as dealers or police officers and so forth.

What concerns the National Rifle Association about this approach is that the inanimate object is being given a sense of morality, a purpose, an emotional ability to do something wrong. It is already totally illegal to shoot a police officer or anyone else with whatever ammunition is available. It is a crime to commit murder, to assault——

Mr. HUGHES. That is after the fact, though. That doesn't save a life.

Mr. CASSIDY. Yes, sir, but——

Mr. HUGHES. That is after the fact.

Mr. CASSIDY. But the people who are going to misuse armor-piercing ammunition are going to pay no attention to any legislation this Congress passes.

Mr. HUGHES. You know, I don't want to sound as if I am lecturing when I say this, but you stake out a position here which I just find absolutely unreasonable. Much of your organization is comprised of law enforcement officials. What we are talking about is an effort to save lives. It is not a balancing against sporting issues or values because that is not even involved. The ammunition, everybody concedes at this point, including the NRA, as I understand your testimony, has no sporting value.

It has been testified here that there are dealers in the country that don't know that they have it, but are selling it. I can't imagine that that is in the public interest. I can't imagine that being in the dealer's interest to do that, for all the reasons I tried to articulate earlier.

I don't know what a dealer loses. First of all, at this posture, one of the things he loses is perhaps some ammunition, and in the last Congress, Mr. Biaggi and I fashioned a provision that would allow treasury to buy the ammunition. There were so many critics of that—I mean one would have thought we proposed a raid on the Treasury, and there was so much paranoia developing over that that we dropped that. I mean, that wasn't central to it. We added that because we thought we were being fair to dealers.

We are right back at the central issue and that is in balancing the risks. Is it unfair basically to try to take, what I think is a reasonable step, to say to a dealer, after a certain date, the following ammunition is proscribed; you can't sell it? To say, in essence, if there is some question as to whether or not any of your ammunition fits within that ban, contact the ATF at a certain number by a certain date.

I don't know how you find that unreasonable.

Mr. CASSIDY. Mr. Chairman, you have heard one officer, one of the representatives, testify that he went into two gun stores in Arlington and asked for armor-piercing ammunition and they could not provide it because they did not sell it. I think the Treasury Department, in all candor, will tell you that there is very little of that ammunition available. The NRA isn't taking a stand because of the number of rounds of armor-piercing ammunition that may or may not be out there. Frankly, we think there are very few out there. Most of it has been burned up by people using it in target practice and competitions over the years that it was allowed to be in. We

120

think there is very little. It is a matter of principle; it is being purported as something that will save law enforcement personnel.

The NRA believes that—and has followed for years in——

Mr. HUGHES. Well, that is the principle and what is wrong with that principle?

Mr. CASSIDY. Nothing is wrong with the principle, but the installation of capital punishment, the building of more jails, cutting down on rescidivism. Any professional police officer knows this is the problem with crime in the country, the plea-bargaining. We talked about some attorneys here earlier. The parole, the probation, the fact that the man who murdered Robert Kennedy has been up a couple of times already for parole hearings. It is inconceivable.

We totally agree that anything the NRA can do to proect and help the law enforcement community in this country, we will do. We just think that this won't do it.

Mr. HUGHES. I think I finally see where you are coming down. The principle that I am concerned about is protecting police officers' lives and balancing it against the potential risk to a dealer not knowing he had ammunition he shouldn't have sold. That is the risk on that side.

What is the principle you are defending?

Mr. CASSIDY. The principle that I am defending?

Mr. HUGHES. Yes.

Mr. CASSIDY. That the inanimate——

Mr. HUGHES. What is the principle you are defending by being against this sale?

Mr. CASSIDY. The inanimate object is not a criminal and it doesn't have a criminal mind or an angelic mind. We are aiming legislation at something that will not cause. It may be a tool used by a criminal, but that is the best it can be. That is the principle we disagree on, I think.

Mr. HUGHES. Then I would take it you probably support the legalization of drugs?

Mr. CASSIDY. The legalization of drugs?

Mr. HUGHES. Yes.

Mr. CASSIDY. Of course not.

Mr. HUGHES. The same principle would apply. You know, you could apply it to the distribution of bazookas. Is it your feeling that we should be distributing bazookas if people want bazookas? We ban certain things because there is no legitimate public use for certain things. One of my great complaints is that we have never made silencers illegal, for instance. Now, realize that some collectors like silencers, but others like silencers, too, members of——

Mr. CASSIDY. They are illegal.

Mr. HUGHES [continuing]. Organized crime like silencers, but it is an inanimate object, isn't it?

Mr. CASSIDY. They are illegal, though.

Mr. HUGHES. No, they are not illegal. I beg to differ with you.

Mr. CASSIDY. The use of them is illegal.

Mr. HUGHES. Well, you get caught with a silencer on a weapon, it is illegal, but you can get permission to buy a silencer. It is not illegal. I have legislation—I have had legislation in the past that would make it illegal, but we have to make some policy decisions

from time to time as to what is in the interest of society. It is a balancing of rights and privileges and responsibilities.

What I am saying to you is there is a principle at stake here, trying to save police officers—I happen to disagree with you. I don't think that we have to see any police officers killed——

Mr. CASSIDY. I didn't say we did, either.

Mr. HUGHES [continuing]. Before we have a problem. Yes, but we keep hearing the same testimony over and over again, that we haven't seen any police officers killed. To which I say, well, but there is a risk there. Do we have to see a police officer killed before we identify a problem? Can't we be proactive, as opposed to reactive? That is a principle that I have identified and my difficulty with NRA's position is I don't understand the principle you are defending.

We are forever identifying inanimate objects and saying, "Thou shalt not do a certain thing." We do it with heroin. We do it with any number of things. We do it with child pornography. You name it, credit card fraud, computer card fraud. We make certain things using inanimate objects criminal. It is a balancing that we end up doing.

Mr. CASSIDY. I think it is a philosophical argument, Mr. Chairman, that any of your drug legislation has done any good whatsoever. We are quite active in Florida and in south Florida. We have an active membership down there. They are under heavy fire because of the drug situation, as far as law-abiding gun owners are concerned.

I think you can look at legislation after legislation after legislation and it doesn't address the real problem. There are approximately 570,000 uniformed police officers in the United States. Now, the DuPont Corporation recently did a study of the 575,000, one-halfowned bullet-proof vests and approximately 15 percent of the officers who have them wear them. If you ban all of the armor-piercing ammunition available today, only 15 percent of the uniformed officers in this country would have vests on against the conventional ammunition.

Mr. HUGHES. You are making a good argument for doing a better job of encouraging police officers to wear bullet-proof vests, but you almost make it mutually exclusive. We should be doing both. We should be encouraging police officers to use bullet-proof vests. We should be trying to pursue research so we can make the vests more effective, lighter. The one advantage the criminal has, the felon has, he knows when he is going to need a bullet-proof vest. Unfortunately, the police officer, particularly in the wintertime in certain areas—they have got heavy clothing on and it is a drag to wear the bullet-proof vest, even though it is for their own protection. They are unfortunately in the position where they don't know when they need one.

In the Huberty instance, it wouldn't have done any good. In some other instance, it wouldn't do any good if they are using ammunition that can pierce that armor. The telex, the communication to Customs from EPIC, suggests that the information is well known in criminal circles.

Mario Biaggi, I think, is absolutely correct when he suggests that the felons know before law enforcement what is occurring, what is

122

available, how to deal with problems. I spent 10 years in law enforcement. That was my experience, that the criminals are way ahead of us often.

So, I suggest to you that to use the argument that police don't use bullet-proof vests, and that is unfortunate, as a reason for not supporting reasonable steps to try to prevent felons from killing them when they do use bullet-proof vests, I think is without merit.

Mr. CASSIDY. Mr. Chairman——

Mr. HUGHES. Insofar as providing tools for drug traffickers, if I heard you correctly, you suggest that we pass legislation to provide tools, but that doesn't do any good.

Mr. CASSIDY. I think because so much is made in the media blitz——

Mr. HUGHES. What is your answer? In the last Congress, we passed a major crime bill—and I am proud of the crime bill. I was one of the prime sponsors and my colleague, Mr. McCollum, worked very closely with us on it and the ranking Republican, Hal Sawyer, who is retired from the Congress, was the prime author of many of the initiatives, including the child pornography bill.

We have literally hundreds of prosecutions today, new prosecutions under the authority just granted, hundreds of bail hearings where we are bringing people in that are a danger to the community. We are identifying them and we are putting them in the slammer when they are a danger to the community.

How can you suggest that that is not going to help in some way in dealing with the crime problem?

Mr. CASSIDY. We supported that——

Mr. HUGHES [continuing]. Going to solve the problem. We are never going to work ourselves out of a job.

