# Exhibit "

**ATF FRAMEWORK FOR DETERMINING WHETHER
CERTAIN PROJECTILES ARE "PRIMARILY INTENDED FOR SPORTING PURPOSES"
WITHIN THE MEANING OF 18 U.S.C. 921(a)(17)(C)**

To protect the lives and safety of law enforcement officers from the threat posed by ammunition capable of penetrating a protective vest when fired from a handgun, the Gun Control Act of 1968 (GCA), as amended, prohibits the import, manufacture, and distribution of "armor piercing ammunition" as defined by the statute. The GCA, however, allows for the exemption of ammunition that would otherwise be considered armor piercing if the Attorney General determines that the specific ammunition at issue is "primarily intended to be used for sporting purposes." Interpreting the meaning of this statutory language, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has developed a framework that will apply to requests seeking a determination that certain projectiles qualify for this "sporting purpose" exemption. The framework is intended to uphold the requirements of the statute and its goal of protecting law enforcement while respecting the interests of sportsmen and the industry. This notice is provided to ensure that the regulated industry and members of the public understand the statute and relevant legislative history, and have an opportunity to review and provide comments or suggestions on the proposed framework. It is important to note that only projectiles that meet the statutory definition of "armor piercing" – *i.e.,* those made out of the specific listed materials that may be used in a handgun – are subject to the statutory restrictions. As a result, manufacturers are, and will continue to be, free to manufacture projectiles from non-restricted materials, completely independent of the application of this framework or any exemptions. ATF will accept comments for 30 days from the date this notification, which will be considered prior to finalizing the framework.

**I.      BACKGROUND:**

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

The Attorney General is responsible for enforcing the Gun Control Act of 1968 (GCA), as amended, 18 U.S.C. Chapter 44.  He has delegated that responsibility to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), subject to the direction of the Attorney General and the Deputy Attorney General.  28 CFR 0.130(a).

The GCA provisions defining and governing armor piecing ammunition were originally enacted in the Law Enforcement Officers Protection Act of 1986 (P.L. 99-408) ("LEOPA").  The primary goal of the LEOPA provisions regarding armor piecing ammunition was the protection of police officers from death or injury as the result of the criminal use of handgun ammunition capable of penetrating protective vests (soft body armor).

## II.    LEOPA LEGISLATIVE HISTORY

Ammunition capable of penetrating body armor was originally designed and manufactured primarily for military and law enforcement applications, not for use by the general public.  By the late 1970's, however, law enforcement organizations began to voice concern that armor piercing ammunition was readily available to the general public and posed extreme safety risks to police officers when used by criminals.  Over the next several years, Congress debated various bills to both define and limit the availability of ammunition capable of penetrating body armor.

The early bills on the issue included a performance standard – *i.e.*, the ammunition at issue must be capable of penetrating body armor – and applied only to handgun ammunition.  In a hearing on one of these early bills, Senator Moynihan made clear that the intent of the bill was to ban only ammunition that both met the performance standard and was *designed* to be used in a handgun:

- 2 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

> [L]et me make clear what this bill does not do.  Our legislation would not limit the availability of standard rifle ammunition with armor-piercing capability.  We recognize that soft body armor is not intended to stop high powered rifle cartridges.  Time and again Congressman Biaggi and I have stressed that only bullets capable of penetrating body armor and *designed to be fired from a handgun* would be banned; rifle ammunition would not be covered.

Hearings, Senate Committee on the Judiciary, 98th Congress, 2d Session, May 17, 1984. 30-31.

(Senator Moynihan) (emphasis added).  Accordingly, under the original bills, if the manufacturer

of the ammunition "designed [it] to be fired from a handgun*"* and it was "capable of penetrating

body armor", then it would meet the definition of "armor piercing."  If the manufacturer

designed and intended the ammunition to be used in rifles (or if it was not capable of penetrating

body armor), it would not meet the definition.

      When LEOPA was finally passed by Congress in 1986, however, the final bill did not

include a performance-based standard, or limit the definition of armor piercing ammunition to

ammunition "*designed*" for use in a handgun.   Instead, the definition has two alternatives:  the

first focuses on the composition of the ammunition, and whether it "may be used" in a handgun;

the second focuses on size, jacket weight, and the design and intention for the ammunition.