Mr. CASSIDY. We supported that legislation, Mr. Chairman, totally, but we supported it because you were aiming it at the criminal element. This legislat' is not aimed at the criminal element. We supported that legislation and there is a 5-year mandatory, as you well know, for the commission of a felony with an armor-piercing. That hasn't even been let—to be tried for a year or two to see if it works.

Mr. HUGHES. Well, I have gone way over my time.

The gentleman from Florida has some questions, and I apologize for taking so much time.

Mr. MCCOLLUM. No, the chairman is asking pertinent questions. I just appreciate very much his yielding to me for a couple of minutes.

I want to make something clear that I am reading into your testimony and I think I am reading it right. The National Rifle Association does support legislation that would ban the manufacture of armor-piercing bullets; is that not correct?

Mr. CASSIDY. The National Rifle Association, if I may clarify it, supports the Brooks-Dingell bill, as did 150 or 190 of your fellows last year—it is the same bill—in the event that the Members of Congress feel that the law enforcement community requires legislation of this sort to satisfy their concern.

Yes, on the manufacture and the importation, if that is going to be required of this Congress, the National Rifle Association has supported it. That is correct. Not because we philosophically agree

123

with it, and not because we think it will do any good, but if the law enforcement community thinks it will do any good; if our mutual friends in the Congress think it will do some good for them to agree, then we support it.

Now, those are a lot of caveats, Congressman.

Mr. McCOLLUM. I understand the caveats. I gather the feeling and the emotion that has been in this as I said to other witnesses, you have heard me say, I didn't participate so I haven't gone through that ringer and others have, but I wanted to clarify that.

And one of the reasons I want to clarify it is because the tenor of the questioning and all might lead one not to realize that you had reached that point and I think that is a major point in the whole process.

I have been involved in some of the concerns expressed earlier that you picked up on in one of your answers to Mr. Hughes' question about some of these matters with the administration-raised question about the sale issue. Assume for the moment that some provision is put into the law, whether you like it or not, dealing with sale.

Mr. CASSIDY. Dealing with what?

Mr. McCOLLUM. Dealing with sale of these armor-piercing bullets, if that were to be the case, would it not be better to have some modifier in there such as knowing, willful or reckless in terms of the intent of the dealer if that goes through? You have not addressed that. That hasn't been an issue here for you to address because you have said the NRA opposes any legislation on the item of sale. But I am asking you an "if" question because, quite frankly, you have come to us saying, "We really don't feel so hot about this legislation altogether at all, but we have come around to supporting H.R. 13 in its present form," so you have obviously thought of a lot of contingencies, knowing, as I do, there is going to be legislation.

I sense that coming out of this committee, that there is going to be some form of a ban on sale involved in this. Maybe I am wrong, but assuming there is going to be—I am still openminded. I am not saying my position, but I am sensing that there will be. Would you feel it important to have a modification such as something like reckless or knowing or whatever placed in the statute?

Mr. CASSIDY. I think, although NRA prides itself on being idealistic, I think we are also realistic. As it stands now, there are two bills offering different things in the House of Representatives.

Mr. McCOLLUM. Right.

Mr. CASSIDY. Mr. Brooks' bill and Mr. Biaggi's. There is no brother bill of Mr. Biaggi in the United States Senate. The only bill on the floor is the Thurmond bill, which is brother to the Brooks' bill. Obviously, passage in this body of one type and the passage in the other of another would require a conference committee and what happens in conference committees where unquestionably people who are not friends of the NRA might be in the House Conference Committee and people who are will be in the Senate Conference Committee, so we understand that there is going to be some discussion and debate. Certainly, although we have not had a chance to study the Treasury Department's amendment that they passed out.

124

Any bill that requires some intent, particularly willful, and a prospective penalty versus a bill that requires no intent, like Mr. Biaggi's, and is retroactive in essence, we would, of course, be looking toward a willful and prospective, rather than no intent and retroactive.

Mr. McCOLLUM. Thank you very much. I appreciate your answering my questions.

Thank you.

Mr. CASSIDY. Thank you, sir.

Mr. HUGHES. I thank the gentleman.

I just have a couple more questions. I sense, with your explanation with H.R. 13, that you do support it, but you are not crazy about it. Am I correct in that?

Mr. CASSIDY. That is a fair assumption, yes, sir.

Mr. HUGHES. And I assume you support H.R. 13 because essentially all it does is reaffirm what has already been done voluntarily.

Mr. CASSIDY. That is correct.

Mr. HUGHES. So it basically does nothing. It does nothing. All it does is legislatively reaffirm what has already been accomplished by ATF and——

Mr. CASSIDY. Well, if ATF's actions have continued the record of no police officers being killed by the ammunition, cutting it down to 150 to 190 rounds per month, I would say that is a great——

Mr. HUGHES. No, no. I am saying that has already been accomplished, though, by voluntary agreements. That has already been accomplished. So actually, H.R. 13 just reaffirms what has already been accomplished and that is why you support it.

Mr. CASSIDY. That is correct.

Mr. HUGHES. And that is why you don't support the sale—it is an initiative that would reach the inventory that the police feel are out there.

I just have one further observation to make and I want to do it respectfully because I have always had a great deal of regard over the years, as a sportsman, for the NRA, but I am offended somewhat, by a statement that is made in your testimony—the suggestion that by having hearings in some way, we create or we assist in the proliferation of the problem.

I have some difficulty with that because I hear it quite a bit. I heard it with credit card and computer crime. We couldn't get witnesses to come in and testify about computer crime because they feared for any number of reasons that they would give youngsters a little more information than they should have and somebody else would experiment with it. I heard it with credit card fraud. We had witnesses who didn't want to testify on credit card fraud for any number of reasons, not the least of which is it wouldn't look good if some of the major companies came in and admitted that they had extensive credit card fraud.

We can't legislate unless we develop a hearing record. We can't deal with public policy concerns unless we are able to do it through a hearing process. That is how we function.

I am proud of the fact that this committee has attempted to be rather discreet about that type of testimony. We have tried to steer clear of testimony that would, in fact, invite testimony in sensitive

areas. We are not averse to taking it in executive session if, in fact, there are matters that should be brought to the attention of the committee that might impact the public in a negative fashion. You know, I just think it represents, really, an insensitivity to the need to deal with some of the public issues that impact us.

I don't know how we could deal with this problem, armor-piercing ammunition, unless we did it through a public hearing process. That is the American system and I trust you agree, that it is a fairly good system.

Mr. CASSIDY. I was referring more, Mr. Chairman, to the initial media blitz that was created back when the television networks, against the advice of most of these same police organizations that testified here today, just before my testimony. Those same groups asked the National Rifle Association not to come out and make a big thing about it. They asked the networks not to do it because they said the result will be head-shot police officers. That is exactly what has happened——

Mr. HUGHES. Mr. Cassidy, let me read your statement because that is not what you said.

Last paragraph:

> The number of officers saved from criminal assaults could be substantially increased if every officer were issued a vest and required to wear it. Without the accompanying publicity attendant to a media blitz or to a hearing, such as this.

Mr. CASSIDY. Well, I did put "media blitz" first, respectfully, and that is basically what my objection to it is.

Mr. Chairman, I might say this, we have suffered through—and two wrongs don't make a right—we have been called lovers of cop-killer bullets. We have won three suits against major newspapers because allegedly "the NRA has been out attempting to wipe out the law enforcement community of the United States." I apologize if those comments offended you——

Mr. HUGHES. Mr. Cassidy, you have never heard me say anything like that.

Mr. CASSIDY. No, I did not, but I said we have been on the receiving end and perhaps we get sensitive or overly sensitive.

Mr. HUGHES. Well, you have never heard me say anything like that, and I am offended when it is suggested to me, publicly or otherwise, that I am part of the problem, not part of the solution.

Thank you very much.

Mr. CASSIDY. Thank you.

Mr. HUGHES. That concludes our testimony. The hearing stands adjourned.

[Whereupon, at 5:50 p.m., the subcommittee was adjourned, to reconvene subject to the call of the Chair.]

126

### ADDITIONAL MATERIAL



**Congressional Research Service**
**The Library of Congress**

Washington, D.C.  20540

November 27, 1984

TO        :  Honorable Mario Biaggi
              Attn:  Craig Floyd

FROM      :  American Law Division

SUBJECT   :  Summaries of Reported Judicial Decisions Making Reference to
              Armor-Piercing Ammunition.

This will respond to your request and our subsequent telephone conver-
sation regarding the above matter.  Specifically, you ask for a brief descrip-
tion of the significance of armor-piercing ammunition in the written opinions
of the cases you have cited.  In addition to summaries of those decisions pro-
vided by your office, we have included a few additional ones found in our
research.  In all of these cases only the merest reference to armor-piercing
ammunition is made by the court.