Specifically, the definition of "armor piercing ammunition" in 18 U.S.C. 921(a)(17)(B) provides:

> (B)  The term "armor piercing ammunition" means—
>
> > (i)  a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper or depleted uranium; or
> >
> > (ii)  a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

- 3 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

Although the design and intention for the ammunition is relevant to the second alternative definition, the first alternative contains no such limitation.  In fact, during the final vote on LEOPA, Congress specifically rejected an amendment that would have limited the definition of armor piercing ammunition to ammunition "*intended*" to be used in a handgun, thereby exempting "standard rifle ammunition."[1]  As a result, rather than limiting the definition to the manufacturer's "design" or "intent," the final bill passed by Congress clearly expanded the definition of armor piercing ammunition to include any ammunition containing the specified metal content "which *may* be used in a handgun."  This definition has remained unchanged since enactment of LEOPA in 1986.

In adopting a definition of armor piercing ammunition that included ammunition that "may" be used in a handgun, 18 U.S.C. 921(a)(17)(B)(i), Congress expressly sought to protect law enforcement officers from the effects of a projectile that, although originally intended for a rifle, could be fired from a handgun.  Accordingly, under the first of the two alternative definitions enacted into law, all projectiles meeting the metal content criteria that "may be used in a handgun" are defined as "armor piercing ammunition" under the statute.

LEOPA also contains an exemption provision applicable to ammunition which otherwise falls within the definition of armor piercing, but which the Attorney General determines to be "primarily intended to be used for sporting purposes."  18 U.S.C. 921(a)(17)(C).  LEOPA did not further define the terms "primarily intended" or "sporting purposes."  As noted, the Attorney General has delegated the authority to make "sporting purposes" determinations to the Director

_____

[1] Senator Steven Symms introduced Amendment 1644, proposing to define "armor piercing ammunition" as a solid projectile made of the specified metals and "*intended* for use in a handgun."  132 Cong Rec S 2135.

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

of ATF.   To facilitate the exercise of that authority ATF promulgated 27 CFR 478.148.  This section provides that "a person who desires to obtain an exemption under this section for [armor piercing ammunition] which is primarily intended for sporting purposes . . . shall submit a written request to the [ATF] Director."  27 CFR 478.148.

    Prior to the passage of LEOPA, the GCA already contained other provisions that relied upon "sporting purpose" language as a basis for exempting otherwise applicable restrictions on firearms.[2]  In administering these provisions of the GCA, ATF has consistently interpreted "sporting purposes" to include the traditional sports of hunting, competitive target shooting, and skeet and trap shooting.[3]  Although those activities constituting "sporting purposes" are well established, the application of that term under 921(a)(17)(C) is unique.  As stated above, the GCA requires that the Attorney General determine that the ammunition is  "primarily intended" to be used for sporting purposes in order for ammunition that is otherwise defined as armor piercing to qualify for the exemption.

    Between 1986 and 2011, ATF received few exemption requests for armor piercing ammunition.  In 1986, ATF exempted 5.56 mm (.223) SS109 and M855 "green tip" ammunition containing a steel core.  Similarly, in 1992, ATF exempted .30-06 M2AP cartridges.  Since 2011, however, ATF has received approximately 30 exemption requests for armor piercing ammunition.  Several developments since 1992 have spurred the influx of exemption requests.

---

[2] *See* Title 18, United States Code, sections 921(a)(4)(B), 922(a)(5), and 925(d)(3).
[3] *See* Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles (1989); Department of the Treasury Study on the Sporting Purposes Suitability of Modified Semiautomatic Assault Rifles (1998); and ATF study on the Importability of Certain Shotguns (2011).

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

ATF understands that one of the primary factors is the increased pressure on the ammunition industry to produce suitable hunting alternatives to lead ammunition. The widespread use of lead ammunition for hunting has been linked to lead contamination in certain species that consume carrion and "gut piles" containing remnants of lead projectiles. The endangered California Condor, which scavenges on carrion, has proven particularly vulnerable to this type of lead poisoning. The impact of lead poisoning on the Condor and other species has resulted in at least one State banning the use of lead ammunition in certain environmentally sensitive areas, and has generated substantial advocacy for broader availability of non-lead ammunition. Generally, rifles are the type of firearm predominately used for hunting purposes, particularly the type of hunting conducted in sensitive environmental areas such as the California Condor range. It thus appears that rifle-based hunting is the primary driving force behind the market demand for lead-alternative ammunition made with the metals listed in section 921(a)(17)(C).