<u>State Cases</u>

1.  <u>People v. Goodman</u>, 396 N.E. 2d 274 (Ill. App. Ct.), 77 Ill.
    App. 3d 569 (1979).  The defendant appealed her conviction
    on charges of involuntary manslaughter.  The appellate court
    here held that the evidence failed to prove beyond a reason-
    able doubt that she had not acted in self-defense.  Her con-
    viction was reversed.  The victim was her husband, a police
    sergeant, who was shot with his own weapon.  The only ref-
    erence in the case to armor-piercing ammunition is in a
    dissenting opinion which states that "decedent was hit 3
    times with armor-piercing bullets (not the type normally
    carried in the service weapon used by him on police duty)."
    (at 279).

Exhibit A
Page 132

CRS-2

2. **People** v. **French**, 75 Ill. App. 2d 453 (1966). This
was an appeal from an armed robbery conviction. In
discussing a prior armored car robbery that the
defendant may have been involved in, the court made
reference to the fact that defendant had been given
six armor-piercing bullets before that incident. The
conviction was affirmed.

3. **Louisiana** v. **Ce ching**. No. KA-0548, slip. op., La.
Ct. App. '*h Ci . (August . 1983). The defendant was
found gui ' of be ng a convicted felon is possession
of a firea in violation of a Louisiana statute. On
appeal his co iviction was affirmed. He was apprehended
on suspicion of attempted murder whereupon his firearm
was seized. It was found to contain teflon-coated am-
munition. Testimony by an expert witness had been re-
ceived to the effect that "this ammunition could pen-
etrate a bullet-proof vest, and that it was the most
dangerous ammunition on the market today."

4. **People** v. **White**, 220 N.W. 2d 789 (Mich. Ct. App.) 54
Mich. App. 342 (1974). The defendant was convicted
of assault with intent to murder. He appealed on the
grounds that a search following his arrest made with-
out a warrant was not a reasonable one. The Court
of Appeals here held that the search was reasonable
in that the apprehending officers had been fired upon
before defendant surrendered. Speedy trial arguments
were also rejected. Armor-piercing bullets were seized
at the time of arrest.

5. **State** v. **Hansen**, 312 N.W. 2d 96 (Minn. 1981). The
defendant appealed convictions relating to charges
of aggravated criminal damage to property. He had
been accused of firing armor-piercing ammunition
through the vehicle of private security guards at a
powerline construction site. After finding that certain
statements admitted into evidence were not properly
admissible and that the defendant's Sixth Amendment
right of confrontation was violated, the Supreme Court
of Minnesota reversed the conviction.

6. **Williams** v. **State**, 369 So. 2d 910 (Ala. Crim. App. 1979).
The defendant was convicted of robbery and assault with
intent to murder. On his arrest police officers found
an assortment of weapons loaded with armor-piercing am-
munition. The Alabama Court of Criminal Appeals affirmed
the conviction.

128

CRS-3

7. <u>Tafero</u> v. <u>State</u>, 403 So. 2d 355 (Fla. 1981). After conviction of robbery, kidnaping, and murder, the defendant was sentenced to death. Two police officers were shot in the incident leading to apprehension, the court stating that armor-piercing ammunition was employed by the defendant. The Florida Supreme Court affirmed the convictions and sentence.

8. <u>State</u> v. <u>Francoeur</u>, 387 So. 2d 1063 (Fla. 1980). The State of Florida appealed the lower court granting of a motion to suppress controlled substances taken from a vehicle. At the time of defendant's apprehension he was in possession of a .45 calibre automatic pistol loaded with armor-piercing bullets. The appellate court here held the exigent circumstances permitted the search and therefore reversed and remanded.

9. <u>Pressley</u> v. <u>State</u>, 261 So. 2d 522 (Fla. Dist. Ct. App. 1972). The defendant appealed a first degree murder conviction. The District Court of Appeals affirmed, finding no reversible error in failure to sever the trial of two defendants. The indictment was for murder in the course of armed robbery of a grocery store. The decedent "was shot five times with a .38 calibre Taurus Brazil pistol and died as a result of the wounds inflicted by the four armor-piercing conical bullets coursing through his chest . . ."

## Federal Cases

10. <u>United States</u> v. <u>Melvin</u>, 596 F.2d 492 (1st Cir.), <u>cert. denied</u>, 444 U.S. 837 (1979). The defendant was convicted of possession of unregistered firearms in violation of 26 U.S.C. 5861 (d) and he appealed. He challenged the validity of the warrant authorizing the search of his home which led to seizure of the weapons. A cache of ammunition, including armor-piercing bullets, was described in a dissenting opinion as having been taken by the police. The conviction was affirmed.

11. <u>United States</u> v. <u>Cahalane</u>, 560 F. 2d 601 (3d Cir. 1977), <u>cert. denied</u>, 434 U.S. 1045 (1978). The defendants in this case appealed their conviction for conspiracy and aiding and abetting the illegal exportation of arms and ammunition to Northern Ireland without a license. Some of the ammunition involved was of the armor-piercing variety. The Court of Appeals affirmed the conspiracy counts of the indictment. See also, lower court decision, 422 F. Supp. 147 (E.D. Pa. 1976).

129

CRS-4

12. United States v. Hillick, No. 75-1036, slip op., 4th Cir. (Aug. 25, 1975). Appellants appealed their sentences on convictions of multiple violations of the Federal Gun Control Act of 1968 (Pub. L. 90-618, 82 Stat 1213, as amended). They had been found guilty of conspiring to transport weapons, explosives, and armor-piercing ammunition to the Irish Republican Army. The sentences were upheld.

13. United States v. Burton, 341 F. Supp. 302 (W.D. Mo. 1972). See also, United States v. Burton, 351 F. Supp. 1372 (W. D. Mo. 1972), aff'd, 475 F.2d 469 (8th Cir. 1973). The defendant was charged with delivering a firearm and ammunition to a common carrier for transportation and shipment in interstate commerce without giving proper notice. Some of the rounds in a fully loaded revolver were armor-piercing. A challenge of the search leading to the prosecution was rejected.

It would appear from a reading of these decisions that armor-piercing ammunition was in no instance a primary focus of judicial inquiry. The cases may nevertheless be of significance to the extent that they shed light on the frequency with which incidents involving such bullets have come before the courts. It is, of course, impossible to know how many cases have involved such ammunition but have not resulted in specific reference to armor-piercing capability in a written opinion.

We hope this information will be of some assistance. If we can be of further help, please let us know.

Kent M. Ronhovde
Legislative Attorney



**Congressional Research Service**
**The Library of Congress**

Washington, D.C.   20540

January 10, 1985

TO          :  House Committee on the Judiciary,
               Subcommittee on Crime
                  Attention:  Eric Sterling

FROM        :  American Law Division

SUBJECT     :  Revocation of Federal Firearm Dealers' Licenses for the Sale of
               Armor-Piercing Ammunition Under Proposed Legislation

This will respond to your request for information regarding the above matter. Specifically, you ask for background information on legal issues involved in legislation to ban the sale of armor-piercing ammunition by federally licensed gun dealers. You have expressed concern that in certain instances license revocation may be harsh when identification of armor-piercing rounds may be difficult for the well-intentioned individual dealer. While contemplated lists of proscribed rounds would be furnished by the Secretary of the Treasury, a significant burden might be placed upon dealers considered to be on notice that to sell any such rounds is an offense. [1] If, as has been suggested, a _scienter_ requirement is included in the offense, the hardship of revocation would only fall upon those with some degree of foreknowledge of the wrongfulness of the sale.

_____

[1] Not only would dealers conceivably be faced with long lists of prohibited types and makes of ammunition, but they would also face the problem that many such rounds may not be distinguishable from other ammunition by physical inspection.