In addition to the demand for lead-alternative ammunition, the firearm industry has developed commercially available handguns designed to use conventional rifle ammunition. This ammunition meets the content requirement of the definition, but previously was not classified as "armor piercing" under the statute because there were no handguns that could "use" it. As a result of the availability of these handguns, however, some conventional rifle ammunition now falls within the statutory definition and is properly classified as "armor piercing ammunition," despite the fact that the ammunition itself has not changed. Consequently, ammunition manufacturers have requested exemptions for this ammunition.

- 6 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

Pursuant to the GCA, ATF must first determine whether such ammunition is "primarily intended" for sporting purposes before exercising its discretion to grant an exemption.  However, that analysis also necessarily implicates the officer safety concern LEOPA was designed to address—ammunition containing armor-defeating metals that may be fired from relatively small, concealable firearms.

In light of recent developments in the firearm and ammunition marketplace, ATF sought input from industry, law enforcement organizations, and the general public on the application of the unique "sporting purpose" exemption set forth in 18 U.S.C. 921(a)(17)(C).  In November 2012, ATF held four meetings with interested parties representing law enforcement, the firearms and ammunition industries, and non-governmental organizations.  In addition, after completion of these meetings, ATF also solicited and accepted comments from the general public through December 31, 2012.  All of that input was considered in interpreting the meaning of the statutory language, and developing the framework described below.

## III.    SPORTING PURPOSES EXEMPTION FRAMEWORK

The application of the "sporting purposes" exemption must be consistent with the goals of the statute:  to protect law enforcement officers.    That is, the Attorney General[4] must determine that a specific type of armor piercing projectile does not pose a significant threat to law enforcement officers because the projectile at issue is "primarily intended" for use in

---

[4] When LEOPA was originally enacted, the statute designated the Secretary of the Treasury as the executive branch official vested with the authority to make "sporting purpose" exemptions.  Pub. L. 99-408.   When ATF was transferred to the Department of Justice in 2003, the Act was amended to transfer that determination authority to the Attorney General.  Pub. L. 107–296.

- 7 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

shooting sports, and is therefore unlikely to be encountered by law enforcement officers on the streets.

One of the main issues raised in the meetings that ATF held with industry and law enforcement in November 2012 was *whose* intent should control the analysis as to whether a type of ammunition is primarily intended for sporting purposes.  Some representatives of the industry argued that the sporting purpose analysis should be subjective and conclusive—focusing solely on the intent of the ammunition manufacturer.  If the manufacturer designed and intended the armor piecing ammunition to be used primarily in rifles for hunting or target shooting, they argued, then the fact that the ammunition could also be used in handguns was irrelevant to the sporting purpose analysis.  Their view was that the manner in which individual consumers, whether they are law-abiding citizens or criminals, chose to use the armor piercing ammunition could not alter the "primary" sporting purpose envisioned by the manufacturer.

From the perspective of law enforcement, however, the most relevant intent is that of a criminal who seeks to use ammunition capable of penetrating body armor when fired from a handgun.  If ammunition containing the metal content enumerated in section 921(a)(17)(B)(i) can be used in a handgun—the type of firearm most frequently used by criminals whom police officers encounter on the streets—then, from the law enforcement perspective, the manufacturer's intent that the ammunition be used for hunting or target shooting (in rifles or handguns) becomes irrelevant.  The mere availability of handguns capable of using the ammunition made of the enumerated metals creates the potential for diversion to criminals who could use it in easily concealed firearms to defeat the protective vests worn by police officers – the exact officer safety concern targeted by LEOPA.  Contrary to the industry's position, law

- 8 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

enforcement representatives focused on the intent of one class of potential consumer group—those criminals who pose the greatest threat to law enforcement.

In assessing the competing views of law enforcement and industry, ATF is bound by the plain language of the statute and the statutory framework, and guided by the courts.  To begin, the text of section 921(a)(17)(B)(i) (as reinforced by the legislative history) strongly supports the perspective of the law enforcement community in defining "armor piercing ammunition."  As noted, Congress considered, but did not adopt, subjective standards that would have defined armor piercing ammunition based on the designed and intended use envisioned by the manufacturer.  Instead, Congress adopted a two prong definition, the first of which contains an objective standard focused on whether ammunition comprised of enumerated metals *may* be used in handguns.  It would make little sense for Congress to reject an approach focusing on a manufacturer's design and intent to qualify the ammunition as armor piercing, and for the Attorney General to then exempt out ammunition based on such design and intent.  In short, that approach would render the restrictions on armor piercing essentially ineffective, applying only to the small body of ammunition specifically created for the military – a result Congress clearly did not intend.  Hence, when ATF considers "sporting purpose" exemption requests, the plain text, overall statutory scheme, and clear Congressional intent of LEOPA preclude the application of a subjective standard depending only on the intent of ammunition manufacturers.  While the intent of manufacturers may be *a* factor in the analysis of whether a particular type of armor-piercing ammunition is "primarily intended" for sporting purposes, that intent cannot be dispositive.