131

CRS-2

## ABSOLUTE LIABILITY

Statutory impositions of strict liability for failure to comply with reasonable efforts to preserve the general welfare have been upheld in the face of due process challenge.  Not only have such regulatory schemes withstood challenge in the civil context, but in the criminal context as well, where statutes will be more strictly construed.  United States v. Balint, 258 U.S. 250 (1922).  See also, Lambert v. California, 355 U.S. 225 (1957); United States v. Dotterweich, 320 U.S. 277 (1943).  The Supreme Court said long ago in City of Chicago v. Sturges, 222 U.S. 313 (1911), a case involving exercise of state police powers:

> It is a general principle of our law that there is no individual liability for an act which ordinary human care and foresight could not guard against. It is also a general principle of the same law that a loss from any cause purely accidental must rest where it chances to fall. But behind and above these general principles which the law recognizes as ordinarily prevailing, there lies the legislative power, which, in the absence of organic restraint, may, for the general welfare of society, impose obligations and responsibilities otherwise nonexistent.
>
> Primarily, governments exist for the maintenance of social order.  Hence it is that the obligation of the government to protect life, liberty and property against the conduct of the indifferent, the careless and the evil-minded may be regarded as lying at the very foundation of the social compact. A recognition of this supreme obligation is found in those exertions of the legislative power which have as an end the preservation of social order and the protection of the welfare of the public and the individual. If such legislation be reasonably adapted to the end

CRS-3

in view, affords a hearing before
judgment, and is not forbidden by
some other affirmative provision of
constitutional law, it is not to be
regarded as denying due process of
law under the provisions of the
Fourteenth Amendment (at 322).

In United States v. Balint, supra, the Court upheld imposition of strict

criminal liability under a statute making it unlawful to sell narcotics

without a written order. The defendant claimed that the indictment was

insufficient because it failed to allege that he had known that the drugs

sold were narcotics. Chief Justice Taft said in that case:

While the general rule at common
law was that the scienter was a
necessary element in the indictment
and proof of every crime, and this
was followed in regard to statutory
crimes even where the statutory
definitions did not in terms include
it . . . there has been a modification
of this view in respect to prosecu-
tions under statutes the purpose of
which would be obstructed by such a
requirement. It is a question of
legislative intent to be construed
by the court. It has been objected
that punishment of a person for an
act in violation of law when ignorant
of the facts making it so, is an
absence of due process of law. But
that objection is considered and
overruled in Shevlin-Carpenter Co.
v. Minnesota, 218 U.S. 57, 69, 70,
in which it was held that in the
prohibition or punishment of
particular acts, the State may in
the maintenance of a public policy
provide "that he who shall do them
shall do them at his peril and will
not be heard to plead in defense
good faith or ignorance." Many
instances of this are to be found
in regulatory measures in the

CRS-4

> exercise of what is called the police
> power where the emphasis of the
> statute is evidently upon achievement
> of some social betterment rather than
> the punishment of the crimes as in
> cases of mala in se . . . . (at 252)
> (Emphasis supplied)

In Balint the Court stressed that "where one deals with others and his mere

negligence may be dangerous to them, as in selling diseased food or poison,

the policy of the law may, in order to stimulate proper care, require the

punishment of the negligent person though he be ignorant of the noxious

character of what he sells" (at 253).  In language of arguable application

to armor-piercing ammunition as well as narcotics, the Court concluded:

> [The statute's] manifest purpose
> is to require every person dealing
> in drugs to ascertain at his peril
> whether that which he sells comes
> within the inhibition of the
> statute, and if he sells the
> inhibited drug in ignorance of its
> character, to penalize him.  Congress
> weighed the possible injustice of
> subjecting an innocent seller to a
> penalty against the evil of exposing
> innocent purchasers to danger from
> the drug, and concluded that the
> latter was the result preferably to
> be avoided.  Doubtless considerations
> as to the opportunity of the seller
> to find out the fact and the diffi-
> culty of proof of knowledge contribu-
> ted to this conclusion." (at 254) 2/

In United States v. Park, 421 U.S. 658 (1975), the Court upheld conviction

of the president of a large national food chain for violations of the Federal

---

2/  For a discussion of arguments for and against strict liability in
criminal laws, see 12 Stanford Law Review 731 (1960).

Exhibit A
Page 139

CRS-5

Food, Drug, and Cosmetic Act involving exposure of interstate shipments of food to rodent contamination at a company warehouse. While the company pleaded guilty, the president argued that provision of sanitary storage was a matter that he had delegated to "dependable subordinates." At issue on appeal to the Supreme Court was whether proof of "wrongful action" on the part of the President was an element of the offense required by due process. The Court's holding that such proof was not necessary may also suggest a rationale for the conclusion that failure of a firearms dealer to track types of ammunition could be made grounds for permissible license revocation in spite of an absence of knowledgeable wrongdoing. The Court said in Park: "Congress has seen fit to enforce the accountability of responsible corporate agents dealing with products which may affect the health of consumers by penal sanctions cast in rigorous terms, and the obligation of the courts is to give them effect so long as they do not violate the constitution." (at 673) Descriptions of the nature of the Federal Food, Drug, and Cosmetic Act included in Park also suggest parallels which could be drawn to federal firearms laws:

> . . . the Act imposes not only a positive duty to seek out and remedy violations when they occur, but also, and primarily, a duty to implement measures that will insure that violations will not occur. The require- ments of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who volun- tarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them. (at 672) (Emphasis supplied)

135

CRS-6

In <u>United States v. Freed</u>, 401 U.S. 601 (1971), the Supreme Court upheld the validity of provisions of the National Firearms Act (48 stat. 1236, as amended) prohibiting the receipt or possession of an unregistered firearm without requiring any specific intent on the part of the defendant.  The Court held that the absence of such a requirement in an essentially regulatory statute in the area of public safety does not violate due process requirements. In <u>Freed</u> the appellees had been indicted under the act for possessing unregistered hand grenades.  The Court said:  "This is a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act.  They are highly dangerous offensive weapons, no less dangerous than the narcotics involved in <u>United States v. Balint</u> . . . ." (at 609)  3/

## The Gun Control Act of 1968

The Gun Control Act of 1968 (P.L. 90-618, 82 stat. 1213, as amended) now provides for revocation of licenses to manufacture, import, or deal in firearms as a business.  Section 923(e) of Title 18 of the <u>United States Code</u> reads:

> The Secretary may, after notice
> and opportunity for hearing, revoke
> any license issued under this section
> if the holder of such license has
> violated any provision of this chapter
> or any rule or regulation prescribed
> by the Secretary under this chapter.
> The Secretary's action under this

_____

3/  For a discussion of <u>Freed</u> and the view that strict criminal liability is unjust, see 24 <u>Wayne Law Review</u> 1571 (1978).

CRS-7

> subsection may be reviewed only as
> provided in subsection (f) of this
> section.

Revocations under 18 U.S.C. 923 must be accompanied by (1) written notice from the Secretary of the Treasury stating specifically the grounds for revocation (to be tendered prior to the effective date of the revocation); (2) opportunity for a hearing to review the revocation; (3) opportunity for a stay of the effective date of the revocation; and (4) judicial review of revocation in United States District Court.  The Secretary has issued regulations detailing revocation procedures.  See 27 CFR §178.71 et seq.

While the license revocation provision of current law does not require that violations of the Act be "willfull" in order to trigger revocation, one court has so interpreted the intent of Congress.  In Rich v. United States, 383 F. Supp. 797 (1974), the court found that it could only interpret the revocation provisions of the Gun Control Act in light of the license issuance provisions included in the law:

> The licensing provisions of §923
> impose a duty upon the Secretary to
> issue a license unless the applicant
> is disqualified by the carefully
> defined exceptions of §923(d)(1).
> Sections 923(d)(1)(C) and (D) provide
> that licenses may be denied only for
> "willfull" violations of the provi-
> sions of the Act or regulations or
> willfull failure to disclose material
> information.  The lack of an equiva-
> lent willfull intent in the revocation
> section 923(e) creates an anomalous
> situation.  Apparently the Secretary
> may revoke for error, inadvertence,
> or simple ignorance of regulation.
> Such revocation then becomes an
> exercise in futility if thereafter
> the Secretary by the plain language

137

CRS-8

> of §923(d) must reissue the license
> absent a showing of willfull violation.
> It cannot be that Congress intended
> this formalistic paradox. Accordingly,
> we hold that the Secretary must show a
> willfull violation of statutes or rules
> and regulations promulgated thereunder
> in order to prevail herein.

See also, Shyda v. Director, B.A.T.F., 448 F. Supp. 409 (M.D. Pa. 1977).

The Federal Firearms Owners Protection Act

Legislation reported out by the Senate Judiciary Committee in the 98th Congress would have amended §923(e) to make it clear that revocation could only follow "willfull" violations. The Federal Firearms Owners Protection Act (S. 914, H.R. 2420) as reported would have made this change "to ensure that licenses are not revoked for inadvertent errors or technical mistakes." S. Rept. No. 98-583, 98th Cong., 2d Sess. 14 (1984).