Similarly, however, the view that the potential misuse or non-sporting use of ammunition renders all types of ammunition ineligible for the sporting purpose exemption is also not

- 9 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

consistent with the statute.  If this view were correct, then the sporting purpose exemption would be superfluous, a result Congress also clearly did not intend.  On the contrary, the inclusion of the exemption shows Congress anticipated that certain types of ammunition properly classified as armor-piercing could be manufactured and distributed for sporting use without creating a significant risk to law enforcement through diversion to criminals.  Consequently, for purposes of applying the exemption, the intent of one group of potential consumers (criminals) is no more determinative than the intent of manufacturers.  The relevant inquiry under section 921(a)(17)(B), therefore, must primarily be based on objective criteria, not the subjective intentions of any particular group.

In fact, the Supreme Court has specifically concluded that the phrase "primarily intended" sets forth an objective standard.  *See, Posters 'N' Things v. U.S.*, 511 U.S. 513, 521-522 (1994).  In *Posters 'N' Things v. U.S.*, the Supreme Court held that a federal statute defining "drug paraphernalia" as products "primarily intended . . . for use" in the manufacture or consumption of controlled substances established an objective standard for determining when a product constituted such paraphernalia.  511 U.S. at 521-522.  Emphasizing that its holding was supported by a "natural reading" of the same phrase in the GCA's definition of armor piercing ammunition, 18 U.S.C. 921(a)(17)(B), the Court explained that an objective analysis of whether an item is "primarily intended" for a specified use must focus on the "*likely* use" of that item in the general community, not the subjective intent of any user or discrete group.  *Id*. (emphasis added).[5]

---

[5] The Court stated:  "Finally, an objective construction of the phrase 'primarily intended' is consistent with the natural reading of similar language in definitional provisions of other federal criminal statutes.  *See* 18 U.S.C. §

- 10 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

Determining the "likely use" in the general community of any type of ammunition necessarily involves examination of the cartridges in which the armor piercing projectiles can be loaded, and the handguns that are readily available to accept those cartridges.  More specifically, the characteristics of the handgun or handguns in which a specific armor piercing projectile may be used will generally determine that projectile's "likely use" in the general community.  When the only readily available handgun that can accept a cartridge containing the projectile is objectively and primarily sporting, it may reasonably be inferred that the likely use of that projectile will also be objectively and primarily sporting.  Conversely, when a handgun's objective design is not limited to primarily sporting purposes, such as handguns designed to be carried and concealed, it may be reasonably inferred that ammunition capable of use in such handguns is unlikely to be used primarily for sporting purposes.  Furthermore, applying objective criteria that focuses on the general use of handguns in which the ammunition may be used also fulfills the officer safety objectives of LEOPA.  By limiting the first definition of armor piercing to ammunition that may be used in handguns, Congress recognized that the threat to officer safety generally corresponds to the type of firearm police officers are most likely to encounter on the streets.

---

921(a)(17)(B) ("armor piercing ammunition" excludes any projectile that is "primarily intended" to be used for sporting purposes, as found by the Secretary of the Treasury)….We conclude that the term 'primarily intended . . . for use' in § 857(d) **is to be understood objectively and refers generally to an item's likely use.  Rather than serving as the basis for a subjective scienter requirement**, the phrase "primarily intended or designed for use" in the definitional provision establishes objective standards for determining what constitutes drug paraphernalia." (emphasis added).  *Posters 'N' Things v. U.S.*, 511 U.S. 513, 521-522 (1994).

Exhibit B
Page 181

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

With these factors in mind, ATF has developed the following framework to guide its analysis in processing requests to exempt as "primarily intended to be used for sporting purposes" projectiles otherwise appropriately classified as armor piercing:

### Category I:  .22 Caliber Projectiles

**A .22 caliber projectile that otherwise would be classified as armor piercing ammunition under 18 U.S.C. 921(a)(17)(B) will be considered to be "primarily intended to be used for sporting purposes" under section 921(a)(17)(C) if the projectile weighs 40 grains or less AND is loaded into a rimfire cartridge.**

ATF has long recognized .22 rimfire firearms and ammunition as primarily intended for sporting use.[6]  Further, .22 rimfire projectiles are usually 40 grains or lighter and are generally suitable only for use against small game and at short distances.  This ammunition poses little threat to law enforcement and exemption of such ammunition is consistent with the language, statutory scheme, and intent of LEOPA.