That legislation would also have amended current law to allow a licensee to sell a firearm with a barrel length of greater than three inches to a resident of any other state, if the sale, delivery and receipt of that firearm fully comply with the legal conditions of sale in both states. The proposal stipulated that "any licensed manufacturer, importer or dealer shall be presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States." The Senate Report includes the following discussion of the burden this places upon the licensee:

> Since licensees are presumed to
> have knowledge of existing state law
> and published local ordinances under
> the Committee amendment, Section
> 109(1) of the bill requires the
> Secretary of the Treasury, upon the
> effective date of the Act, the [sic]
> publish and provide to all licensees

CRS-9

a compilation of the state laws and published ordinances of which licensees are presumed to have knowledge. Any amendments thereto are required to be published in the Federal Register, revised annually, and furnished to each licensee.

In view of the stiff penalties to which a licensee is potentially subject under the bill, the Committee anticipates that the Secretary will make every effort to ensure the accuracy and completeness of the information required to be provided. Furthermore, where a dealer feels uncertain about the requirements of the law of the state of the purchaser's residence, he may, of course, decline to make a sale to such person. Alternatively, he could require of the purchaser that the transaction be conducted through a licensee in the purchaser's own state. (at 10-11)

## Scienter

To the extent that the informational burden to be placed on the licensee under an armor-piercing bullet ban is severe, and to the extent that standards for making determinations as to bullet capabilities may be somewhat vague, the inclusion of a scienter requirement would avoid revocation of the license of well-intentioned dealers. Due process challenges for vagueness or uncertainty in statutory proscriptions may be overcome by requirements that those penalized have acted in bad faith. See, e.g., Gorin v. United States, 312 U.S. 19, 27-28 (1941). The courts will generally look to the intent of the legislature in determining how to interpret scienter language, even when the term used is "knowing", "willfull", "reckless", or other common language.

CRS-10

The lack of uniformity with which such terms have been applied in the past is perhaps best summarized by the Senate Report to accompany the Criminal Code Reform Act of 1981 (S. 1630, 97th Congress) which sought to make order of this "chaos":

> Present Federal criminal law is composed of a bewildering array of terms used to describe the mental element of an offense. The National Commission's [on Reform of Federal Criminal Laws] consultant on this subject identified 78 different terms used in present law. These range from the traditional "knowingly," "willfully," and "maliciously," to the redundant "willfull, deliberate, malicious, and premeditated," and "knowingly and willfully," to the conclusive "unlawfully," "improperly," and "feloniously," to the self-contradictory "willfully neglects." No Federal statute attempts a comprehensive and precise definition of the terms used to describe the requisite state of mind. Nor are the terms defined in the statutes in which they are used. Instead the task of giving substance to the "mental element" used in a particular statute, or to be inferred from a particular statute, has been left to the courts.
>
> Not surprisingly, the proliferation of these terms has left the criminal justice system with confusing and even conflicting laws. Justice Jackson characterized the mental element concepts in Federal law as being "elusive" because of "the variety, disparity and confusion" of judicial definitions. For example, the term

CRS–11

"willfull" has been construed by the courts in a variety of ways, often inconsistent and contradictory. The courts have defined a "willfull" act as an act done voluntarily as distinguished from accidentally, an act done with specific intent to violate the law, an act done with bad purpose, an act done without justifiable excuse, an act done stubbornly, an act done without grounds for believing it is lawful, and an act done with careless disregard whether or not one has the right so to act.

The term "knowingly," which is often used in conjunction with "willfully," has been defined in terms of awareness; in terms of a defendant's inference from the circumstances or belief that something is probably true; in terms of a defendant's awareness of a "high probability" that a circumstance exists; in terms of intentional or purposeful or "studied ignorance" as to the existence of a fact; and in terms of "gross indifference to" or "willfull neglect of" a duty in respect to ascertainment of particular facts.

Similarly, the concept of "malicious," which in some contexts has been defined to mean little more than intentionally or knowingly engaging in prohibited conduct without legal justification, in other contexts has meant doing a harm malevolently, for the sake of the harm as an end in itself. "Wanton" has appeared to serve as an equivalent of "reckless" or "with gross negligence."

As Professor Weinreb, consultant to the National Commission, summarized the state of Federal law with respect to the "mental element":

> Unsurprisingly, the courts have been unable to find substantive correlates for all these varied descriptions of mental states, and in fact, the opinions display far fewer mental states than the statutory language. Not only does the statutory language not reflect accurately or consistently what are the mental elements of the various crimes; there is no discernible pattern or consistent

141

CRS-12

> rationale which explains why one
> crime is defined or understood
> to require one mental state and
> another crime another mental
> state or indeed no mental state
> at all.
> (S. Rept. No. 97-307, 97th Congress, 1st Session
> 64-65 (1981)).

Rules of strict construction in criminal matters may not be applied in a civil license revocation proceeding, allowing greater flexibility in legislative interpretation. However, one treatise suggests that "[o]n the theory that legislation concerned with the revocation or suspension of licenses to engage in a profession or vocation is penal in nature, a rule of strict construction is sometimes applied with respect to such provisions." 51 Am. Jur. 2d Licenses and Permits §58 (1970). Thus whether the procedure of revocation is to be considered civil or criminal, clarity in defining the scienter requirement will add to the predictability and consistency of future court rulings should revocation be contested.

Other License Revocation Statutes

Under federal drug laws, those dispensing narcotic drugs to individuals for maintenance treatment or detoxification must obtain specific annual registration from the Attorney General for that purpose. As provided in 21 U.S.C. 823(g) the Attorney General shall register an applicant:

> (1) if the applicant is a practitioner
> who is determined by the Secretary
> [of Health and Human Services] to be
> qualified (under standards established
> by the Secretary) to engage in the
> treatment with respect to which
> registration is sought;
> (2) if the Attorney General determines
> that the applicant will comply with
> standards established by the Attorney
> General respecting (A) security of

142

CRS-13

stocks of narcotic drugs for such
treatment, and (B) the maintenance
of records (in accordance with
section 827 of this title) on such
drugs; and
(3) if the Secretary determines that
the applicant will comply with
standards established by the Secretary
(after consultation with the Attorney
General) respecting the quantities of
narcotic drugs which may be provided
for unsupervised use by individuals
in such treatment.

The regulations governing such treatment of narcotic addicts are lengthy and detailed. (See 21 C.F.R. Part 291 and Part 1301.) Denial, revocation, and suspension of such registration is authorized at 21 U.S.C. 824 which states, inter alia: "A registration pursuant to section 823(g) of this title to dispense a narcotic drug for maintenance treatment or detoxification treatment may be suspended or revoked by the Attorney General upon a finding that the registrant has failed to comply with any standard referred to in section 823(g) of this title." While extensive due process procedures are provided by section 824 (e.g., notice and hearing) no scienter language is included in the statute. As described in the House Report to accompany the Narcotic Addict Treatment Act of 1974 (Pub. L. 93-281): "The proposal requires separate registration with D.E.A. for narcotic treatment programs. Registration will be predicated on the demonstrated ability to comply with medical standards established by F.D.A. and security standards established by D.E.A. The bill also provides authority to withdraw registration for failure to comply with these standards . . . ." H. Rept. No. 93-884, 93rd Cong., 2d Sess. 4 (1974).

As drug laws represent an effort to protect the public welfare from a harmful substance, so do arms export/import laws seek to provide protection for

CRS-14

national interests.  Under 22 U.S.C. 2778 no defense articles designated by the
President may be exported or imported without a license.  In this instance the
license itself provides for revocation at the discretion of the Secretary of
State.  It is statutorily required by 22 U.S.C. 2791 that "[e]ach export license
issued under section 2778 . . . shall provide that such license may be revoked,
suspended, or amended by the Secretary of State, without prior notice, whenever
the Secretary deems such action to be advisable."