### Category II:  All Other Caliber Projectiles

**Except as provided in Category I (.22 caliber rimfire), projectiles that otherwise would be classified as armor piercing ammunition will be presumed to be "primarily intended to be used for sporting purposes" under section 921(a)(17)(C) if the projectile is loaded into a cartridge for which the only handgun that is readily available in the ordinary channels of commercial trade is a single shot handgun.  ATF nevertheless retains the discretion to deny any application for a "sporting purposes" exemption if substantial evidence exists that the ammunition is not primarily intended for such purposes.**

---

[6] *See, e.g.,* Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles (1989) in which ATF exempted all .22 rimfire caliber rifles because, although they bore a "striking resemblance" to the "true assault rifle," .22 caliber rifles were considered "sporting" because they were "generally recognized as suitable for hunting small game."  These rifles were exempted regardless of configuration.

- 12 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

> **The term "single shot handgun" means a break-open or bolt action handgun that can accept only a single cartridge manually, and does not accept or use a magazine or other ammunition feeding device.  The term <u>does not</u> include a pocket pistol or derringer-type firearm.**

Except for pocket pistols and derringer-type handguns, which are easily concealable and lightweight, single shot handguns are generally large, heavy handguns used for traditional sporting purposes, such as target shooting and hunting.  Further, these single shot handguns are ineffective crime guns because of their limited ammunition capacity.  In light of the limited utility of such handguns as crime guns, ammunition which may only be used in these firearms poses minimal threat to law enforcement officers.  Exemption of such ammunition, therefore, is fully consistent with the plain language, statutory scheme, and Congressional goal underlying LEOPA—officer protection.

While the design of most single shot handguns shows that they are *primarily* intended to be used for sporting purposes, this is not necessarily the case of handguns with larger ammunition capacities.  Revolvers and semi-automatic handguns, which are designed to be loaded with multiple rounds of ammunition that can be fired and reloaded quickly, differ substantially in design and function from single shot handguns.  The likely use of revolvers and semi-automatic handguns in the community varies, and the projectiles they use are, in many cases, interchangeable among models designed to use the same or similar calibers.  Consequently, it is not possible to conclude that revolvers and semi-automatic handguns as a class are "primarily intended" for use in sporting purposes.  Similarly, most handguns designed to be loaded with two-rounds of ammunition are small-frame, easily concealable, derringer-type firearms.  While two-shot derringers may share certain design characteristics with single-shot firearms (for example, a break-open loading function), they are not useful as sporting firearms.

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

Consequently, ammunition for two-shot and semi-automatic handguns cannot be characterized as "primarily intended" for use in sporting purposes. To achieve consistent application of the sporting purpose exemption in light of these considerations, ATF has determined that the exemption will presumptively apply to projectiles loaded into cartridges for which the only handgun that is readily available in the ordinary channels of commercial trade is a single shot handgun other than a pocket pistol or derringer-type handgun. ATF recognizes that there will be some cartridges currently manufactured using non-restricted materials (*e.g.* lead or brass) that have been used by hunters and target shooters for sporting purposes, that if manufactured from listed materials, will not be eligible for exemption under the framework. These cartridges will remain available in the non-restricted materials, as they are today.

## IV.   PREVIOUS EXEMPTIONS

As explained above, in 1986, ATF held that 5.56mm projectiles in SS109 and M855 cartridges were exempt. Further, in 1992, ATF held that 30-06 M2AP cartridges were also exempt. In each case, ATF found that, "it is well documented" that the respective ammunition "has been recognized as being suitable for target shooting with rifles due to its accuracy." *Id.* These cartridges were originally produced for the military and were only later adopted by civilians for sporting purposes. When assembled into a complete cartridge, the projectiles were exempt, but ATF did not exempt the projectiles before the cartridges were assembled.