The federal securities laws provide for registration and regulation of
brokers and dealers by the Securities and Exchange Commission.  The Securities
Exchange Act of 1934, (48 stat. 74, 15 U.S.C. 77a et seq., as amended), provides,
among other bases for revocation of such registration, a finding (after notice
and opportunity for hearing) that a broker or dealer "has willfully violated
any provision of the Securities Act of 1933, the Investment Advisers Act of 1940,
the Investment Company Act of 1940, this chapter, the rules or regulations under
any of such statutes, or the rules of the Municipal Securities Rulemaking
Board . . ." (§15(b) of the Act) (Emphasis supplied).  In Gearhart & Otis, Inc.
v. Securities and Exchange Commission, 348 F.2d 798 (D.C. Cir. 1965), the
petitioners sought review of a Commission order revoking their broker-dealer
registration.  At issue in the case was whether the petitioners had to be found
to have willfully intended to violate the law.  The court held that specific
intent to violate the law was not an essential element of the willfulness
required to violate section 15(b) of the Act:  "The proof necessary for a viola-
tion of section 15(b) by using a false and misleading offering circular in the
sale of common stock is a showing that petitioners sold common stock knowingly
using a false and misleading offering circular." (at 803)  Gearhart cited

CRS-15

<u>Tager v. Securities & Exchange Commission</u>, 344 F.2d 5 (2d Cir. 1965) in which
the Second Circuit had said: "It has been uniformly held that "willfully" in
this context means intentionally committing the act which constitutes the viola-
tion. There is no requirement that the actor also be aware that he is violating
one of the Rules or Acts." (at 8)

Clearly, there is no uniformity among federal licensing statutes as to
standards for revocation.  Some laws appear to suggest reliance upon the notion
that "the ultimate authority from which a license to carry on a particular
activity derives has inherent power to withdraw the license."  51 Am. Jur. 2d
<u>Licenses and Permits</u> §58 (1970).  Other statutory schemes rely on failure of
the licensee to meet requirements built into the licensing agreement as the
basis for revocation.  These violations have to be intentional in some instances,
and in other laws the violation itself amounts to sufficient cause for revocation
regardless of intent.  Some laws require "flagrant" or "repeated" violations in
order that license revocation be instituted.<u>4/</u>   In one statute "knowing or
careless" improper conduct is made grounds for revocation.<u>5/</u>

——————————

<u>4/</u>  For example, live poultry dealers and handlers must be licensed by the
Secretary of Agriculture under 7 U.S.C. 218a.  The statute stipulates at 7 U.S.C.
218d as follows:

> Whenever the Secretary determines, after
> opportunity for a hearing, that any licensee
> has violated or is violating any of the
> provisions of this subchapter, he may
> publish the facts and circumstances of such
> violation and by order suspend the license
> of such offender for a period not to exceed
> ninety days and if the violation is flagrant
> or repeated he may by order revoke the
> license of the offender.

<u>5/</u>  Licensing of cotton classifiers by the Secretary of Agriculture under
7 U.S.C. 53.

145

CRS-16

Another federal licensee may lose that license if he "has committed an act
of incompetence, misconduct, or negligence."[6]

Conclusion

Where the authority to issue a license is clear, where revocation grounds
are stipulated by statute, and where due process procedures are provided,
legislative discretion in the creation of licensing schemes would appear to be
exceedingly broad.  By accepting and acting under a license, the licensee may
be said to consent to all valid conditions imposed thereby, including provisions
for its revocation.  See 51 Am. Jur. 2d Licenses & Permits §58 (1970).  In some
cases the burden assumed by the licensee in order to remain in compliance with
license requirements may be great.  But especially where police powers are
invoked by the legislature to protect the public welfare from a reasonably
perceived danger, the complexity of the licensee's burden would not appear to
be an obstacle to revocation for delinquency.

Thus the fact that a federal firearm licensee could suffer revocation of
his license for negligently selling armor-piercing ammunition would not appear
to jeopardize the validity of such a provision.  Assertions of legislative
concern over the inherent dangers in the proliferation of such ammunition
coupled with requirements that the Secretary of the Treasury provide necessary
data on prohibited rounds would in all likelihood suffice to overcome judicial
challenges regarding the reasonableness of the penalty for error.

The Gun Control Act of 1968 already provides for federal firearm license
revocation for violation of its provisions and regulations issued by the

_____

[6]  See Merchant Mariners documents provision, 46 U.S.C. 7703.

CRS-17

Secretary of the Treasury pursuant thereto.  While judicial pronouncements have interpreted the legislative intent as requiring "willful" violations in such cases, it has not been held that such <u>scienter</u> is constitutionally mandated.

To be sure, inclusion of a clearly defined intent element in violations of ammunition sales provisions would seem reasonable where the burden on the licensee is truly onerous and where well-intentioned error is inevitable. But where Congress perceives the danger to be significant, the courts will be slow to question the validity of a regulatory scheme adopted to protect the public from perceived danger.

Kent M. Ronhovde
Legislative Attorney
American Law Division
January 10, 1985

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, D.C. 20515
#### Ninety-ninth Congress

February 12, 1985

John M. Walker, Jr.
Assistant Secretary for Enforcement and Operations
Department of the Treasury
Washington, D.C.  20220

Dear Mr. Walker:

Two similar bills to control armor piercing ammunition, H.R. 4 and H.R. 13, have been introduced in this session of the House of Representatives.

The definitions in those bills (different in phrasing but identical in effect) are taken from H.R. 5845 (98th Congress).  You supported that bill as the Administration's bill in your testimony before the Subcommittee on Crime on June 27, 1984.  The definition, you testified, was developed with the participation of the Department of Justice and the Bureau of Alcohol, Tobacco and Firearms.  Using that definition, you said the bill would prohibit importation and manufacture of all of the ammunition that is specifically designed to be armor piercing.

Please advise me what specific ammunition the Department believes would be covered by this definition.  I would like to know specifically what ammunition would be subject to the prohibition on manufacture and importation.  I would also like to know specifically what ammunition, which meets the construction half of the definition with respect to solid projectiles or projectile cores, would be excluded from the definition because it has a "legitimate use for sporting purposes".

Thank you you very much for your kind assistance.

Sincerely yours,


William J. Hughes
Chairman
Subcommittee on Crime

WJH:oes

61-780    230

Exhibit A
Page 153

148



**ASSISTANT SECRETARY**

## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C.  20220

MAR 18 1985

Dear Mr. Chairman:

This refers to your letter of February 12, 1985, in which you ask about specific cartridges which would be covered by the definition of armor-piercing ammunition as contained in H.R. 4 and H.R. 13.  You also asked which ammunition, although covered by the definition, would be excluded because it has a legitimate use for sporting purposes.

The definitions contained in H.R. 4 and H.R. 13 would restrict the manufacture and importation of all conventional military type armor-piercing ammunition which contains a projectile core constructed from any of the materials listed in the definition.  Additionally, certain recently developed military cartridges, such as the NATO 5.56x45mm cartridge, which utilize a hard metallic penetrator, would also be covered.  The definition would also prohibit the manufacture or importation of ammunition, such as KTW, Arcane, THV, Czechoslovakian and German 9mm ammunition which has a steel or iron projectile core and other similar type ammunition.

With respect to your question concerning ammunition, which meets the construction portion half of the definition, with respect to solid projectile or projectile cores, but would be excluded from the definition because it has a legitimate use for sporting purposes; ammunition of this type would consist of various high powered sporting cartridges which are intended for use against dangerous game.

Many of these cartridges use projectiles which contain a hard insert to aid the bullet's penetration of the animal's skin and then cause the projectile to expand.  Projectiles of this type are most often found in British and other European large-caliber sporting cartridges.  It should be pointed out that soft body armor was never intended to provide protection against cartridges of this power, and even if ammunition of this type

149

- 2 -

were loaded with projectiles constructed entirely from lead,
soft body armor would not provide protection against them.

    We trust that the foregoing has been responsive to your
inquiry.  If we can be of further assistance, please contact us.

                    Sincerely,

                    *John Walker*

                    John M. Walker, Jr.
                    Assistant Secretary
                    (Enforcement and Operations)

The Honorable
William J. Hughes
Chairman, Subcommittee on Crime
Committee on the Judiciary
House of Representatives
Washington, DC  20515

Enclosure

150

WILLIAM J. HUGHES
[illegible address lines]

# Congress of the United States
## House of Representatives
### Washington, D.C. 20515

February 18, 1985

John M. Walker, Jr.
Assistant Secretary for Enforcement and Operations
Department of the Treasury
Washington, D.C.  20220

Dear Mr. Walker:

The Department has testified that it has obtained voluntary
agreements from several manufacturers of armor piercing
ammunition to restrict sale only to police agencies.

Last fall I requested copies of these agreements, which were
negotiated by former Deputy Assistant Secretary Robert E.
Powis, from Deputy Assistant Secretary Edward T. Stevenson.
Mr. Stevenson ordered a canvass of Mr. Powis' files on this
subject and transmitted to my staff copies of correspondence
and a memorandum written by Mr. Powis.

Despite requests in Mr. Powis' letters to three of the manufac-
turers for written confirmation of their agreement to restrict
sales of this ammunition, such letters were not among the
documents from his file transmitted to my staff.  A June 1982
letter from Mr. Powis to a fourth manufacturer, American
Ballistics Company, indicated that the matter was still being
considered by them.  No agreement appears to ever have been made
with that firm.  What is the status of that firm's sales of
armor piercing ammunition?

Did any of the manufacturers ever confirm in writing their
agreement to restrict the sale of armor piercing ammunition?
What is the current status of the voluntary agreements by
the various manufacturers of armor piercing ammunition?  What
is being done to monitor the sales of armor piercing ammunition?

Thank you for your attention to this matter.