Applying the sporting purposes framework set-forth above, the 5.56mm projectile that ATF exempted in 1986 does not qualify for an exemption because that projectile when loaded into SS109 and M855 cartridges may be used in a handgun other than a single-shot handgun. Specifically, 5.56mm projectiles loaded into the SS109 and M855 cartridges are commonly used

- 14 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

in both "AR-type" rifles and "AR-type" handguns.  The AR platform is the semi-automatic version of the M16 machinegun originally designed for and used by the military.  The AR-based handguns and rifles utilize the same magazines and share identical receivers.   These AR-type handguns were not commercially available when the armor piercing ammunition exemption was granted in 1986.  To ensure consistency, upon final implementation of the sporting purpose framework outlined above, ATF must withdraw the exemptions for 5.56 mm "green tip" ammunition, including both the SS109 and M855 cartridges.[7]

ATF recognizes that this ammunition is widely available to the public.  Because it is legally permissible to possess armor piercing ammunition under current law, withdrawing the exemption will not place individuals in criminal possession of armor piercing ammunition. However, with few exceptions, manufacturers will be unable to produce such armor piercing ammunition, importers will be unable to import such ammunition, and manufacturers and importers will be prohibited from selling or distributing the ammunition.[8]  ATF is specifically soliciting comments on how it can best implement withdrawal of this exemption while minimizing disruption to the ammunition and firearm industry and maximizing officer safety.

Under the proposed framework, the exemption for 30-06 M2AP cartridges would continue because ATF is not aware of any multi-shot handguns available in the ordinary channels of commerce that currently accept such ammunition.

_____

[7] Projectiles of this caliber loaded into these cartridges made from other metals, *e.g.*, lead or copper, is not armor piercing to begin with, and will not be effected by the withdrawal of this exemption.
[8] *See* 18 U.S.C. § 922(a)(7) and (a)(8).

- 15 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

With respect to the more than 30 requests received pursuant to section 478.148 that remain pending, the determination of whether to grant an exemption in a specific case will be made when the framework has been finalized.  Those determinations will be conveyed separately to the respective requestors.

## V.   SUMMARY

When considering requests submitted pursuant to 27 CFR 478.148 to exempt ammunition that is "primarily intended for sporting purposes," ATF intends to apply the following framework:

### Category I:  .22 Caliber Projectiles

**A .22 caliber projectile that otherwise would be classified as armor piercing ammunition under 18 U.S.C. 921(a)(17)(B) will be considered to be "primarily intended to be used for sporting purposes" under section 921(a)(17)(C) if the projectile weighs 40 grains or less AND is loaded into a rimfire cartridge.**

### Category II:  All Other Caliber Projectiles

**Except as provided in Category I (.22 caliber rimfire), projectiles that otherwise would be classified as armor piercing ammunition will be presumed to be "primarily intended to be used for sporting purposes" under section 921(a)(17)(C) if the projectile is loaded into a cartridge for which the only handgun that is readily available in the ordinary channels of commercial trade is a single shot handgun.  ATF nevertheless retains the discretion to deny any application for a "sporting purposes" exemption if substantial evidence exists that the ammunition is not primarily intended for such purposes.**

**The term "single shot handgun" means a break-open or bolt action handgun that can accept only a single cartridge manually, and does not accept or use a magazine or other ammunition feeding device.  The term <u>does not</u> include a pocket pistol or derringer-type firearm.**

- 16 -

Framework for Deciding Sporting Purpose Ammunition pursuant to 18 USC 921(a)(17)

Some ammunition that was previously exempted as "primarily intended to be used for sporting purposes," specifically 5.56mm constituent projectiles of SS109 and M855 cartridges, will again be regulated as "armor piercing ammunition."  Except as provided by law, no person may manufacture or import such ammunition, and manufacturers or importers may not sell or deliver such ammunition.  ATF will maintain the exemption for 30-06 M2AP cartridges.

## VI.   PUBLIC PARTICIPATION

ATF will carefully consider all comments, as appropriate, received on or before March 16, 2015, and will give comments received after that date the same consideration if it is practical to do so, but assurance of consideration cannot be given except as to comments received on or before March 16, 2015.  ATF will not acknowledge receipt of comments.

Submit comments in any of three ways (but do not submit the same comments multiple times or by more than one method):

- ATF website:  *APAComments@atf.gov*.  Follow the instructions for submitting comments.
- Fax:  (202) 648-9741.
- Mail:  Denise Brown, Mailstop 6N-602, Office of Regulatory Affairs, Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 99 New York Avenue, NE, Washington, DC 20226: *ATTN:  AP Ammo Comments.*

**FOR FURTHER INFORMATION CONTACT:**  Denise Brown, Enforcement Programs and Services, Office of Regulatory Affairs, Bureau of Alcohol, Tobacco, Firearms, and Explosives, U.S. Department of Justice, 99 New York Avenue, NE, Washington, DC 20226; telephone: (202) 648-7070.

- 17 -