Sincerely yours,

William J. Hughes
Chairman
Subcommittee on Crime

WJH:ees

151



ASSISTANT SECRETARY

**DEPARTMENT OF THE TREASURY** --
WASHINGTON, D.C. 20220

MAR 2 8 1985

Dear Mr. Chairman:

This letter provides an update on the status of the 1982 agreements that were obtained by this office from the manufacturers and importers of ammunition generally classified as armor-piercing.

Under the terms of these agreements, manufacturers and importers of armor-piercing ammunition are required to limit domestic sales to law enforcement and military purchasers. Of the seven firms manufacturing or importing this type of ammunition in recent years, only three continue to do so, and four have discontinued production and sale altogether.

In April, 1984, special agents from the Bureau of Alcohol, Tobacco and Firearms interviewed executive officers of the firms manufacturing and importing armor-piercing ammunition and conducted a review of the distribution records of these firms. There was no evidence that sales to anyone other than authorized buyers were taking place. In March, 1985, ATF conducted a second examination, with the same results. In all cases, the producers were found to be in compliance with the voluntary agreement and exhibited an attitude of cooperation. ATF also obtained from the firms information on the volume of production. Monthly production from the three remaining producers is 15 to 19 boxes, or 150 to 190 cartridges. The manufacturer of KTW ammunition reported that his sales were negligible and that he had little stock left.

The following lists the manufacturers and importers and summarizes the status of their commercial activity with respect to armor-piercing ammunition:

<u>Voluntary Agreements on Sales</u>

1. **North American Ordinance Company**          KTW
   2271 Stax Court                              Police and Military
   P.O. Box 4288                                 Sales Only
   Pontiac, Michigan  48057

2. **Euclid Sales Company**                      Black Steel
   1145 Euclid Avenue, NE                        Police and Military
   Atlanta, Georgia  30307                       Sales Only

3. **American Ballistics**                       A.P. Ammunition
   P.O. Box 1410                                 Police and Military
   Marietta, Georgia  30061                      Sales Only

- 2 -

Discontinued Manufacture or Import

| | | |
|---|---|---|
| 1. | Winchester Group<br>Olin Corporation<br>East Alton, Illinois  62024 | Hiway Master<br>Discontinued 1982 |
| 2. | Dynamit Nobel of America<br>105 Stonehurst Court<br>Northvale, New Jersey  07647 | GECO Metal Piercing import<br>Discontinued 1982 |
| 3. | Interarms<br>10 Prince Street<br>Alexandria, Virginia  22213 | 9 Luger Czek. import<br>Discontinued 1980 |
| 4. | Van Riper Ammunition Company<br>Governor Bent House<br>18 Bent Street, Box 2494<br>Taos, New Mexico  87571 | "Pointed Nose" Police<br>bullets<br>Discontinued 1984 |

We have enclosed a summary of the 1985 ATF review and
correspondence from dealers as evidence of their compliance
with the agreement.  I trust this information is helpful, and
I would be pleased to respond to any additional questions you
may have.

                    Sincerely,

                    /s/ John M. Walker, Jr.


                    John M. Walker, Jr.
                    Assistant Secretary
                    (Enforcement and Operations)

The Honorable
William J. Hughes
Chairman
Subcommittee on Crime
House of Representatives
Washington, D.C.  20515

Enclosures

Briefing Paper
Firearms Division
Law Enforcement
March 15, 1985

**Purpose:**  Report survey results on armor-piercing ammunition

On March 12, 1985, a survey of four armor-piercing ammunition manufacturers/dealers was conducted.  The following relates to the current market, production, and availability of armor-piercing ammunition:

1.  The North American Ordinance Company
    2271 Star Court, Auburn Hills, Michigan

    Owner John Kline advised that his philosophy on the disposition of armor-piercing bullets had not changed since his discussion with Mr. Powis. He delivers only to bona fide law enforcement. However, his business in the armor-piercing ammunition area is almost negligible and he has little KTW stock left.

2.  The Euclid Sales Company
    1145 Euclid Avenue, N.W., Atlanta, Georgia

    Steve Feinberg of Euclid Sales said his company was selling armor-piercing ammunition only to police departments, at a rate of five to seven boxes a month.

3.  American Ballistics
    P.O. Box 1410 Marietta, Georgia

    Jim Mullinax of American Ballistics advised that they sold only to law enforcement and the military, at a rate of ten to twelve boxes a month.

4.  Van Riper Ammunition Company
    P.O. Box 1, Carson, New Mexico

    Mr. Van Riper was in California at the time of the visitation, but his wife, who is familiar with his business, advised that Van Riper no longer manufactured or distributed armor-piercing ammunition.  She said that Mr. Van Riper had discontinued production quite some time ago.

-2-

Synopsis:  Of the four distributors, all current distri-
butors of armor-piercing ammunition voluntarily restrict
sales to police and military.  A total of fifteen to
ninteen boxes (10 rounds each) are distributed per month.



Briefing Paper
Headquarters
March 1, 1984

Purpose:  Survey of armor piercing ammunition manufacturers

Pursuant to a request, the Firearms Enforcement Branch
contacted field offices and requested that a special agent
personally contact the below listed six manufacturers to
determine if they were producing armor-piercing ammunition,
and if so, to whom they were selling such ammunition.

Their individual responses are listed below:

1.  North American Ordnance Company (KTW ammunition)
    2271 Star Court
    P.O. Box 4288
    Pontiac, Michigan  48057
    (313) 852-8735
    Mr. John Klein

North American sells its armor-piercing ammunition only to
law enforcement.  It does not sell to dealers.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

2.  Remington Arms Company
    939 Barnum Avenue
    P.O. Box 1939
    Bridgeport, Connecticut  06601

Remington has never produced armor-piercing ammunition.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

3.  Winchester
    Shamrock Street
    East Alton, Illinois

Winchester discontinued production of its armor-piercing
ammunition in February 1982.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

4.  National Cartridge
    Distributed by Euclid Sales
    1145 Euclid Avenue
    Atlanta, Georgia  30307

-2-

Armor piercing ammunition survey

National sold armor-piercing ammunition to the U.S. Navy and to Federal firearms licensees. The licensees were instructed to sell to law enforcement only. They manufactured 10,000 rounds and have 20 cases in stock.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

5.  Randy Moore
    Kestrel International Corp.
    P.O. Box 809
    Mesquite, Texas  75149

Kestrel has stopped production and never sold any armor-piercing ammunition.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

6.  Dynamite Nobel of America Inc.
    105 Stonehurst Court
    Northvale, New Jersey  07647
    (210) 767-1660

Dynamite Nobel does not manufacture armor-piercing ammunition, nor do they handle it.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

It should also be note that Mr. Klein of North American Ordnance Company, has stated he may testify at congressional hearings relative to armor-piercing ammunition legislation.

JAM:dg D#179  PC: 10

157



# NORTH AMERICAN ORDNANCE CORPORATION

January 22, 1982

ATTENTION:  ALL POLICE & LAW ENFORCEMENT PERSONNEL

SUBJECT:  SALE OF KTW AMMUNITION

Gentlemen:

This correspondence is forwarded to you to reemphasize our concern and commitment to distribute KTW ammunition to law enforcement agencies and law enforcement personnel only.  We have instructed our dealers to deliver KTW Metal Piercing Ammunition only to the following agencies or persons:.

Local Police Agencies & Local Police Personnel
State Police Agencies & State Police Personnel
Federal Police Agencies & Federal Police Personnel
Military Agencies & Military Personnel

Each dealer must upon placing an order with us for KTW Metal Piercing Ammunition fully execute the enclosed "Statement of Understanding & Compliance".  We have experienced media personnel and newspaper personnel trying to purchase KTW under a number of erroneous circumstances.  We are, therefore, asking that any law enforcement personnel requesting information on KTW ammunition please send us a photocopy of his credentials.

State, County & Municipal Government agencies can place orders directly with North American Ordnance Corporation.  If the order is received on a formal purchase order or agency letterhead, the requirement to ship through a local dealer is exempted.

KTW ammunition will no longer be available in the NTW, 12-round ammo wallets; our standard packaging will be 50-round boxes.  Our minimum purchase requirements per agency order is at least two (2) 50-round boxes for delivery to police organizations.  It is permissable to order two (2) different calibers; each 50-round box must contain only one caliber.

North American Ordnance Corporation reserves the right to refuse any order. Further, North American Ordnance Corporation reserves the right to sell KTW to parties it deems acceptable.

If you have any questions, please feel free to contact me.

Sincerely,

NORTH AMERICAN ORDNANCE CORPORATION

John N. Klein
President

JNK/rsf
Enc.

2271 STAR COURT, P.O. BOX 4388  •  PONTIAC, MICHIGAN 48057  •  (313) 852-8735  •  TELEX 0235803

Exhibit A
Page 163

158

# NORTH AMERICAN ORDNANCE CORPORATION

"STATEMENT OF UNDERSTANDING AND COMPLIANCE"

_____, 1982

I _____ certify that I am an officer of _____
 (NAME)                                              (PURCHASING COMPANY)

_____   _____   _____ ; FFL# _____
   (CITY)                  (STATE)                (ZIP CODE)

I acknowledge that our company has ordered KTW Metal Piercing ammunition under our purchase
order number _____ of ____/____/82.  I understand and agree to dispense
KTW ammunition consistent with the policy of "POLICE USE ONLY."  I agree to screen and
verify the credentials of all potential customers and to sell KTW ammunition only to sworn
police officers, military policemen, security agents, or bonafided police product dealers.
 agree to retain a photocopy of all KTW purchasers' identification credentials or to record
the badge number and the department or agency which employs the purchaser.

I agree that North American Ordnance Corporation personnel have the right, with seven (7)
days notice, to inspect _____ ammunition distribution records with
                            (PURCHASING COMPANY)
respect to the sale of KTW ammunition.

Finally, I agree not to sell KTW ammunition to parties who do not fit the above description
or comply with the criteria set forth in this statement.

_____
   (SIGNATURE)

2271 STAR COURT, P.O. BOX 4298  ●  PONTIAC, MICHIGAN 48057  ●  (313) 852-8736  ●  TELEX 0235803

159

**(NA)**

## NORTH AMERICAN ORDNANCE CORPORATION

Thank you for your recent order for KTW ammunition. Since KTW is a "POLICE USE ONLY" product, it is necessary that certain formalities and criteria be met before we ship your order of KTW ammunition.

The enclosed "Statement of Understanding & Compliance" is forwarded to insure your understanding of our distribution policy and to further alert you to your responsibility in screening the recipients of KTW ammunition.

Your cooperation in continuing to distribute KTW for "POLICE USE ONLY" As greatly appreciated. Please fill out the enclosed "Statement of Understanding & Compliance" form and return it to us. Your order will then be shipped.

Thank you.

NORTH AMERICAN ORDNANCE CORPORATION

160



## NORTH AMERICAN ORDNANCE CORPORATION

)

Thank you for your recent order for KTW ammunition.  Since KTW is a "POLICE USE ONLY" product, it is necessary that certain formalities and criteria be met before we ship your order of KTW ammunition.

The enclosed "Statement of Understanding & Compliance" is forwarded to insure your understanding of our distribution policy and to further alert you to your responsibility in screening the recipients of KTW ammunition.

Your cooperation in continuing to distribute KTW for "POLICE USE ONLY" is greatly appreciated.  Please fill out the enclosed "Statement of Understanding & Compliance" form and return it to us.  Your order will then be shipped.

Thank you.

NORTH AMERICAN ORDNANCE CORPORATION



# NORTH AMERICAN ORDNANCE CORPORATION

January 21, 1982

ATTENTION: ALL KTW DEALERS

SUBJECT: DISTRIBUTION OF KTW AMMUNITION

Gentlemen:

This correspondence is forwarded to you to reemphasize North American Ordnance Corporation's policy for the sale of KTW Metal Piercing Ammunition. Dealers are directed to deliver KTW Metal Piercing Ammunition only to the following agencies and/or persons:

Local Police Agencies & Local Police Personnel
State Police Agencies & State Police Personnel
Federal Police Agencies & Federal Police Personnel
Military Agencies & Military Personnel

North American Ordnance Corporation requires that each order for KTW will be written on official company stationery of the purchasing company and payment affected by the purchasing organization. No personal checks will be accepted. In addition, each order will be accompanied by a fully-executed copy of the enclosed "Statement of Understanding & Compliance"; there will be no exceptions. We urge you to check the credentials of all potential KTW purchasers and be especially alert for newspaper and TV personnel who may try to impersonate police officers.

KTW will no longer be available in MTM, 12-round ammo wallets; our standard packaging will be 50-round boxes. Our minimum purchase requirements per order is at least four (4) 50-round boxes. It is permissable to order four (4) different calibers; each 50-round box containing only one caliber.

North American Ordnance Corporation reserves the right to refuse any order. Further, North American Ordnance Corporation reserves the right to sell KTW to parties it deems acceptable.

If you have any questions, please feel free to contact me.

Sincerely,

NORTH AMERICAN ORDNANCE CORPORATION

John M. Klein
President

JMK/rsf
Enclosure

2271 STAR COURT, P.O. BOX 4298   •   PONTIAC, MICHIGAN 48057   •   (313) 852-8735   •   TELEX 0235803

162

# EUCLID SALES CO.

Importers, Exporters, Wholesale Distributors of Firearms & Accessories
1148 Euclid Avenue N.E., Atlanta, Georgia 30307
Call Toll Free 1-800-554-7738
404-525-2801

March 1, 1984

Robert E. Powis
Deputy Assistant Secretary (Enforcement)
Department of the Treasury
Washington, D.C., 20220

Dear Mr. Powis:

This letter is to reaffirm our desire to fully co-operate
with your request for voluntary restrictions of the sales of
Black SteelAmmunition.

We were expecting a reply to our letter of October 18, 1983, in
which we attempted to set up a dialogue with you, in order to
provide a satisfactory solution which will be equitable to all
concerned.  However, we will voluntarily, upon your approval,
cease all sales of the Black Steel Ammunition, except under the
following circumstances:  To Police Departments; Authorized Law
Enforcement Agencies at the State & Local Level; Armed Forces of
the United States; Approved Exports; Police Officers who provide
certification, signed by their Chief, or Superior Officers, that
the ammunition is required in the performance of their official
duties as sworn officers of the Department.

An example of the Certification, which by the way, is a modifi-
cation of the Strum Ruger & Co. form used for purchases of similar
Law Enforcement Products, is enclosed for your inspection and approval.

We are still waiting for your reply to our inquiry regarding our
proposed line of Tracer Ammunition as to the voluntary agreements
or non-published restrictions.  We would appreciate a response in
this matter in order to facilitate our operation.

Sincerly yours,

Stephen Feinberg, Sec. Treas.
EUCLID SALES COMPANY

CC:  Noel A. Haera                    Earl P. Taylor
     BATF                             BATF
     Chief Firearms Branch            44 Broad St. NW
     1200 Pennsylvania Ave.           Suite 300
     Federal Building                 Atlanta, GA., 30303
     Washington, D.C., 20226

*Euclid Sales to Law Enforcement Sales*



# STURM, RUGER & Company, INC.

~~CONCORD, CONNECTICUT 06050 U.S.A.~~

## OFFICER REQUEST TO PURCHASE ~~MINI 14/20GB,~~
## ~~FOLDING STOCKS AND 30-ROUND MAGAZINES~~

*Issue Armor or metal piercing Ammunition*

TO: ~~RUGER~~ *Euclid* LAW ENFORCEMENT DISTRIBUTOR

NAME: _____

ADDRESS: _____

_____

_____

We are a legally constituted Law Enforcement agency, a State, County or City municipality in the U.S.A.:

AGENCY: _____

ADDRESS: _____

_____

_____

Our Agency requests that Officer _____
(Name of Officer)

Badge Number_____, be able to purchase _____
(Badge Number)                                          (Ruger Product(s))

_____, which is required in the performance of his duties as a sworn officer of this Department.

**PLEASE PRINT NAME**

CHIEF, SHERIFF OR WARDEN: _____

SIGNATURE OF CHIEF,
SHERIFF OR WARDEN _____

DATE:_____



**American Ballistics Company, Inc.**
DESIGNERS AND MANUFACTURERS OF SPECIAL PURPOSE AMMUNITION

P.O. BOX 1419
MARIETTA, GEORGIA 30061
(404) 424-9075
CABLE-AMBACO ATLANTA
TELEX 54-3481



Mar. 8, 1985

E.T. Stevenson
U.S. Department of the Treasury
15th & Pennsylvania Ave.
Room 4308
Washington, D.C.  20220

Dear Mr. Stevenson:

This will confirm our telecon the day and past conversations with Mr. Robert Powis relative to the Armor-Piercing ammunition that we manufacture and sell.

American Ballistics does affirm that all our sales of Armor-Piercing ammunition are restricted to Local, State, and Federal government enforcement agencies; U.S. Military department., and Foreign Military Export sales approved by U.S. Department of State/Munitions Control.

We have voluntarily agreed to restrict sales per the Treasury Department request and will continue to maintain that position in the future.

Sincerely,

James Maltenieks
President
AMERICAN BALLISTICS CO., INC.

JM/pam